2017-2154

# In the
# United States Court of Appeals for the Federal Circuit

BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

————————————

**Appeal from the United States Court of Federal Claims,
Case No. 16-651 (Griggsby, J.)**

————————————

**BRIEF FOR APPELLANT**

————————————

<div style="display:flex; justify-content:space-between;">

LAWRENCE S. SHER
REED SMITH LLP
1301 K Street, NW, Suite 1000
Washington, D.C. 20005
(202) 414-9200

JAMES C. MARTIN
COLIN E. WRABLEY
KYLE R. BAHR
CONOR M. SHAFFER
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-3131

</div>

*Attorneys for* Appellant Blue Cross and Blue Shield of North Carolina

## CERTIFICATE OF INTEREST

Counsel for Appellant Blue Cross and Blue Shield of North Carolina certifies the following:

1.     The full name of every party or *amicus curiae* represented by me is:

Blue Cross and Blue Shield of North Carolina.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

N/A

4.     The names of all law firms and partners or associates that appeared for the party or *amicus curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

Reed Smith LLP:  Lawrence S. Sher, James C. Martin, Colin E. Wrabley, Kyle R. Bahr, Conor M. Shaffer.

*/s/ Lawrence S. Sher*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

STATEMENT OF RELATED CASES ................................................. xii

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF JURISDICTION .................................................... 3

STATEMENT OF THE ISSUES ........................................................... 3

STATEMENT OF THE CASE ............................................................... 4

I.    Congress Enacts The ACA To Expand Health Insurance Coverage. ............ 4

II.   The ACA Includes A Risk-Corridors Provision, Requiring That Payments Be Made Annually And In Full To Insurers. .................................. 6

III.  HHS Expressly Establishes Risk-Corridors Payments As Non-Budget-Neutral And Annual, Inducing BCBSNC To Participate. .................. 8

IV.   After BCBSNC Provides Coverage, HHS Announces That The Risk-Corridors Provision Will Be Implemented In A Budget-Neutral Manner, But Reiterates The Government's Full-Payment Obligation. ......... 11

V.    Congress Takes Steps To Limit Funding Sources For Risk-Corridors Payments, But Leaves The Government's Full-Payment Obligation Intact. ............................................................................. 12

VI.   The Government Acknowledges That It Owes BCBSNC Over $362 Million In Risk-Corridors Payments For 2014 And 2015 ............................ 13

VII.  BCBSNC Files Suit To Recover Unpaid Risk-Corridors Payments, But Its Claims Are Dismissed On The Theory That The Payments Are Not Presently Due. ....................................................................... 14

VIII. Trial Courts Decide Risk-Corridors Cases, But Their Rulings Do Not Align With The Decision In This Case. ....................................... 17

SUMMARY OF ARGUMENT ............................................................ 18

STANDARD OF REVIEW ................................................................. 20

ARGUMENT ......................................................................................... 20

I.    The Court Should Reverse The Dismissal Of BCBSNC's Statutory Claim. ....................................................................................... 20

A.    BCBSNC's statutory claim for CY 2014 risk-corridors payments is ripe. ......................................................21

     1.    The Government owes risk-corridors payments annually. ......................................................21

     2.    The trial court erred in imposing a "presently due" requirement and in finding that risk-corridors payments are not presently due. .............................23

B.    BCBSNC is entitled to the full risk-corridors payments for CY 2014. ......................................................28

     1.    Section 1342 requires the Government to make full risk-corridors payments. ......................................29

     2.    HHS agrees that the Government must make full risk-corridors payments. ......................................33

C.    There are no statutory limits on the Government's obligation to make full risk-corridors payments. .................................35

     1.    Section 1342 does not limit the Government's full-payment obligation. ......................................35

     2.    The appropriations riders do not limit the Government's full-payment obligation. ......................................41

         a.    The riders' express text does not alter the Government's full-payment obligation. .........................41

         b.    The riders do not impliedly repeal or supersede the Government's full-payment obligation. .........................44

         c.    Construing the riders to repeal the Government's full-payment obligation raises serious constitutional issues. ......................................49

II.    The Court Should Reverse The Dismissal Of BCBSNC's Implied-In-Fact Contract And Implied-Covenant Claims. .............................52

III.    The Court Should Reverse The Dismissal Of BCBSNC's Takings Claim. ......................................................60

CONCLUSION ......................................................61

STATUTORY ADDENDUM

ADDENDUM: OPINION AND JUDGMENT

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocate Health Care Network v. Stapleton*,
  137 S. Ct. 1652 (2017).........................................................................41

*Army & Air Force Exch. Serv. v. Sheehan*,
  456 U.S. 728 (1982)...........................................................................56

*ARRA Energy Co. I v. United States*,
  97 Fed. Cl. 12 (2011) ............................................................ 43-44, 53

*Chevron U.S.A., Inc. v. Nat'l Res. Def. Council*,
  467 U.S. 837 (1984).................................................23, 24, 26, 27

*Cienega Gardens v. United States*,
  331 F.3d 1319 (Fed. Cir. 2003) .........................................................60

*Clark v. Martinez*,
  543 U.S. 371 (2005)...........................................................................50

*Collins v. United States*,
  15 Ct. Cl. 22 (1879) ....................................................................38, 40

*Delmarva Power & Light Co. v. United States*,
  542 F.3d 889 (Fed. Cir. 2008) ...........................................................38

*Dimare Fresh, Inc. v. United States*,
  808 F.3d 1301 (Fed. Cir. 2015) .........................................................20

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016).......................................................................26

*EPA v. EME Homer City Generation, L.P.*,
  134 S. Ct. 1584 (2014).......................................................................32

*Fed. Crop Ins. Corp. v. Merrill*,
  332 U.S. 380 (1947).............................................................................2

*Fernandez-Vargas v. Gonzales*,
  548 U.S. 30 (2006).............................................................................50

**Page(s)**

*Forest Glen Props., LLC v. United States*,
    79 Fed. Cl. 669 (2007) ...................................................................52, 56

*Gibney v. United States*,
    114 Ct. Cl. 38 (1949) ....................................................42, 44, 45, 47

*Grav v. United States*,
    14 Cl. Ct. 390 (1988) ...............................................................................56

*Greenlee Cnty., Ariz. v. United States*,
    487 F.3d 871 (Fed. Cir. 2007) ....................................30, 31, 36, 38, 39

*H. Landau & Co. v. United States*,
    886 F.2d 322 (Fed. Cir. 1989) .........................................................58

*Health Republic Ins. Co. v. United States*,
    129 Fed. Cl. 757 (2017) ...........................................17, 21, 22, 23, 25

*Henson v. Santander Consumer USA Inc.*,
    137 S. Ct. 1718 (2017)..........................................................32, 34, 39

*Hercules, Inc. v. United States*,
    516 U.S. 417 (1996)...................................................................53, 55

*Hesse v. Dep't of State*,
    217 F.3d 1372 (Fed. Cir. 2000) .........................................................31

*Highland Falls-Fort Montgomery Central Sch. Dist. v. United States*,
    48 F.3d 1166 (Fed. Cir. 1995) .....................................................48, 49

*Hymas v. United States*,
    810 F.3d 1312 (Fed. Cir. 2016) .........................................................41

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
    534 U.S. 124 (2001)...........................................................................41

*King v. Burwell*,
    135 S. Ct. 2480 (2015).................................................4, 21, 22, 24, 32

*Kyocera Solar Inc. v. ITC*,
    844 F.3d 1334 (Fed. Cir. 2016) .........................................................25

**Page(s)**

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) .................................................................49, 50

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ...........................................................................30

*Lopez v. Davis*,
531 U.S. 230 (2001) .........................................................................30

*Lublin Corp. v. United States*,
98 Fed. Cl. 53 (2011) .......................................................................58

*Lynch v. United States*,
292 U.S. 571 (1934) .........................................................................60

*Maine Cmty. Health Options v. United States*,
2017 WL 1021837 (Fed. Cl. Mar. 9, 2017) ....................................17

*Maine Community Health Options v. United States*,
2017 WL 3225050 (Fed. Cl. July 31, 2017) ....................................17

*Mid Continent Nail Corp. v. United States*,
846 F.3d 1364 (Fed. Cir. 2017) .......................................................26

*Mitchell v. United States*,
463 U.S. 206 (1983) .........................................................................37

*Moda Health Plan, Inc. v. United States*,
130 Fed. Cl. 436 (2017) ............................................................*passim*

*Molina Healthcare of Calif., Inc. v. United States*,
2017 WL 3326842 (Fed. Cl. Aug. 4, 2017) ................................*passim*

*N.Y. Airways, Inc. v. United States*,
369 F.2d 743 (Ct. Cl. 1966) .................................. 37-38, 42, 53, 55, 57

*N.Y. State Dep't of Soc. Services v. Dublino*,
413 U.S. 405 (1973) .........................................................................33

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*,
470 U.S. 451 (1985) .........................................................................55

**Page(s)**

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.
Comm'n,*
461 U.S. 190 (1983) ....................................................................... 43

*Prairie Cnty., Mont. v. United States,*
782 F.3d 685 (Fed. Cir.), *cert. denied,* 136 S. Ct. 319 (2015) .......... 36, 37, 38, 41

*Prudential Ins. Co. of Am. v. United States,*
801 F.2d 1295 (Fed. Cir. 1986) ......................................................... 52

*Radium Mines, Inc. v. United States,*
153 F. Supp. 403 (Ct. Cl. 1957) .................................................. 53, 56

*Roberts v. United States,*
745 F.3d 1158 (Fed. Cir. 2014) .................................................. 36, 40

*Salazar v. Ramah Navajo Chapter,*
567 U.S. 182 (2012) ................................................................. 50, 51

*Silverman v. United States,*
679 F.2d 865 (Ct. Cl. 1982) .............................................................. 59

*Slattery v. United States,*
635 F.3d 1298 (Fed. Cir. 2011) (*en banc*) .................................. 36, 37

*Smith v. Brown,*
35 F.3d 1516 (Fed. Cir. 1994) .......................................................... 34

*St. Martin Evangelical Lutheran Church v. South Dakota,*
451 U.S. 772 (1981) .......................................................................... 50

*Telenor Satellite Servs. Inc. v. United States,*
71 Fed. Cl. 114 (2006) ...................................................................... 59

*Timex V.I., Inc. v. United States,*
157 F.3d 879 (Fed. Cir. 1998) .......................................................... 25

*TVA v. Hill,*
437 U.S. 153 (1978) .......................................................................... 42

*United States v. Dickerson,*
310 U.S. 554 (1940) ................................................................... 46, 47

**Page(s)**

*United States v. Langston*,
  118 U.S. 389 (1886)...................................................................45, 46

*United States v. Mitchell*,
  109 U.S. 146 (1883)...........................................................................46

*United States v. Will*,
  449 U.S. 200 (1980)...............................................................42, 46, 47

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996)......................................................................2, 51

*Vargas v. United States*,
  114 Fed. Cl. 226 (2014) ....................................................................54

**Statutes**

28 U.S.C. § 1295(a)(3).............................................................................3

28 U.S.C. § 1491(a) ................................................................................3

38 U.S.C. § 7111 ..................................................................................34

42 U.S.C. § 280k(a) ...............................................................................8

42 U.S.C. § 293k(d) ...............................................................................8

42 U.S.C. §§ 300gg, 300gg–1 ...................................................................5

42 U.S.C. § 300hh-31(a) ..........................................................................8

42 U.S.C. § 1395w-4(p)(4)(C) ...................................................................8

42 U.S.C. § 1395w-115(e) ........................................................................6

42 U.S.C. § 1395w-115(e)(3) .............................................................22, 40

42 U.S.C. § 1395w-115(e)(3)(A)................................................................6

42 U.S.C. § 1397m-1(b)(2)(A) ..................................................................8

42 U.S.C. § 18061(b)(1) ..........................................................................8

42 U.S.C. § 18062...........................................................................*passim*

42 U.S.C. § 18062(a) .........................................................................6, 22

**Page(s)**

42 U.S.C. § 18062(b) ...................................................................7, 8, 28

42 U.S.C. § 18062(b)(1) .......................................................12, 22, 28

42 U.S.C. § 18062(b)(2) .....................................................................22

42 U.S.C. § 18062(c)(1) .....................................................................22

42 U.S.C. § 18062(c)(2) ...............................................................7, 22

42 U.S.C. § 18121 ................................................................................6

Patient Protection and Affordable Care Act, Pub. L. 111-148, §§1001,
  1104(h), 124 Stat. 132, 135, 149 (Mar. 23, 2010) ........................30

Pub. L. 113-76, 128 Stat. 374 (Jan. 17, 2014) ................................39

Pub. L. 113-235, § 227, 128 Stat. 2491 (Dec. 16, 2014) .................13

Pub. L. 114-113, § 225, 129 Stat. 2624 (Dec. 18, 2015) .................13

Pub. L. 115-31, § 223, 131 Stat. 135 (May 5, 2017) .......................13

**Regulations**

42 C.F.R. § 423.336(c) .........................................................................6

45 C.F.R. § 147.104 ...........................................................................11

45 C.F.R. § 153.230(d) ......................................................................34

45 C.F.R. § 153.510(b) .............................................................8, 9, 33

45 C.F.R. § 153.510(d) ........................................................................9

45 C.F.R. § 153.530(d) .................................................................9, 13

45 C.F.R. § 156.290(a)(2) .................................................................11

76 FR 41929 (July 15, 2011) ..............................................................8

76 FR 41929, 41935 (July 15, 2011) ..................................................4

76 FR 41929, 41942 (July 15, 2011) ................................................10

77 FR 17219 (Mar. 23, 2012) .............................................................8

**Page(s)**

77 FR 17219, 17221 (Mar. 23, 2012) ...................................................5, 10

77 FR 73118 (Dec. 7, 2012)...................................................................9

77 FR 73118, 73119 (Dec. 7, 2012) ....................................................54

77 FR 73118, 73139 (Dec. 7, 2012) ....................................................34

78 FR 15409 (Mar. 11, 2013) ...............................................................9

78 FR 15409, 15413 (Mar. 11, 2013) ...................................................5

78 FR 15409, 15441 (Mar, 11, 2013) .................................................34

78 FR 15409, 15473 (Mar. 11, 2013) .................................................10

78 FR 72321,72379 (Dec. 2, 2013)................................................10, 54

79 FR 13743, 13829 (Mar. 11, 2014) .................................................11

79 FR 30239, 30260 (May 27, 2014)..............................................11, 12

**Rules**

RCFC 12(b)(1) ....................................................................15, 16, 23

RCFC 12(b)(6) ................................................................................*passim*

**Other Authorities**

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014)...................................13

161 Cong. Rec. S8420-21 (daily ed. Dec. 3, 2015) ................................43

163 Cong. Rec. H3954 (daily ed. May 3, 2017)......................................13

Br. of United States, *Land of Lincoln Mut. Health Ins. Co. v. United
States*, No. 17-1224, Doc. 107 (filed Apr. 24, 2017)............................28, 35, 40

Br. of United States, *Moda Health Plan, Inc. v. United States*,
No. 17-1994, Doc. 18 (filed July 10, 2017)...........................................28, 35, 40

Comp. Gen. B-325630 (Sept. 30, 2014) ........................................10, 39

**Page(s)**

Def.'s Mem. in Supp. of Mot. for Sum. J. at 20, *U.S. House of Representatives v. Burwell*, No. 1:14-cv-01967-RMC, Doc. 55-1 (Dec. 2, 2015 D.D.C.) ........................................................................37

H.R. 3541, 113th Cong. (2013) ...................................................43

H.R. 3812, 113th Cong. (2014) ...................................................43

H.R. 3851, 113th Cong. (2014) ...................................................43

H.R. 3985, 113th Cong. (2014) ...................................................43

H.R. 4354, 113th Cong. (2014) ...................................................43

H.R. 4406, 113th Cong. (2014) ...................................................43

H.R. 5175, 113th Cong. (2014) ...................................................43

H.R. 221, 114th Cong. (2015) .....................................................43

H.R. 724, 114th Cong. (2015) .....................................................43

Office of Inspector Gen., Dep't of Health & Human Servs., OEI-02-08-00460, *Medicare Part D Reconciliation Payments for 2006-2007* 5 (Sept. 2009) ....................................................................6, 7

S. 1726, 113th Cong. (2013) .......................................................43

S. 2214, 113th Cong. (2014) .......................................................43

S. 123, 114th Cong. (2015) .........................................................43

S. 359, 114th Cong. (2015) .........................................................43

S. Rep. No. 114-74 (2015) ..........................................................13

## STATEMENT OF RELATED CASES

(1)    No other appeal in or from the present civil action has previously been before this or any other appellate court.

(2)    This Court designated the pending appeals in *Land of Lincoln Mutual Health Insurance Co. v. United States*, No. 17-1224, and *Moda Health Plan, Inc. v. United States*, No. 17-1994, as companion appeals and ordered that the two appeals be assigned to the same merits panel.    This brief addresses issues relevant to resolving those appeals.

(3)    The following cases pending before the United States Court of Federal Claims are related cases within the meaning of Federal Circuit Rule 47.5(b):

*Atkins v. United States,* No. 17-906C (Kaplan, J.);

*Alliant Health Plans, Inc. v. United States*, No. 16-1491C (Braden, J.);

*BCBSM, Inc. v. United States*, No. 16-1253C (Coster Williams, J.);

*Blue Cross and Blue Shield of Alabama v. United States*, No. 17-95C (Campbell-Smith, J.);

*Blue Cross and Blue Shield of Kanas City v. United States*, No. 17-95C (Braden, J.);

*BlueCross BlueShield of Tennessee v. United States*, No. 16-651C (Horn, J.);

*Blue Cross of Idaho Health Service, Inc. v. United States*, No. 16-1384C (Lettow, J.);

*Common Ground Healthcare Cooperative v. United States*, No. 17-877C (Sweeney, J.);

*EmblemHealth, Inc. v. United States*, No. 17-703C (Wheeler, J.);

*Farmer v. United States*, No. 17-363C (Campbell-Smith, J.);

*First Priority Life Ins. Co. v. United States*, No. 16-587C (Wolski, J.);

*Health Alliance Medical Plans, Inc. v. United States*, No. 17-653C (Campbell-Smith, J.);

*Health Net, Inc. v. United States*, No. 16-1722C (Wolski, J.);

*HealthNow New York Inc. v. United States*, No. 17-1090C (Hodges, J.);

*Health Republic Ins. Co. v. United States*, No. 16-259C (Sweeney, J.);

*HPHC Insurance Co., Inc. v. United States*, No. 17-87C (Griggsby, J.);

*Maine Cmty. Health Options v. United States*, No. 16-967C (Bruggink, J.);

*Medica Health Plans v. United States*, No. 17-94C (Horn, J.);

*Minuteman Health Inc. v. United States*, No. 16-1418C (Griggsby, J.);

*Molina Healthcare v. United States*, No. 17-97C (Wheeler, J.);

*Montana Health CO-OP v. United States*, No. 16-1427C (Wolski, J.);

*Neighborhood Health Plan, Inc. v. United States*, No. 16-1659C (Smith, J.);

*New Mexico Health Connections v. United States*, No. 16-1199C (Bruggink, J.);

*Ommen v. United States*, No. 17-712C; *Ommen v. United States*, No. 17-957C (Lettow, J.);

*Sanford Health Plan v. United States*, No. 17-357C (Bruggink, J.);

*Wisconsin Physicians Service Ins. Corp. v. United States*, No. 17-1070C (Braden, J.).

## PRELIMINARY STATEMENT

In 2010, Congress enacted the Patient Protection and Affordable Care Act (ACA), to help address the country's health-care crisis, stabilize health insurance markets, and expand insurance coverage for tens of millions of previously uninsured Americans.  Plaintiff Blue Cross and Blue Shield of North Carolina (BCBSNC) agreed to participate in that effort principally because of the Government's repeated promises—anchored in the ACA's risk-corridors provision, § 1342, 42 U.S.C. §18062—to limit potential losses beyond prescribed targets and share the risk by paying insurers a statutorily fixed percentage of their yearly losses in 2014, 2015, and 2016.  To BCBSNC's profound detriment, however, the trial court allowed the Government to renege on its full risk-corridors payment obligation.  This Court should not.

As every court analyzing § 1342 has concluded, the statute's "shall pay" language mandates that risk-corridors payments be made to Qualified Health Plan issuers (QHPs) like BCBSNC.  In the years following the ACA's enactment, the Government repeatedly reiterated its obligation to make full risk-corridors payments annually, while Congress repeatedly rejected attempts to amend § 1342 to limit—or even eliminate—the Government's full-payment obligation. Nevertheless, long after BCBSNC had set its premiums and provided the called-for coverage, Congress used appropriations riders to cut off a few (but not all) funding

sources for making risk-corridors payments. The Government then refused to make full risk-corridors payments to BCBSNC and other insurers. The result: The Government owes insurers over $8 billion in risk-corridors payments for 2014 and 2015, and BCBSNC is owed over $147 million for 2014 alone.

BCBSNC brought this suit to hold the Government to its full-payment obligation. The trial court rightly exercised jurisdiction over BCBSNC's claims and rejected the Government's ripeness argument that risk-corridors payments are "not presently due." But it nevertheless dismissed BCBSNC's statutory claim on the merits under Rule 12(b)(6) for that very reason, holding that the Government's risk corridors payments are "not 'presently due.'" That ruling is wrong. The text, structure, purpose, and history of § 1342 make clear that BCBSNC has a statutory right to the full amount of risk-corridors payments due and owing. The Government's contrary position—based on § 1342's silence regarding specific appropriations, and the appropriations riders passed years after the ACA's enactment—contravenes controlling case law, proper statutory construction, and fundamental public policies.

The U.S. Supreme Court has observed that "'[i]t is very well to say that those who deal with the Government should turn square corners.'" *United States v. Winstar Corp.*, 518 U.S. 839, 886 n.31 (1996) (plurality op.) (quoting *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 387-388 (1947) (Jackson, J., dissenting)). But

as the Court also has admonished, this notion is not "'a one-way street.'" *Id.* Here, this Court should compel the Government to turn a square corner, hold it to its full-payment obligation, and reverse the trial court's dismissal of BCBSNC's claims.

## STATEMENT OF JURISDICTION

The trial court had jurisdiction under 28 U.S.C. § 1491(a)(1) and 42 U.S.C. § 18062. Final judgment was entered on April 18, 2017, and BCBSNC timely appealed. Appx36, Appx39. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

1.     Whether the trial court erred in dismissing under Rule 12(b)(6) BCBSNC's statutory claim pursuant to § 1342 and the Tucker Act where BCBSNC sufficiently pled the required elements of that claim and is entitled, as a matter of law, to the full annual risk-corridors payments due to it?

2.     Whether the trial court erred in dismissing under Rule 12(b)(6) BCBSNC's implied-in-fact contract and implied covenant of good faith and fair dealing claims where BCBSNC sufficiently pled the required elements of those claims?

3.     Whether the trial court erred in dismissing under Rule 12(b)(6) BCBSNC's takings claim where BCBSNC sufficiently pled the required elements

of that claim, including a valid contract regarding full and timely risk-corridors payments?

## STATEMENT OF THE CASE

### I.    Congress Enacts The ACA To Expand Health Insurance Coverage.

By any relevant measure, the ACA is an extraordinary piece of legislation. Its goal was to create a series of "interlocking reforms designed to expand" the availability of health insurance nationwide for individuals who previously lacked access to the marketplace.  *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015).  To achieve that goal, the ACA called for the creation of an "Exchange" in each State where individuals who wanted access to the marketplace could "compare and purchase insurance plans."  *Id.*

While the concept was easily stated, carrying it out posed major challenges. The ACA's success depended on broad-based insurer participation charging reasonable premiums.  Yet, insurers understandably were circumspect about providing guaranteed coverage because they initially lacked any data on the health of the millions who would be insured on the Exchanges.[1]  Given these uncertainties, insurers opting to participate ordinarily would have added "risk

---

[1]   One year after the ACA's enactment, HHS acknowledged that "there is significant uncertainty about Exchange enrollment, the overall health of the enrolled population, and the cost of care for new enrollees."  76 FR 41929, 41935 (July 15, 2011).

premiums" to their rates to account for the Exchange populations being less healthy and more costly to insure until accurate actuarial data was available.[2] But by design, the ACA prohibited insurers from managing their risk by traditional methods of underwriting and rate-setting. *See* 42 U.S.C. §§ 300gg, 300gg–1. This threatened to make the Exchanges too expensive, thereby deterring insurer participation.

Congress, however, drew on an available solution. It incorporated the risk-corridors program already used in the Medicare Part D prescription drug program (Part D) to help mitigate similar risks. As HHS explained, utilization of a risk-corridors program in the ACA would "protect QHP issuers…against inaccurate rate setting and will permit issuers to lower rates ***by not adding a risk premium*** to account for perceived [market] uncertainties[.]"  78 FR 15409, 15413 (Mar. 11, 2013) (emphasis added).

Contemporaneous with § 1342's enactment, Congress appropriated $1 billion "for Federal administrative expenses to carry out" the ACA, without restriction, and placed those funds with HHS in a new Health Insurance Reform

---

[2]  *See, e.g.*, 77 FR 17219, 17221 (Mar. 23, 2012) ("To protect themselves from adverse selection, issuers may include a margin in their pricing (that is, set premiums higher than necessary) in order to offset the potential expense of high-cost enrollees.").

Implementation Fund (Implementation Fund).  42 U.S.C. § 18121.  Funding for

risk-corridors payments thus became available at the ACA's enactment.

## II.   The ACA Includes A Risk-Corridors Provision, Requiring That Payments Be Made Annually And In Full To Insurers.

Section 1342 directs the HHS Secretary to "establish and administer a

program of risk corridors for calendar years 2014, 2015, and 2016" that "shall be

based on" Part D's risk-corridors program.  42 U.S.C. § 18062(a).

**Part D.**   The Part D risk-corridors program "requires the Federal

Government to share in sponsors' unexpected profits and losses."   Office of

Inspector Gen., Dep't of Health & Human Servs., OEI-02-08-00460, *Medicare*

*Part D Reconciliation Payments for 2006-2007* 5 (Sept. 2009), *available at*

https://oig.hhs.gov/oei/reports/oei-02-08-00460.pdf (citing 42 U.S.C. § 1395w-

115(e)).  Thus, "if a [Part D] plan's allowable costs are at least 2.5 percent above

or below the target amount, then a portion of these profits or losses are subject to

risk sharing." *Id.*

In implementing Part D, CMS always has made its risk-corridors payments

annually. *See, e.g.*, 42 U.S.C. § 1395w-115(e)(3)(A).  The controlling regulations

thus provide that "CMS makes payments after a coverage year" after receipt of all

cost data information, and that "CMS at its discretion makes either lump-sum

payments or adjusts monthly payments in the following payment year."  42 C.F.R.

§ 423.336(c).  Moreover, Part D's program was neither designed nor implemented

6

as budget-neutral.  HHS OIG, *Medicare Part D Reconciliation Payments for 2006-2007* 11 tbl. 2 (showing for 2007 that sponsors owed Medicare $795 million while Medicare owed $195 million to sponsors, netting Medicare $600 million); Appx536 ("For the … Medicare Part D risk mitigation programs, the payments that CMS makes to issuers are not limited to issuer contributions.").

**ACA.**  Consistent with Part D, Congress designed the ACA to require annual risk-corridors payments.  Section 1342 thus mandates that "[t]he Secretary shall provide under the" program, "for any plan year," a payment depending on an insurer's profits or losses beyond three percent of a "target amount," defined as total premiums minus administrative costs.  *Id.* §§ 18062(b) & (c)(2).  It also expressly defines the duration of the program as "calendar years 2014, 2015, and 2016[,]" as opposed to a general three-year period.  *Id.*

As with Part D, Congress likewise intended the annual ACA risk-corridors payments to be made in full.  Nothing in § 1342 states or even suggests that Congress intended the risk-corridors program to be administered in a budget-neutral fashion.  Rather, the provision specifically states that either "the Secretary shall pay to the plan" a statutorily mandated percentage of its losses ("payments out"), or "the plan shall pay to the Secretary" a like percentage of its profits ("payments in").  *Id.* § 18062(b).

7

In particular, Congress did not cap "payments out" or "payments in," link the two together, or indicate that one was limited by or contingent on the other.[3] Rather, in keeping with its full-payment mandate, Congress eschewed in § 1342 the structure it employed in multiple other ACA provisions, which variously provide that they "shall be implemented in a budget neutral manner[,]" 42 U.S.C. § 1395w-4(p)(4)(C), or that payments to insurers are "subject to the availability of appropriations." *See, e.g.*, 42 U.S.C. § 280k(a); 42 U.S.C. § 300hh-31(a); 42 U.S.C. § 293k(d); 42 U.S.C. § 1397m-1(b)(2)(A).

### III. HHS Expressly Establishes Risk-Corridors Payments As Non-Budget-Neutral And Annual, Inducing BCBSNC To Participate.

HHS promulgated regulations in March 2012 implementing the risk-corridors program. *See* 45 C.F.R. § 153.510(b); *see also* 76 FR 41929 (July 15, 2011) (proposed rule); 77 FR 17219 (Mar. 23, 2012) (final rule). In line with § 1342(b), the regulations did not make the Government's risk-corridors payments contingent on collections from profitable insurers—they were ***not*** budget-neutral. *See id.* Also, as prescribed by § 1342, HHS had no discretion to pay anything less than the full amount. *See id.* HHS thus made it clear that the agency "will pay,"

---

[3]    This stands in stark contrast to ACA § 1341, which immediately precedes § 1342, and which sets forth the ACA's "reinsurance" risk-mitigation program. That provision, unlike § 1342, expressly provides that it is budget-neutral, linking "payments out" to "payments in." *See* 42 U.S.C. § 18061(b)(1) ("[T]he applicable reinsurance entity collects payments under subparagraph (A) and uses amounts so collected to make reinsurance payments to health insurance issuers.").

and QHPs "will receive," risk-corridors payments in "an amount equal to" the risk-corridors calculation "[w]hen" it is determined that a QHP qualifies for risk-corridors payments—not some fraction of that amount at some indeterminate future date, or perhaps no payment at all.  *See id.*

A year later, HHS adopted additional regulations, confirming the risk-corridors program's annual focus.  *See* 77 FR 73118 (Dec. 7, 2012) (proposed rule); 78 FR 15409 (Mar. 11, 2013) (final rule).  HHS required QHPs to submit risk corridors data annually (45 C.F.R. § 153.530(d)), and to pay any risk-corridors collections owed to the Government within 30 days of receiving annual notice of the charges.  *See* 45 C.F.R. § 153.510(d).

Although HHS's regulations forced profitable insurers to promptly remit annual risk-corridors collections to the Government, it never formally imposed a prompt "payment out" requirement on itself.  But that did not signal a change in the Government's obligation.  On the contrary, HHS recognized during rulemaking that "QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers," and the agency stated that "HHS would make payments to QHP issuers that are owed risk corridors amounts within a 30-day period after HHS determines that a payment should be made to the QHP issuer."  Appx218.

Later, in the March 2013 final rule's preamble, HHS reiterated that "[t]he

9

risk corridors program is not statutorily required to be budget neutral," and that, "[r]egardless of the balance of payments and receipts, HHS will remit payments [to QHPs] as required under section 1342[.]"  78 FR 15409, 15473 (Mar. 11, 2013). This unequivocal, non-budget-neutral interpretation reaffirmed HHS's repeated statements regarding § 1342's purpose and the Government's role in sharing risk under the program.[4]  As the Government Accountability Office (GAO) put it, profitable QHPs who paid into the program were "paying for the certainty that any potential losses related to [their] participation in the Exchanges [were] limited to a certain amount."  Comp. Gen. B-325630 at 10 (Sept. 30, 2014).

With this backdrop, in 2013, BCBSNC developed and established approved ACA premiums, executed QHP Agreements with CMS, and made an unalterable

---

[4]  Appx221 ("Risk corridors create a mechanism for sharing risk for allowable costs between the Federal government and qualified health plan issuers."); 76 FR 41929, 41942 (July 15, 2011) (same); Appx217 (Mar. 23, 2012) ("The temporary Federally administered risk corridors program serves to protect against uncertainty in rate setting by qualified health plans sharing risk in losses and gains with the Federal government."); 77 FR 17219, 17221 (Mar. 23, 2012) ("The risk corridors program, which is a Federally administered program, will protect against uncertainty in rates for QHPs by limiting the extent of issuer losses (and gains)."); Appx516 (Dec. 7, 2012) ("The temporary risk corridors program permits the Federal government and QHPs to share in profits or losses resulting from inaccurate rate setting from 2014 to 2016."); 78 FR 72321, 72379 (Dec. 2, 2013) ("The risk corridors program creates a mechanism for sharing risk for allowable costs between the Federal government and QHP issuers.  The risk corridors program will help protect against inaccurate rate setting in the early years of the Exchanges by limiting the extent of issuer losses and gains."); Appx248 (Mar. 11, 2014) (same).

commitment to the calendar year (CY) 2014 North Carolina ACA Exchange. *See, e.g.*, 45 C.F.R. §§ 147.104, 156.290(a)(2).

## IV.   After BCBSNC Provides Coverage, HHS Announces That The Risk-Corridors Provision Will Be Implemented In A Budget-Neutral Manner, But Reiterates The Government's Full-Payment Obligation.

After BCBSNC started insuring customers on the CY 2014 Exchange, however, HHS made a 180-degree reversal from its March 2013 position that the risk-corridors program was "not statutorily required to be budget neutral."  In the preamble to a final rule issued March 11, 2014, HHS stated it "intends to implement this [risk-corridors] program in a budget neutral manner."  79 FR 13743, 13829 (Mar. 11, 2014).  The next month, CMS issued a question-and-answer bulletin regarding its reversal on budget-neutrality.  Appx250.  There, it indicated that while "[w]e anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments[,]" if payments exceed collections "for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall[,]" and the next year's collections will be used toward the previous year's shortfall.  *Id.*

Even after announcing its new budget-neutral position, HHS continued to publicly assure QHPs that it would make risk-corridors payments in full.  A month after CMS's April 2014 bulletin, for example, HHS acknowledged its statutory obligation "to make full payments to issuers."  79 FR 30239, 30260 (May 27,

2014).  Other full-payment assurances followed as well, all without equivocation.[5]

Given these assurances, BCBSNC set its CY 2015 premiums, and in October 2014

executed its binding commitment to the CY 2015 North Carolina ACA Exchange.

**V.    Congress Takes Steps To Limit Funding Sources For Risk-Corridors Payments, But Leaves The Government's Full-Payment Obligation Intact.**

For some, funding sources for the Government's risk-corridors obligation

remained an issue once the Exchanges went into operation.  In September 2014,

the GAO responded to Congressional inquiries about the availability of

appropriations for CY 2014 risk-corridors payments.  Appx568.  The GAO

concluded that fiscal year (FY) 2014 appropriations ***did exist*** under the CMS

Program Management (PM) appropriation, but because CY 2014 risk-corridors

charges and payments would not be made until FY 2015, "the CMS PM

appropriation for FY 2015 must include language similar to the language included

in the CMS PM appropriation for FY 2014."  *Id.* at 7.  The GAO also found that

"payments in" from profitable insurers under the risk-corridors program were "user

fees" available to make risk-corridors payments.  *Id.* at 10.

Then, in the appropriations bill for FY 2015, Congress limited some of the

---

[5]    Appx223 ("Section 1342(b)(1) … establishes … the formula to determine … the amounts the Secretary *must pay* to the QHPs if the risk corridors threshold is met.") (emphasis added); Appx227 ("As established in statute, … [QHP] plans with allowable costs at least three percent higher than the plan's target amount will receive payments from HHS to offset a percentage of those losses.").

funding sources for—but did not preclude payment of—risk-corridors payments with a rider stating that:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the [CMS PM] account, may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors).

Pub. L. 113-235, § 227, 128 Stat. 2491 (Dec. 16, 2014). Congress included the identical rider in the appropriations bills for FY 2016 and FY 2017. *See* Pub. L. 114-113, § 225, 129 Stat. 2624 (Dec. 18, 2015); Pub. L. 115-31, § 223, 131 Stat. 135 (May 5, 2017).[6]

Through all this, despite more than a dozen attempts, Congress never amended or repealed § 1342 or the ACA. *Infra* at 43 & n.16.

## VI.    The Government Acknowledges That It Owes BCBSNC Over $362 Million In Risk-Corridors Payments For 2014 And 2015.

In July 2015, BCBSNC submitted its CY 2014 risk-corridors data to CMS. *See* 45 C.F.R. § 153.530(d). In November 2015—nearly two months ***after*** BCBSNC already had committed to the ACA Exchanges for CY 2016 (*see* Appx581 (requiring insurers to sign CY 2016 QHP Agreements by "9/25/2015"))—HHS announced each insurer's CY 2014 risk-corridors charges

---

[6]   The Appropriations Committee Reports and Explanatory Statements accompanying the appropriations riders recognized that risk-corridors payments would still be made. *See* 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014); S. Rep. No. 114-74, at 12 (2015); 163 Cong. Rec. H3954 (daily ed. May 3, 2017).

and payments.  Appx261.  The Government confirmed that it owed BCBSNC

$147,474,968.35 in CY 2014 risk-corridors payments, but indicated that it would

pay only $18,608,194.67—12.6 percent of the amount owed—at some

indeterminate future date.  Appx280.[7]

For CY 2015, the news was worse.  BCBSNC was owed more than $215

million for that year, but the Government refused to pay anything because "all

2015 benefit year collections [would] be used towards remaining 2014 benefit year

risk corridors payments[.]"  Appx509.  Yet this delay in payment, once again, did

not signal a change in the Government's ultimate obligation.  HHS continued

assuring BCBSNC and other insurers that "HHS recognizes that the Affordable

Care Act requires the Secretary to make full payments to issuers."  *Id.*

## VII.  BCBSNC Files Suit To Recover Unpaid Risk-Corridors Payments, But Its Claims Are Dismissed On The Theory That The Payments Are Not Presently Due.

Having received only a fractional payment for what it was owed, in June

2016, BCBSNC brought suit in the U.S. Court of Federal Claims to enforce the

Government's full $147 million CY 2014 risk-corridors liability.[8]  Appx40.

---

[7]    In total, the Government owed insurers nearly $2.9 billion for CY 2014, but expected only $362 million in "payments in" for that year.  Appx255.  Those two numbers produced the Government's 12.6 percent proration rate.  *Id.*

[8]    BCBSNC did not seek damages for its $215 million in unpaid CY 2015 risk-corridors payments only because that year's payment was not due until December 2016.

BCBSNC's complaint asserted causes of action under the Tucker Act for violation of § 1342's money-mandating obligation, as well as claims for breaches of express and implied-in-fact contracts and the implied covenant of good faith and fair dealing, and an unconstitutional regulatory taking.  Appx40, Appx71-82.

The Government moved to dismiss under Rule 12(b)(1), for lack of jurisdiction and ripeness, and under Rule 12(b)(6), for failure to state a claim.  Appx18.  It argued that BCBSNC's claims were not "money-mandating" within the trial court's Tucker Act jurisdiction and were not ripe because the Government's risk-corridors payments were not yet "presently due."  The Government also argued that neither § 1342 nor any contract obligated it to make the full amount of risk-corridors payments.  Rather, it asserted that Congress had not specifically appropriated any funds for those payments and that, regardless, the riders blocked the use of appropriated funds to make those payments.

In opposition (Appx38), BCBSNC demonstrated that § 1342, with its "shall pay" language, is a money-mandating statute plainly requiring "payments out" on an annual basis.  It also refuted the Government's claim that the risk-corridors program is budget-neutral and only obligated the Government to make "payments out" to the extent of "payments in."  As BCBSNC explained, under this Court's controlling precedent, no specific appropriation was necessary for § 1342 to impose a binding obligation on the Government to make full payment.  As for the

riders, they only cut off the use of some, but not all, funds for risk-corridors payments and could not overcome the strong presumption against finding implied repeals of the Government's statutory full-payment obligations.

The trial court agreed with BCBSNC that it had Tucker Act jurisdiction because § 1342 is "money-mandating." Appx20. The court further found that it was "not persuaded" by the Government's ripeness argument that BCBSNC "has no right to 'presently due money damages' under Section 1342," finding that BCBSNC's claims for CY 2014 risk-corridors payments were "neither hypothetical nor in need of further factual development." Appx23.

The court nevertheless dismissed the action. It effectively accepted the Government's ***Rule 12(b)(1) ripeness*** argument—that the Government was not obligated to make annual payments—and dismissed BCBSNC's statutory claim ***under Rule 12(b)(6)*** on grounds that "payments out" were "not 'presently due.'" Appx28.[9] Based on that finding, and its conclusion that BCBSNC had failed to show Congressional intent in § 1342 to contract with BCBSNC, the court also dismissed BCBSNC's implied-in-fact contract and implied-covenant claims.

---

[9]    The court did ***not*** address whether § 1342 is budget-neutral or whether the Government must make full payments. Appx34 n.10.

Appx30-32.  Finding no contract, the court also dismissed BCBSNC's takings claim for lack of a protectable interest.  Appx32-33.[10]

## VIII. Trial Courts Decide Risk-Corridors Cases, But Their Rulings Do Not Align With The Decision In This Case.

The trial court's ruling that risk-corridors payments are "not presently due" conflicts with decisions in four other risk-corridors cases finding an annual-payment obligation.  *See Molina Healthcare of Calif., Inc. v. United States*, 2017 WL 3326842, at *13-14 (Fed. Cl. Aug. 4, 2017) (Wheeler, J.); *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436, 454 (2017) (Wheeler, J.); *Maine Cmty. Health Options v. United States*, 2017 WL 1021837, at *2 (Fed. Cl. Mar. 9, 2017) (Bruggink, J.); *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 774 (2017) (Sweeney, J.).  Further, the court's dismissal of BCBSNC's implied-in-fact contract claim departs from the holdings in *Moda*, 130 Fed. Cl. at 465-66, and *Molina*, 2017 WL 3326842, at *29.  No other court has followed the trial court's rulings here.

Judge Bruggink recently granted the Government's Rule 12(b)(6) motion to dismiss the statutory claim in *Maine Community Health Options v. United States*, 2017 WL 3225050 (Fed. Cl. July 31, 2017) (*Maine II*), finding that Congress's

---

[10]  BCBSNC's express contract claim and request for declaratory relief were also dismissed.  Appx29, Appx34.  BCBSNC disagrees with those particular rulings, but does not challenge them in this appeal.

later-enacted appropriations riders effectively repealed whatever obligation § 1342 imposed, and "capped" the Government's liability at payments in. *Id.* at *12.

Shortly thereafter, Judge Wheeler denied the Government's motion to dismiss in *Molina* and granted summary judgment to the risk-corridors plaintiff on its statutory and implied-in-fact contract counts. Considering Judge Bruggink's critique of his earlier *Moda* opinion, Judge Wheeler reaffirmed *Moda* and correctly rejected the Government's attempts to avoid its full-payment obligation.

Specifically addressing the *Maine II* ruling, Judge Wheeler noted that "Judge Bruggink did not address whether Section 1342 was 'budget neutral' when it was created." *Molina*, 2017 WL 3326842, at *24. Taking up that issue, Judge Wheeler observed that whether the later appropriations riders impliedly repealed § 1342's full-payment mandate could only be "properly resolve[d]" by first determining the scope of § 1342's payment obligation. *Id.* And, looking at that obligation, he concluded that, "[g]iven that Section 1342 clearly requires the Government to make full annual risk corridors payments, Congress cannot repeal this commitment by foreclosing the use of CMS PM funds alone. The initial and unequivocal obligation created by Section 1342 stands." *Id.*

## SUMMARY OF ARGUMENT

This Court should reverse the trial court's dismissal of BCBSNC's complaint for multiple reasons.

18

A.     BCBSNC sufficiently pled the elements of its statutory claim under § 1342 and the Tucker Act and, as a matter of law, is entitled to the full, statutorily fixed amount of risk-corridors payments due for CY 2014.   The trial court erroneously dismissed that claim under Rule 12(b)(6) on grounds that no payments "presently" are due to BCBSNC.   When payments are due, however, is a ripeness issue, not a merits issue, and the court elsewhere concluded that BCBSNC's claims are ripe despite the Government's "presently due" argument.   In any event, § 1342 requires annual payments, and HHS itself repeatedly has agreed with that interpretation.   Accordingly, the trial court's deference to the Government's created-for-litigation position that annual payments are not required was reversible error.   And, § 1342 requires that the full amount of risk-corridors payments be made.

B.     BCBSNC sufficiently pled the elements of its implied-in-fact contract claim.   Section 1342 plainly was intended to, and did, induce BCBSNC and other insurers to participate in the Exchanges, and the statute gave HHS no discretion in determining when risk-corridors payments are due or in what amount.   The trial court's exclusive focus on the President's and Congress's conduct in enacting the ACA is impermissibly narrow because, contrary to controlling law, it ignores the circumstances surrounding the creation and implementation of the risk-corridors program, which demonstrate the Government's contractual intent.

C.    BCBSNC also sufficiently pled the elements of its constitutional takings claim.  Contrary to the trial court's ruling, BCBSNC has a contractual right to full risk-corridors payments, and the Government has unlawfully interfered with that legally protectable property right in violation of the Takings Clause.

## STANDARD OF REVIEW

Dismissals for failure to state a claim present "'issue[s] of law which we review de novo.'"  *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (citation omitted).  "To avoid dismissal for failure to state a claim, a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Id.* (citations omitted).  This Court, like the trial court, must accept BCBSNC's "well-pleaded factual allegations as true[,]" and draw all reasonable inferences from those allegations in BCBSNC's favor.  *Id.* (citiation omitted).  In assessing a Rule 12(b)(6) dismissal motion, the Court "also look[s] to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" *Id.* (citation omitted).

## ARGUMENT

## I.    The Court Should Reverse The Dismissal Of BCBSNC's Statutory Claim.

The trial court dismissed BCBSNC's § 1342 statutory claim under Rule 12(b)(6) on grounds that the Government's CY 2014 risk-corridors payments to BCBSNC "are not 'presently due.'"  Appx28.  That finding is legally infirm,

however, because when risk-corridors payments are due is a jurisdictional ripeness issue, not a merits pleading issue. In any event, the court misconstrued § 1342 and erroneously deferred to HHS's purported position on the timing of payments. In fact, BCBSNC established the ripeness of its claims and sufficiently pled its statutory claim. The Government is legally obligated to pay BCBSNC its full CY 2014 risk-corridors payments. This Court therefore should reverse.

### A.    BCBSNC's statutory claim for CY 2014 risk-corridors payments is ripe.

#### 1.    The Government owes risk-corridors payments annually.

"If the statutory language is plain," courts "must enforce it according to its terms." *King*, 135 S. Ct. at 2489 (citation omitted). "[W]hen deciding whether the language is plain, [courts] must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *Id.* (citation omitted).

As several courts recently have held, § 1342's plain text, consistent with the risk-corridors program's purpose, requires the Government to make annual risk-corridors payments. *See Molina*, 2017 WL 3326842, at *13-14 (citing cases). Under § 1342(a), the risk-corridors program spans "calendar years 2014, 2015, and 2016," rather than "calendar years 2014 through 2016." *Health Republic*, 129 Fed. Cl. at 774 (citation omitted). By referencing distinct years, § 1342 establishes "that Congress wanted HHS to make annual payments." *Moda*, 130 Fed. Cl. at 452 (citing *Health Republic*, 129 Fed. Cl. at 774); *see also Molina*, 2017 WL

3326842, at *13 (same).  If HHS must calculate the program's "payments in" and "payments out" on the basis of insurers' costs in "any plan year," Congress intended it also to pay annually, *not* after the program's three years had elapsed. 42 U.S.C. § 18062(b)(1)-(2), (c)(1)-(2).

By the same token, § 1342 nowhere mentions or suggests that "payments out" are only to be made in the risk-corridors program's final year.  That is particularly significant because § 1342(a) states that it "shall be based on" the Part D risk-corridors program, which also requires annual payments.  *See* 42 U.S.C. § 1395w-115(e)(3).  Had Congress intended the ACA's risk-corridors payments to be different, it presumably would have said so expressly.  But it did exactly the opposite.  Section 1342's "shall be based on" language thus reflects Congress's intent to follow the annual-payment schedule in Part D.  *See Moda*, 130 Fed. Cl. at 452; *Health Republic*, 129 Fed. Cl. at 775-76.

Finally, the purpose of the risk-corridors program and the ACA as a whole confirm this plain-text construction.  *See King*, 135 S. Ct. at 2496 ("If at all possible, [courts] must interpret" the ACA "to improve health insurance markets, not to destroy them").  Because health insurance premiums are set annually, all aspects of the ACA's risk-corridors program are measured and performed on an annual basis.  *See Health Republic*, 129 Fed. Cl. at 775-76.  Exempting risk-corridors payments—but not collections—from this annual schedule, and delaying

Government payment until December 2017 or later, is inconsistent with Congress's intent to encourage insurer participation and mitigate the "risk premium." *Supra* at 5-8.

> ### 2. The trial court erred in imposing a "presently due" requirement and in finding that risk-corridors payments are not presently due.

The trial court held that risk-corridors payments are not presently due based on its deference, given under *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837 (1984), to HHS's supposed April 2014 "interpretation" that risk-corridors payments are not due annually. Appx15, Appx27-28. That holding is flawed in its premises and conclusion.

Initially, the court was wrong to dismiss BCBSNC's statutory claim under Rule 12(b)(6) based on its finding that risk-corridors payments were not "presently due." Appx28. There is no requirement that those payments be "presently due" in order to plead a viable claim under § 1342. At most, the timing-of-payment question in risk-corridors cases presents a Rule 12(b)(1) jurisdictional ripeness issue, not a Rule 12(b)(6) merits pleading issue. *See Molina*, 2017 WL 3326842 at *13; *Moda*, 130 Fed. Cl. at 450 ("Government's 'presently due' argument [is] a ripeness argument in disguise.") (citing *Health Republic*, 129 Fed. Cl. at 772).

The trial court held that it had jurisdiction over all of BCBSNC's claims and that all of its claims were ripe. Appx19-23. Nevertheless, the court erroneously

applied the inapposite "presently due" standard to dismiss BCBSNC's statutory claim under Rule 12(b)(6) (Appx 28), despite the fact that the court had previously **rejected** the Government's "not-presently-due" arguments, finding them "unavailing." Appx22. And it did so despite the fact that the Government did not even move under Rule 12(b)(6) for dismissal of BCBSNC's statutory claim on a "not-presently-due" ground. Appx38 (Gov't Mot. to Dismiss). Nor did it rely in its motion to dismiss on any cases that could support a Rule 12(b)(6) dismissal on that basis. *Id.* Thus, both the court's reasoning and its result are flawed as a matter of law, and this Court should reverse for this reason alone.

Beyond that, the trial court's resort to *Chevron* deference to find that payments are "not presently due" is legally erroneous. First, the court misapplied *Chevron*'s 2-step framework, which provides for deference to "an agency's interpretation of a statute" only when "the statute is ambiguous" (step-1) and "the agency's interpretation is reasonable" (step-2). *King*, 135 S. Ct. at 2488. As noted, at step-1, there is no ambiguity in § 1342 on the timing of risk-corridors payments—they are required annually. *Supra* at 21-23.

The trial court nonetheless found ambiguity because § 1342's text does not specifically establish "a deadline for the payment…." Appx25. But courts do not "simply defer to the agency" where "the statute's text does not explicitly address the precise question"—the step-1 "search for Congress's intent must be more

thorough than that." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). Rather, courts must "examine 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" *Kyocera Solar Inc. v. ITC*, 844 F.3d 1334, 1338 (Fed. Cir. 2016) (citation omitted). The trial court failed to do so here. If it had, it would have found that § 1342 is unambiguous when it comes to the timing of payments.

Second, in making its step-2 conclusion that HHS's belated, April 2014 "interpretation" was reasonable, the trial court ignored HHS's multiple, pre-April 2014 statements recognizing the Government's duty to make full risk-corridors payments annually. *Supra* at 8-11. As several courts have concluded, however, ***these*** are the statements to which deference is owed—***not*** HHS's *post-hoc* position, adopted without any explanation or reasoned basis. *See Molina*, 2017 WL 3326842, at *14 ("HHS … indicated repeatedly that it would make annual payments to insurers."); *Moda*, 130 Fed. Cl. at 454 (same); *Health Republic*, 129 Fed. Cl. at 776-77 (same). The court also disregarded both the April 2014 Bulletin's statements that annual payments ***are due***, and HHS's actual conduct— making yearly payments to BCBSNC and other insurers. Appx23; *see Moda*, 130 Fed. Cl. at 454 (noting that "HHS in fact calculated payments on an annual basis" and "followed a rigid annual schedule in practice as well as in interpretation"); *Health Republic*, 129 Fed. Cl. at 778 (same). Here, a purported agency

interpretation so at odds with the agency's actual conduct is unreasonable and deserves no *Chevron* deference.

Third, the court further departed from a proper *Chevron* analysis by failing to point to an explanation by HHS for rejecting its prior interpretation that § 1342 required full annual risk-corridors payments. HHS did not, and could not, offer any reasoned explanation for its 180-degree shift regarding budget-neutrality. But "under *Chevron*, an agency can only reject a prior interpretation of an ambiguous statute if it explains why it is doing so." *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1382 (Fed. Cir. 2017). Absent that, as the Supreme Court has made plain, an agency's change in policy "receives no *Chevron* deference." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (citation omitted).

Moving beyond its erroneous *Chevron* analysis, the trial court's ruling also rests on additional erroneous findings and assumptions. Without any explanation, the trial court noted that it was "not persuaded" by BCBSNC's argument that HHS's interpretation undermined the risk-corridors program's purpose. Appx27. It went on to find—citing only the Government's reply brief—that HHS's pro-rated payments satisfied the program's purpose of, in the court's words, "protecting issuers from uncertainties regarding the cost of health insurance claims ***during*** the first three years of the ACA's exchanges." Appx27 (emphasis added).

This was just one of many instances where the court—although it was applying Rule 12(b)(6)—erroneously relied on, and accepted as true, assertions in the movant Government's motion-to-dismiss briefing.  *See also* Appx2 n.1. (explaining that recitation of facts was based in part on Government's motion to dismiss and reply brief).  And, in any event, these findings were flawed:  Pro-rated payments made in 2018, two years after the program's end, could not, as the trial court found, protect insurers like BCBSNC "from uncertainties…*during*" the program (Appx27); only full annual payments would advance that purpose.

Finally, the trial court also rested its ruling on erroneous assumptions—that HHS "requir[ed] that the government make up any outstanding payments owed during the subsequent years of the program[,]" and was "committ[ed] to make up any shortfall in those payments during subsequent program years."  Appx28.  In fact, as the court was aware, the Government's position was that it is *not* required to "make up any outstanding payments" or "shortfall[s]" later in the risk-corridors program years.  Appx18.  And, as BCBSNC alleged, HHS in fact has *not* "ma[d]e up any shortfall," Appx67-68,—the program ended in December 2016, and the Government still owes more than $8 billion in risk corridors payments.  Appx261-91, Appx1016-28.[11]

---

[11]    The Government did not seek—and the trial court did not give—*Chevron* deference to HHS's view on whether *full* risk-corridors payments are required.

The key premises for the trial court's ruling accordingly are legally unsupported, in conflict with BCBSNC's well-pled allegations, and cannot be sustained.[12] This Court should reverse.

## B.    BCBSNC is entitled to the full risk-corridors payments for CY 2014.

BCBSNC's statutory claim seeks to recover the unpaid risk-corridors payments to which it is entitled under § 1342(b) for CY 2014.  To plead this claim, BCBSNC must allege that (i) it was a QHP; (ii) it sustained "allowable costs" in excess of 103 percent of its "target amount" for CY 2014 (§ 1342(b)(1)); (iii) the Government was obligated by § 1342 to pay BCBSNC a prescribed percentage of its excess "allowable costs"; and (iv) the Government failed to pay.  BCBSNC's complaint alleges each of these elements.

*First*, BCBSNC alleges (and it is indisputable) that, as a QHP, it necessarily participated in the risk-corridors program since the program's first year in 2014.

---

Appx38 (Gov't Mot. to Dismiss).   The Government has maintained that position in this Court.  *See* Br. of United States, *Moda Health Plan, Inc. v. United States*, No. 17-1994, Doc. 18 (filed July 10, 2017) ("*Moda* Br.") , at 43;  Br. of United States, *Land of Lincoln Mut. Health Ins. Co. v. United States*, No. 17-1224, Doc. 107 (filed Apr. 24, 2017)  ("*Lincoln* Br."), at 40.

[12]   Regardless of whether the Government was obligated each year to make risk-corridors payments to BCBSNC, the Government indisputably must make payment once the program concludes on December 31, 2017.  That date likely will pass while this appeal is pending.  When it does, the annual-payment question likely will become moot.  *See also Moda* Br. at 54.

Appx46-47 (¶¶ 34-42); *see* 42 U.S.C. § 18062(a) (mandating that all QHPs "shall participate").

***Second***, BCBSNC alleges (and it is indisputable) that it is owed $147,474,968.35 in risk-corridors payments for CY 2014.  Appx66 (¶¶129,131); Appx280.

***Third***, BCBSNC alleges that § 1342 obligated the Government to pay BCBSNC the full CY 2014 risk-corridors payment amount by December 31, 2015. Appx58 (¶87).

***Fourth***, BCBSNC alleges (and it is indisputable) that the Government has paid only a small percentage of the payment due for CY 2014.  Appx67-68 (¶ 138).

Given the sufficiency of BCBSNC's pleading, only a legal question remains: Has the Government violated a statutory obligation to pay BCBSNC the full $147 million the Government admits it owes BCBSNC for CY 2014?  Although the trial court declined to address this full-payment question, the answer plainly is "yes."

### 1.    Section 1342 requires the Government to make full risk-corridors payments.

Section 1342(b) requires, in mandatory "shall pay" language, the Government to make risk-corridors payments pursuant to a specified and fixed statutory formula.  *See Molina*, 2017 WL 3326842, at *19 (noting "mountain of controlling case law holding that when a statute states a certain consequence 'shall' follow from a contingency, the provision creates a mandatory obligation")

(citations omitted).   "The mandatory 'shall' … normally creates an obligation impervious to judicial discretion."  *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

The mandatory effect of § 1342's "shall pay" language is particularly powerful because Congress used the permissive term "may" elsewhere in the ACA.[13]  *See Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting significance of Congress's "use of the permissive 'may'" in "contrast[] with the legislators' use of a mandatory 'shall' in the very same section" of statute).   Thus, § 1342's "shall pay" directive "is unambiguous and overrides any discretion the Secretary otherwise could have in making 'payments out' under the program."  *Moda*, 130 Fed. Cl. at 455.   No separate, second promise to appropriate funds—for an obligation Congress already has mandated "shall" be paid—is necessary to create the obligation.  *See Molina*, 2017 WL 3326842, at *19-20 (noting this Court's "'repeated [] recogni[tion] that the use of the word 'shall' generally makes a statute money-mandating'") (citing *Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007)).

What Congress omitted from § 1342—in light of the rest of the ACA—is just as significant in supporting a mandatory full-payment construction.  Section

---

[13]   *See, e.g.*, ACA, Pub. L. 111-148, §§ 1001, 124 Stat. 132, 135 (amending §§ 2713(c) and 2717(a)(2) of the Public Health Service Act), 1104(h), 124 Stat. 149.

1342 nowhere states or suggests that the risk-corridors program would be budget-neutral, such that "payments out" would be restricted to "payments in" from profitable insurers. *See Molina*, 2017 WL 3326842, at *2 ("The words 'budget neutral' do not appear anywhere in the ACA's Section 1342."); *Moda*, 130 Fed. Cl. at 455 (finding "no language of any kind in Section 1342 that makes 'payments out' of the risk corridors program contingent on 'payments in' to the program").

Nor does § 1342 contain the language Congress typically uses when it intends to condition a "shall pay" statutory command on a specific appropriation of funds. Three years before the ACA's enactment, this Court described in detail the type of language Congress could have used in § 1342 to limit payments to appropriations. *See Greenlee Cnty.*, 487 F.3d at 878 (noting that the phrases "'subject to the availability of appropriations'" and "'available only as provided in appropriations laws'" are "commonly used to restrict the government's liability to the amounts appropriated by Congress"). "Congress is presumed to know the law, particularly recent precedents that are directly applicable to the issue before it." *Hesse v. Dep't of State*, 217 F.3d 1372, 1380 (Fed. Cir. 2000) (citation omitted). Congress's refusal in 2010 to use the limiting language already mapped out by this Court in *Greenlee County* thus speaks volumes.

Moreover, the ACA itself shows that Congress knew how to adopt budget-neutral provisions when it so intended—as evidenced by the immediately

31

preceding ACA provision (§ 1341) governing reinsurance, and numerous other ACA provisions. *Supra* at 8; *see also Molina*, 2017 WL 3326842, at *23 ("Congress knew how to supersede the mandate to make full annual risk corridor payments in an appropriation law and chose not to do it."). Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1601 (2014) (citation omitted). Rather, courts presume "that differences in language like this convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017).

Lastly, as discussed above (*supra* at 22-23), interpreting § 1342 to require full risk-corridors payments is necessary to effectuate the ACA's purpose. The risk-corridors program "was designed to protect participating insurers from financial harm and also to guarantee that enough insurers participated in the Exchanges to make the ACA viable." *Molina*, 2017 WL 3326842, at *13; *see also King*, 135 S. Ct. at 2496 (same). Limiting or conditioning "payments out" to "payments in" squarely contravenes the risk-corridors program's purpose by transforming it from a program intended for the Government to share in the risks

of the new Exchanges with insurers, *supra* at 22-23, to one where insurers now exclusively bear those risks themselves.

When it passed the ACA, Congress plainly did not intend insurers to be the sole risk-bearers in the early years of the Exchanges, particularly given its express mandate that § 1342 "shall be based on" Part D's non-budget-neutral risk-corridors program. Had the CBO's February 2014 forecast of $8 billion in risk-corridors "payments in" from insurers come true, Appx736, the Government undoubtedly would not be asserting its belated budget-neutrality position here. While the risk-corridors revenues turned out to be negative, that does nothing to alter Congress's original, non-budget-neutral intent for § 1342. Requiring anything less—and certainly, 85% less—than full payments would undercut Congress's goal for §1342 and the ACA, and courts do not "interpret federal statutes to negate their own stated purposes." *N.Y. State Dep't of Soc. Services v. Dublino*, 413 U.S. 405, 419-20 (1973); *see also Moda*, 130 Fed. Cl. at 452.

### 2. HHS agrees that the Government must make full risk-corridors payments.

HHS's own interpretation of § 1342—as evident from its implementing regulations—further confirms that full risk-corridors payments are required.

To begin with, the regulations specify that QHPs "will receive payment from HHS" pursuant to the formula set forth in § 1342, and "HHS will pay" those amounts. 45 C.F.R. § 153.510(b). This language parallels the mandatory "shall

pay" provisions in § 1342 and, like § 1342, contains no qualifications or conditions limiting "payments out" by "payments in" or making payments subject to a Congressional appropriation.

At the same time, HHS's implementing regulations for the ACA's other two risk-mitigation programs explicitly provide that those programs *are* budget-neutral. *See* 45 C.F.R. § 153.230(d) (reinsurance); 77 FR 73118, 73139 (Dec. 7, 2012) (risk-adjustment); 78 FR 15409, 15441 (Mar. 11, 2013) (risk-adjustment).  As with statutes, where an agency uses limiting language in certain regulations, but omits that language in closely related regulations (*e.g.*, § 153.510(b), the risk-corridors regulation), courts presume that the agency did so intentionally and to convey a different meaning.  *See Henson*, 137 S. Ct. at 1723 (courts presume "that differences in language like this convey differences in meaning"); *Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994) ("The canons of construction of course apply equally to any legal text and not merely to statutes.") (citation omitted), *superseded on other grounds by* 38 U.S.C. § 7111.

Further, although the trial court ignored it, HHS repeatedly stated that the risk-corridors program is *not* budget-neutral, and that full payments *are* required. *Supra* at 8-11; *see also Moda*, 130 Fed. Cl. at 457 (finding that HHS "has consistently recognized that Section 1342 is not budget neutral" and that HHS "has

never conflated its inability to pay with the lack of an obligation to pay"); *Molina*, 2017 WL 3326842, at *7, *9 (same).

<p style="text-align:center">*********</p>

Here, the text, structure, purpose, and history of § 1342 and the ACA, together with HHS's views, establish that full risk-corridors payments are due under the statute.  The trial court wrongly dismissed BCBSNC's complaint, and this Court therefore should reverse.

### C.    There are no statutory limits on the Government's obligation to make full risk-corridors payments.

In the trial court, and in its briefing in this Court in *Lincoln*, No. 17-1224, and *Moda*, No. 17-1994, the Government contends that the risk-corridors program is budget-neutral because:  (i) Congress did not expressly authorize in § 1342 the appropriation of funds specifically to pay for risk corridors "payments out"; and (ii) Congress's appropriations riders limited "payments out" to "user fees" collected from "payments in."  Appx38 (Gov't Mot. to Dismiss); *Moda* Br. at 17-26; *Lincoln* Br. at 18-27.  Neither prong of this argument withstands analysis.

### 1.    Section 1342 does not limit the Government's full-payment obligation.

Most fundamentally, the Government erroneously conflates an appropriation of funds to pay for a legally enforceable government obligation with the obligation itself.

In Tucker Act cases, a threshold jurisdictional consideration is whether the statute giving rise to the claim for relief is "money-mandating"—that is, can the statute or regulation "'fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" *Roberts v. United States*, 745 F.3d 1158, 1162 (Fed. Cir. 2014) (citation omitted).    Statutes, like § 1342, providing that the Government "shall" make payment are money-mandating and impose on the Government a legal obligation to pay. *See Greenlee Cnty.*, 487 F.3d at 877; *see also Molina*, 2017 WL 3326842, at *11 (noting all cases addressing issue have found § 1342 is money-mandating).    Because § 1342 contains no express limitation regarding appropriations, Congress intended to "impose[] *a* statutory obligation to pay the full amounts according to the statutory formulas regardless of appropriations[.]"    *Prairie Cnty., Mont. v. United States*, 782 F.3d 685, 690 (Fed. Cir.), *cert. denied*, 136 S. Ct. 319 (2015).

The mere fact that Congress has not specifically appropriated funds to pay for a legally enforceable obligation under a money-mandating statute does not alter the existence of the obligation or prevent the Court of Federal Claims from enforcing it.    *See Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*) ("[T]he jurisdictional foundation of the Tucker Act is not limited by the appropriation status of the agency's funds or the source of funds by which any judgment may be paid.").

36

Thus, as this Court recently reiterated (and the Government itself has acknowledged[14]), it "has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute.'" *Prairie Cnty.*, 782 F.3d at 689 (citation omitted). Indeed, requiring a money-mandating statute to also appropriate funds would in effect engraft the very sort of "second [sovereign immunity] waiver"-requirement on Tucker Act jurisdiction that this Court—sitting *en banc* and following Supreme Court precedent—rightly rejected in *Slattery*. *See Slattery*, 635 F.3d at 1316 (citing *Mitchell v. United States*, 463 U.S. 206, 218 (1983)). Such a statutory revision is a job for Congress, not the courts.

As a result, rather than leaving BCBSNC without remedy or recourse, "[t]he failure to appropriate funds to meet statutory obligations prevents the accounting officers of the Government from making disbursements, but such rights are enforceable in the Court of Claims." *N.Y. Airways, Inc. v. United States*, 369 F.2d

---

[14]  *See* Def.'s Mem. in Supp. of Mot. for Sum. J. at 20, *U.S. House of Representatives v. Burwell*, No. 1:14-cv-01967-RMC, Doc. 55-1 (Dec. 2, 2015 D.D.C.) (asserting that "the absence of an appropriation would not prevent the insurers from seeking to enforce [their ACA] statutory right through litigation").

743, 748 (Ct. Cl. 1966);[15] *see also Collins v. United States*, 15 Ct. Cl. 22, 34-35 (1879) ("Congress, the legislative branch of the government, may by law create [a money-mandating] liability," which "exists independently of the appropriation, and may be enforced by proceedings in this court"); *Molina*, 2017 WL 3326842, at *20 (holding that under controlling precedent, "the Government's obligation to make payments [does not] depend[] on a reference to a specific appropriation" in a money-mandating statute).

To reinforce this point, Congress uses very specific language when it intends to limit a substantive statutory obligation it previously has created. For example, in *Prairie County*, this Court held that the Payment in Lieu of Taxes Act (PILT)—a money-mandating statute providing local governments payments for "tax-immune" federal lands in their jurisdictions—limited the Government's statutory "shall pay" obligation to available appropriations because the statute expressly stated that "[a]mounts are available only as provided in appropriation laws." 782 F.3d at 690 (citation omitted). The Court found, unsurprisingly, that using "only" "reflect[ed] congressional intent to limit the government's liability" for PILT's money-mandating payments. *Id.*; *see also Greenlee Cnty.*, 487 F.3d at 878 ("[I]n some instances the statute creating the right to compensation … may restrict the

---

[15]    Decisions of the Court of Claims, this Court's predecessor, "are binding precedent" in this Court. *Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 893 (Fed. Cir. 2008) (citation omitted).

government's liability … to the amount appropriated by Congress…. [T]he language 'subject to the availability of appropriations' is commonly used[.]").

Unlike the PILT, however, Section 1342's money-mandating "shall pay" language is unqualified and has never been altered.  Its lack of any "subject to the availability of appropriations" language "commonly used to restrict the government's liability to the amounts appropriated by Congress[,]" *Greenlee Cnty.*, 487 F.3d at 878, is particularly significant because Congress used that same limiting language in many other ACA provisions.  *Supra* at 8; *Henson*, 137 S. Ct. at 1723 (courts presume "that differences in language like this convey differences in meaning").  Thus, § 1342 is a "prime example" of a statute that "authorize[s] and mandate[s] payments without making an appropriation[.]"  *Molina*, 2017 WL 3326842, at *19 n.15 (citation omitted).

Further confirmation of this construction comes from Congress's own treatment of the provision.  Far from deeming § 1342 to be budget-neutral, in early 2014, Congress appropriated over $3.6 billion for CMS's "other responsibilities" without any reference to, or restriction related to, the risk-corridors program.  Pub. L. 113-76, 128 Stat. 374 (Jan. 17, 2014).  The GAO later concluded that such "other responsibilities" "include[d] the risk corridors program," and thus that these appropriated funds "would have been available for making" risk-corridors payments.  Comp. Gen. B-325630 (Sept. 30, 2014).

The Government insists that because—unlike the Part D risk-corridors program's statute, 42 U.S.C. § 1395w-115(e)(3), and other ACA provisions— § 1342 does not itself authorize appropriations, no Government payment obligation has been created. Appx38 (Gov't Mot. to Dismiss); *Moda* Br. at 18-19; *Lincoln* Br. at 19-20. But again, this Court's money-mandating test does not contain an appropriations requirement, *see Roberts*, 745 F.3d at 1162; *supra* at 36-38, and 140 years of precedent hold that "[t]his court … does not deal with questions of appropriations, but with the legal liabilities incurred by the United States under[, *inter alia*,] the laws of Congress," which "liabilities may be created where there is no appropriation of money to meet them." *Collins*, 15 Ct. Cl. at 35. Accordingly, "the lack of language specifying that Section 1342 could impact the national budget is not evidence of the lack of Congress's intent to impact the national budget." *Molina*, 2017 WL 3326842, at *16.

Here, if anything, Part D's risk-corridors program provides further ***support*** for BCBSNC's position. Congress required that § 1342 "shall be based on" § 1395w-115(e)(3). As the Government acknowledges, § 1395w-115(e)(3) made Part D's risk-corridors payments a Government obligation. And those Part D "payments out" were not limited to collections received. Appx536. Under the Government's reading, however, § 1342 and § 1395w-115(e)(3) would have directly contrary meanings—the ACA provision not imposing a Government

40

obligation at all; the Part D provision imposing a Government obligation to make full payments. That would improperly read § 1342's "shall be based on" mandate right out of the statute. *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (courts "'give effect, if possible, to every clause and word of a statute'") (citation omitted). This Court therefore should reject the Government's interpretation.

### 2. The appropriations riders do not limit the Government's full-payment obligation.

Congress's later appropriations riders likewise do not repeal or supersede the Government's mandatory full-payment obligation under § 1342—either expressly or impliedly. They merely limit some, but not all, appropriated funds from being used to pay that obligation.

### a. The riders' express text does not alter the Government's full-payment obligation.

It is "'strongly presumed that Congress will specifically address language on the statute books that it wishes to change.'" *Hymas v. United States*, 810 F.3d 1312, 1320 (Fed. Cir. 2016) (citation omitted). To repeal or supersede an existing statute, Congress must do so "expressly or by clear implication[,]" *Prairie Cnty.*, 782 F.3d at 689, and "'the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.'" *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141-42 (2001) (citation omitted).

The already-strong presumption against implied repeals "applies with especial force when[,]" as here, "the provision advanced as the repealing measure was enacted in an appropriations bill[,]" *United States v. Will*, 449 U.S. 200, 221-22 (1980), which has "the limited and specific purpose of providing funds for authorized programs." *TVA v. Hill*, 437 U.S. 153, 190 (1978) (recognizing strong "presum[ption]" that appropriations bills do not change substantive legislation); *see also N.Y. Airways*, 369 F.2d at 749 ("The intent of Congress to effect a change in the substantive law via provision in an appropriation act must be clearly manifest."). Indeed, "[r]epealing an obligation of the United States is a serious matter," and permitting Congress to alter substantive law by "burying a repeal in a standard appropriations bill would provide clever legislators with an end-run around the substantive debates that a repeal might precipitate." *Moda*, 130 Fed. Cl. at 458 (citing *Gibney v. United States*, 114 Ct. Cl. 38, 51 (1949)). Simply put, "[t]here can be no room for inference when dealing with whether the Government will honor its statutory commitments." *Molina*, 2017 WL 3326842, at *24.

These precedents make clear why nothing in the text of the relevant riders repeals the Government's legally enforceable obligation under § 1342 to make full risk-corridors payments. The riders only precluded HHS from using certain funding sources for those payments. They do not prohibit HHS from drawing on funds provided from other possible appropriations sources, such as the

Implementation Fund or the CMS PM account's "user fees" appropriation identified by the GAO. *Supra* at 5-6, 12; *Molina*, 2017 WL 3326842, at *8.

Context reinforces the riders' limited reach and shows that Congress did not believe that they operated to repeal the Government's full-payment obligation. On more than a ***dozen occasions***—before the FY 2015 rider, between the FY 2015 and FY 2016 riders, and after the FY 2016 rider—members of Congress attempted, but failed, to amend § 1342 to make it budget-neutral or even eliminate the Government's risk-corridors payment obligations entirely.[16] Of course, if the riders had accomplished these objectives, there would be no need for either an amendment or a repeal. Congress knew better; the riders did ***not*** limit the Government's § 1342 payment obligations, and it would be "improper for [this Court] to give a reading to the [riders] that Congress" itself did not give them. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 220 (1983); *see also ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 22

---

[16] *See* S. 1726, 113th Cong. (2013) (would eliminate § 1342); H.R. 3541, 113th Cong. (2013) (same); H.R. 3812, 113th Cong. (2014) (same); H.R. 3851, 113th Cong. (2014) (same); H.R. 5175, 113th Cong. (2014) (same); S. 123, 114th Cong. (2015) (same); H.R. 221, 114th Cong. (2015) (same); H.R. 3985, 113th Cong. (2014) (seeking to eliminate § 1342 after 2014); 161 Cong. Rec. S8420-21 (daily ed. Dec. 3, 2015) (noting consideration and rejection of amendment providing that "Secretary shall not collect fees and shall not make payments under" risk-corridors program); S. 2214, 113th Cong. (2014) (would amend § 1342 to "ensur[e] budget neutrality"); H.R. 4354, 113th Cong. (2014) (same); H.R. 4406, 113th Cong. (2014) (would limit payments out to the amount of payments in); S. 359, 114th Cong. (2015) (same); H.R. 724, 114th Cong. (2015) (same).

n.6 (2011) (finding statute money-mandating where Congress unsuccessfully tried to make it discretionary).

In any event, Congress cannot do indirectly what it is required to do directly. The step that Congress did not take—the passage of legislation clearly vitiating the underlying payment obligation—is the one the law requires. Because "Section 1342 clearly requires the Government to make full annual risk corridor payments," "Congress cannot"—and did not—"repeal this commitment" simply by blocking some—but not all—funding sources. *Molina*, 2017 WL 3326842, at *24; *Moda*, 130 Fed. Cl. at 462 (same).

> **b.    The riders do not impliedly repeal or supersede the Government's full-payment obligation.**

With no express legislative repeal, the Government is left to argue that the riders impliedly repeal § 1342's mandate. But controlling precedents confirm that the appropriations riders lack the clear congressional intent required to implicitly repeal the Government's full-payment obligation under § 1342.

To that end, the Court of Claims' ruling in *Gibney*, 114 Ct. Cl. 38, forecloses any implied-repeal attack on § 1342. In *Gibney*, the Court of Claims held that an appropriations bill prohibiting INS from using appropriations for overtime pay, "other than as provided in the Federal Employees Pay Act of 1945," did not suspend the overtime payment obligation. 114 Ct. Cl. at 48-49. According to the court, "a simple limitation on an appropriation bill of the use of funds" has never

"been held to suspend a statutory obligation." *Gibney*, 114 Ct. Cl. at 53.  As noted, the riders here likewise merely limit some funding for the Government's payment obligation, but do not suspend the obligation to pay.

The Supreme Court's decision in *United States v. Langston*, 118 U.S. 389 (1886), leads to the same no-implied-repeal conclusion.  There, a later appropriations act provided $5,000 for the U.S. minister to Haiti's annual salary, statutorily set at $7,500.  *See Langston*, 118 U.S. at 390-91.  The Supreme Court found that there was no "positive repugnancy between the old and the new statutes."  *Id.* at 393 (emphasis added).  It observed that none of the appropriations acts "contains any language to the effect that such sum shall be 'in full compensation' for those years."  *Id.*  Nor "was there in either of them an appropriation of money 'for additional pay,' from which it might be inferred that Congress intended to repeal the act" setting the minister's salary at $7,500.  *Id.* The Court thus held that a money-mandating statute "should not be deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount … for particular fiscal years, and which contained no words that expressly or by clear implication modified or repealed the previous law."  *Id.* at 394.

Here, as in *Langston*, Congress kept the underlying obligation alive, and "merely appropriated a less amount" by limiting certain—but not all—funding sources to make § 1342 payments. *Langston* thus controls.

The stark contrast between the language in the riders and the appropriations bill found to repeal an earlier statute in *United States v. Mitchell*, 109 U.S. 146 (1883), sheds further light on the proper outcome here. In *Mitchell*, a statute set the annual salary of Indian interpreters at $400, which "shall be in full of all emoluments and allowances whatsoever." 109 U.S. at 147. Later appropriations acts cut the base pay to $300, but also appropriated $6,000 "[f]or additional pay…to be distributed in the discretion of the Secretary of the Interior." *Id.* at 149. So, interpreters lost some salary, but could now earn a bonus. The Supreme Court held that the change in compensation structures—from a base salary with no bonus, to a lower base with a bonus—"distinctly reveals a change in the policy of Congress on this subject" that was "irreconcilable" with the 1851 statute, rendering it "suspended." *Id.* at 149-50. By contrast, the riders here clearly do not "reveal[] a change in the policy of Congress" regarding the Government's full risk-corridors payment obligation that was "irreconcilable" with § 1342's "shall pay" mandate. *Id.*

The Government's reliance on *United States v. Dickerson*, 310 U.S. 554 (1940), and *Will*, 449 U.S. 200, does not change the analysis. Neither case is

46

apposite on the critical construction issue. In *Dickerson*, the Supreme Court held that a prior statute for military re-enlistment bonuses was incompatible with a later appropriations bill expressly revoking those bonuses "notwithstanding" the prior statute. As *Gibney* correctly found, it was the "notwithstanding" clause in *Dickerson*'s appropriation that "carried a temporary *suspension* of the legislative authorization" (114 Ct. Cl. at 53)—a term that is absent from the riders here.

*Will* is inapplicable as well. There, the Supreme Court considered the effect of an appropriations bill prohibiting "funds available for payment to executive employees" from being "used to pay any such employee or elected or appointed official any sum in excess of 5.5 percent increase in existing pay and such sum if accepted shall be in lieu of the 12.9 percent due for such fiscal year." 449 U.S. at 208. Because the prior cost-of-living-increase statute could not coexist with an appropriation blocking the use of *any* pay-related funds for cost-of-living increases beyond a certain percentage, which Congress expressly made "in lieu" of the full amount due under the prior cost-of-living statute, the Court found an implied repeal. *Id.* at 223-24 ("Congress intended to *rescind* these raises entirely, not simply to consign them to the fiscal limbo of an account due but not payable. The clear intent of Congress in each year *was to stop* for that year the application of the Adjustment Act.") (emphasis added).

47

But here, Congress did not prohibit the entire universe of "funds available for risk-corridors payments" from being "used to pay any risk-corridors payments," nor did Congress state that "pro-rated risk-corridors user fees if accepted shall be in lieu of the full risk-corridors payment due for such calendar year." And, § 1342's money-mandating "shall pay" obligation plainly is not irreconcilable with the limitation of *some*—but not *all*—funding sources for those payments.

Finally, the Government places particular reliance on this Court's decision in *Highland Falls-Fort Montgomery Central School District v. United States*, 48 F.3d 1166 (Fed. Cir. 1995), but once again context shows its inapplicability. In *Highland Falls*, earmarks for specific amounts in appropriations acts were held to suspend discretionary payments to school districts determined by the Secretary of Education. Regarding those earmarks, this Court found "great difficulty imagining a more direct statement of congressional intent than the instructions in the appropriations statutes at issue here." *Id.* at 1170 (noting that appropriation specifically earmarked "$15,000,000").

In this case, by comparison, there are no earmarks in the risk-corridors riders, and the HHS Secretary has no discretion under § 1342's "shall pay" mandate to pay less than the statutorily-prescribed sums. The *Highland Falls* statute also allowed for the possibility that Congress might underfund the

program—no similar provision exists in § 1342. Thus, *Highland Falls*—like the Government's other cited authorities—does not support the Government's position. *See Molina*, 2017 WL 3326842, at *23 (concluding that the "reasoning in *Highland Falls* simply does not apply because the appropriation laws at issue are quite different").

### c. Construing the riders to repeal the Government's full-payment obligation raises serious constitutional issues.

The Government's reliance on the riders should be rejected for an additional reason: It raises serious constitutional concerns because reading the riders to work an implied repeal of the Government's full-payment obligation would retroactively abrogate BCBSNC's vested rights and upset its legitimate, investment-backed reliance interests protected by the Due Process Clause. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) (noting that the Due Process Clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation").

Here, by the time Congress enacted the FY 2015 rider (in late 2014), BCBSNC had signed on as a QHP, developed and offered ACA plans, and nearly completed its QHP performance for CY 2014; its right to risk-corridors payments for CY 2014 had almost fully vested; and it already had committed to performing in CY 2015. Thus, construing the riders to vitiate the Government's obligation to

pay impermissibly "would impair rights" BCBSNC "possessed when" it performed in CY 2014. *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (citation omitted); *see also Landgraf*, 511 U.S. at 266 (same).

Such a severe retroactive effect on BCBSNC likewise raises constitutional due process concerns that should be avoided under any circumstances. *See Landgraf*, 511 U.S. at 266; *Clark v. Martinez*, 543 U.S. 371, 379 (2005) ("[S]tatutes should be interpreted to avoid constitutional doubts."). And that is especially true here given the strong presumption against "an ***implied repeal*** [that] might raise constitutional questions." *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 788 (1981) (citation omitted; emphasis added).

As the Supreme Court has made clear, the law must, and does, "safeguard[] both the expectations of Government contractors and the long-term fiscal interests of the United States." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012). Requiring the Government to "honor its statutory commitments" and rejecting the riders as a proper means of "back[ing] out" would do just that. *Molina*, 2017 WL 3326842, at *24. If, however, the riders are deemed to impliedly repeal the Government's full-payment obligation, that would cast aside the settled expectations of BCBSNC and the other insurers. It would also turn common sense on its head, because it would be nothing short of "'madness'" for BCBSNC "to have engaged in these transactions with no more protection than"

pro-rata payments limited to unpredictable collections from profitable insurers. *Winstar*, 518 U.S. at 910 (plurality op.) (citation omitted); *Molina*, 2017 3326842, at *28 (same).

At the same time, the Government has its "own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." *Winstar*, 518 U.S. at 883.  But if Congress can eliminate an "unequivocal obligation"  of the Government (*Molina*, 2017 WL 3326842, at *24) by slipping a spending limitation into an appropriations bill, and then later asserting in litigation that the limitation substantively revised an earlier-enacted statute, nobody dealing with the Government—in any industry—could confidently rely upon even an explicit statutory promise.  That would, in turn, send ripple effects throughout the national economy, because if "the Government could be trusted to fulfill its promise to pay only when more pressing fiscal needs did not arise, would-be contractors would bargain warily—if at all—and only at a premium large enough to account for the risk of nonpayment." *Ramah Navajo*, 567 U.S. at 191-92.

This Court accordingly should hold the Government to its clear statutory obligation and require it to make the full CY 2014 risk-corridors payment it owes to BCBSNC.

## II.     The Court Should Reverse The Dismissal Of BCBSNC's Implied-In-Fact Contract And Implied-Covenant Claims.

The trial court separately dismissed BCBSNC's implied-in-fact contract and implied covenant of good faith and fair dealing claims, finding that BCBSNC failed to allege facts surrounding the ACA's enactment that reflect Congress's intent to contractually bind the Government, and that the Government did not breach any contractual obligation because § 1342 did not require it to make full risk-corridors payments.  Appx30-32.  Both conclusions are wrong, and this Court should reverse this aspect of the ruling as well.[17]

To allege the existence of an implied-in-fact contract with the Government, a plaintiff must allege:  (1) mutuality of intent, (2) consideration, (3) offer and acceptance, and (4) actual authority to contractually bind the Government.  *See Forest Glen Props., LLC v. United States*, 79 Fed. Cl. 669, 683 (2007).  An implied-in-fact contract "is not created or evidenced by explicit agreement of the parties, but is inferred as a matter of reason or justice from the acts or conduct of the parties."  *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1297 (Fed. Cir. 1986).  BCBSNC sufficiently pled these elements in this case.

---

[17]     If the Court reverses the dismissal of the implied-in-fact contract claim, it should reverse the dismissal of BCBSNC's implied-covenant claim.  *See Molina*, 2017 WL 3326842, at *29.

**Mutual intent.**   To establish this element, BCBSNC need only allege "language … or conduct on the part of the government that allows a reasonable inference that the government intended to enter into a contract." *ARRA Energy*, 97 Fed. Cl. at 27.   Such intent can be inferred from the "conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996).

Here, § 1342 and HHS's implementing regulations established "a program that offers specified incentives in return for voluntary performance of private parties" in the "form of an actual undertaking" and was "promissory" in nature because it gave HHS "no discretion to decide whether or not to award incentives to parties who perform." *Moda*, 130 Fed. Cl. at 463-64 (relying on *N.Y. Airways*, 369 F.2d 743 and *Radium Mines, Inc. v. United States*, 153 F. Supp. 403 (Ct. Cl. 1957)); *see also Molina*, 2017 WL 3326842, at *25-26 (rejecting Government's challenge to *Moda*'s reasoning and that decision's reliance on *N.Y. Airways* and *Radium Mines*).   Under this controlling authority, these features of the risk-corridors program confirm the Government's intent to contract.[18]

---

[18]   The trial court acknowledged that "Section 1342 and its implementing regulations do mandate the payment" of risk-corridors payments, but stated in conclusory fashion that "these provisions do not contain any language to create a contractual obligation for HHS to make these payments."  Appx30.

Moreover, as BCBSNC alleges, in and after 2012, the Government repeatedly manifested its intent to share the risk with insurers by making annual risk-corridors payments designed to encourage BCBSNC's participation on the ACA Exchange. Appx58-61, Appx70, Appx75-76 (¶¶ 89-105, 151, 188); 77 FR 73118, 73119 (Dec. 7, 2012) (Section 1342 was intended to "protect against uncertainty in rates for qualified health plans by limiting the extent of issuer losses and gains"); 78 FR 72321,72379 (Dec. 2, 2013) (same); Appx248 (Mar. 11, 2014) (same); *Molina*, 2017 WL 3326842, at *28 (noting that "[t]hese statements, made before Molina and similar insurers agreed to offer plans on the Exchanges, were designed to instill confidence in the Government's promise to actually share the risks of the ACA and actually protect against potential losses").

BCBSNC also alleges that the Government approved BCBSNC's status as a QHP, knowing that BCBSNC had expended resources to become a QHP per the Government's requirements, and accepted BCBSNC's services in performance of the contract requirements. Appx44-45, Appx72-73, Appx75-76 (¶¶ 25, 167-71, 185, 188). The Government's collection of CY 2014 risk-corridors charges, and its partial CY 2014 risk-corridors payments, further confirm the parties' meeting of the minds. Appx66-68 (¶¶ 128, 138); *Vargas v. United States*, 114 Fed. Cl. 226, 233 (2014) (finding that, among other facts, government's partial payment of amount owed under written agreement could support implied-in-fact contract).

The trial court ignored these allegations (and others) and found BCBSNC had failed to "identify any circumstances surrounding the enactment of the ACA" that reflect Congress's intent "to contractually bind the government."  Appx31.  This assertion is flawed for several reasons.

First, BCBSNC alleged numerous facts reflecting Congress's intent at the time it enacted § 1342.  Appx45-46, Appx 76-77 (¶¶ 30-33, 190-93).

Second, controlling law again refutes the trial court's narrow focus on only circumstances surrounding enactment of the ACA.  The Supreme Court itself has made clear that courts should consider the conduct and "legitimate expectations" of the parties both before *and* after the relevant legislation was passed, and determine whether "Congress would have struck" the bargain under such circumstances.  *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 468-69(1985); *see also Hercules*, 516 U.S. at 424 (same); *N.Y. Airways*, 369 F.2d at 751 (relying upon statements of "key congressmen" "throughout the years in question").

Third, BCBSNC identified not only "circumstances surrounding the enactment of the ACA"—it went further, pointing to the core features of § 1342 and HHS's implementing regulations themselves, which plainly were promissory in nature and imposed enforceable obligations on the Government.  *Supra* at 53-54; *see also N.Y. Airways*, 369 F.2d at 751-52 (finding implied-in-fact contract arising

out of statutory language, based on parties' conduct indicating an intent to contract); *Radium Mines*, 153 F. Supp. at 405-06 (finding implied offer in regulation designed to induce plaintiffs to purchase uranium); *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 739 n.11 (1982) (citing *Radium Mines* as example of cases "where contracts were inferred from regulations promising payment"); *Moda*, 130 Fed. Cl. at 463-64.

**Consideration.**    BCBSNC's complaint sufficiently alleges consideration. Appx75-76 (¶¶ 184-92).   The Government did not in its motion to dismiss, and cannot here, credibly challenge that it "'offered consideration in the form of risk corridors payments under Section 1342.'"   *Molina*, 2017 WL 3326842, at *26 (quoting *Moda*, 130 Fed. Cl. at 465).   Nor can the Government contest that "'[i]n return,'" BCBSNC "'provid[ed] QHPs to consumers on the … Exchanges.'"   *Id.*

**Offer and acceptance.**    On this element, BCBSNC plausibly alleges a Government offer to make full and timely CY 2014 risk-corridors payments, which BCBSNC accepted by becoming a QHP and performing.   An offer must be manifested by conduct that indicates assent to the proposed bargain.   *See Grav v. United States*, 14 Cl. Ct. 390, 393 (1988) (holding Government's offer in statute was accepted, forming implied-in-fact contract).   Offer and acceptance can be found in the "conduct of the parties."   *Forest Glen*, 79 Fed. Cl. at 684; *see also*

56

*N.Y. Airways*, 369 F.2d at 751-52 (finding implied-in-fact-contract formed through acceptance of Government's offer arising in statute).

The Government's offer was made in the text of § 1342, the provision's implementing regulations, and the Government's subsequent statements surrounding the implementation of the risk-corridors program. *See Molina*, 2017 WL 3326842, at *26, 28; *Moda*, 130 Fed. Cl. at 464. Those statements, as noted, incentivized BCBSNC to participate on the ACA Exchange. *Supra* at 53-54. Becoming a QHP was volitional for BCBSNC, and was subject to the Government's discretion in whether to certify BCBSNC as a QHP. Only after it was awarded QHP status, and accepted the Government's offer to participate on the ACA Exchange, did BCBSNC become obligated to remit risk-corridors charges or entitled to receive risk-corridors payments. Appx74-75 (¶¶ 182-87); 42 U.S.C. § 18062(a).

The Government's repeated, undisputed statements before BCBSNC accepted the offer assured BCBSNC of the Government's intent to make CY 2014 risk-corridors payments by the end of CY 2015. Appx58-59 (¶¶ 93-94). This constituted an offer. And BCBSNC, by engaging in preparations and incurring significant expenses to become a QHP, and then selling QHPs on the Exchanges, accepted the offer and performed. Appx44-45, Appx49-50, Appx73, Appx75-76,

Appx79-80 (¶¶ 25-28, 49-51, 170-71, 183-91, 208); *Molina*, 2017 WL 3326842, at
*26, 28; *Moda*, 130 Fed. Cl. at 464.

**Actual authority.**     Here, BCBSNC must show that "the officer whose
conduct is relied upon had actual authority to bind the government in contract."
*Lublin Corp. v. United States*, 98 Fed. Cl. 53, 56 (2011).  "Authority to bind the
government is generally implied when [it] is considered to be an integral part of
the duties assigned to a government employee."  *H. Landau & Co. v. United States*,
886 F.2d 322, 324 (Fed. Cir. 1989) (alterations omitted).   Here, BCBSNC
adequately pled that an authorized Government agent entered into or ratified an
implied-in-fact contract relating to the CY 2014 risk-corridors payments.

The HHS Secretary "ha[s] actual authority to contract on the Government's
behalf" regarding the risk-corridors program that the Secretary must "establish and
administer."   *Moda*, 130 Fed. Cl. at 465; 42 U.S.C. § 18062(a).  BCBSNC's
complaint thus accurately alleges that the implied-in-fact contracts were authorized
or approved by Government representatives who had actual authority to bind the
Government in contract as part of their employment duties.  Appx58-59, Appx74-
75 (¶¶ 89-94, 182).  BCBSNC also alleges that HHS and CMS officials with
authority repeatedly made statements regarding the Government's obligation to
make full and timely risk-corridors payments.  *Id.*  Accordingly, BCBSNC's
complaint plausibly alleges that the Government's public statements to BCBSNC

were made by officials with express or implied actual authority.

Furthermore, BCBSNC alleges that Kevin Counihan, CMS's CEO of the ACA Marketplace, ratified the terms of the contract through his acceptance of the benefits provided by BCBSNC and his statements confirming the Government's obligations.  Appx60-61, Appx 69-70, Appx 64, Appx76-77 (¶¶ 100, 104, 105, 119, 148, 189-91, 194); *see also Silverman v. United States*, 679 F.2d 865, 870 (Ct. Cl. 1982) (finding Government bound if it ratifies contract even if Government official lacked authorization to enter into it).  Mr. Counihan's job included overseeing the ACA Marketplace, and entering into agreements with QHPs is integral to his duties.  Appx576; *Telenor Satellite Servs. Inc. v. United States*, 71 Fed. Cl. 114, 120 (2006) (agent had implied actual authority where authority was "an integral part of the duties").  These well-pled facts sufficiently allege that Mr. Counihan had actual authority to ratify the implied-in-fact contracts.

**Government breach.**  Finally, on this element, BCBSNC sufficiently pled that the Government breached its implied-in-fact contract by failing to pay risk-corridors payments for losses BCBSNC sustained in CY 2014 by the end of 2015. Appx58, Appx77 (¶¶ 87-88, 195-98).  The trial court found that the Government did not breach based on its erroneous finding that the Government had no statutory or regulatory duty to make annual risk-corridors payments.  Appx32.  As shown above, however, the Government did have such a duty under § 1342.  And even if

it did not, based on all surrounding circumstances, the Government nevertheless had a contractual duty to make full annual risk-corridors payments.

The Court therefore should reverse the dismissal of BCBSNC's implied-in-fact contract and implied covenant of good faith and fair dealing claims.

## III. The Court Should Reverse The Dismissal Of BCBSNC's Takings Claim.

As noted, BCBSNC plausibly alleged that it had a contract with the Government regarding full annual risk-corridors payments. *Supra* at 53-59. It also plausibly alleged that the Government unlawfully interfered with that contract. *Supra* at 59. Its takings claim therefore should not have been dismissed, either. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1336-37 (Fed. Cir. 2003).

As for the deprivation of a protectable property interest, "[v]alid contracts are property," and "[r]ights against the United States arising out of a contract with [the United States] are protected by the Fifth Amendment." *Lynch v. United States*, 292 U.S. 571, 579 (1934). BCBSNC's contract rights therefore are worthy of Fifth Amendment protection.

Looking at interference, in determining whether the Government has engaged in an unconstitutional regulatory taking, courts analyze three factors: "(1) character of the governmental action, (2) economic impact of the regulation on the claimant, and (3) extent to which the regulation interfered with distinct investment-backed expectations." *Cienega Gardens*, 331 F.3d at 1337. Here, BCBSNC

alleged facts showing that Congress's targeting of risk-corridors payments to a small group of QHPs has delayed hundreds of millions of dollars in mandatory payments to BCBSNC and interfered with BCBSNC's investment-backed expectations for participating in the early transition years of the ACA Exchanges. Appx81-82 (¶¶ 214-17). The *ad hoc* and fact-intensive nature of the regulatory takings analysis makes the trial court's dismissal of BCBSNC's takings count premature at the pleadings stage.

## CONCLUSION

For all of the foregoing reasons, the Court should reverse the trial court's judgment dismissing BCBSNC's complaint and remand for further proceedings.

Dated:  August 21, 2017

Respectfully submitted,

REED SMITH LLP

By:  s/ *Lawrence S. Sher*
  LAWRENCE S. SHER
  1301 K Street NW
  Suite 1000-East Tower
  Washington, DC 20005
  (202) 414-9200

  JAMES C. MARTIN
  COLIN E. WRABLEY
  KYLE R. BAHR
  CONOR M. SHAFFER
  225 Fifth Avenue, Suite 1200

Pittsburgh, PA 15222
(412) 288-3131

*Attorneys for Plaintiff-Appellant*
*Blue Cross and Blue Shield of*
*North Carolina*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Statutes**

42 U.S.C. § 280k(a) ....................................................................... A1

42 U.S.C. § 293k(d) ....................................................................... A2

42 U.S.C. § 300hh-31(a) ............................................................... A4

42 U.S.C. § 1395w-4(p)(4)(C) ...................................................... A5

42 U.S.C. § 1395w-115(e)(3) ........................................................ A6

42 U.S.C. § 1397m-1(b)(2)(A) ...................................................... A7

42 U.S.C. § 18061 .......................................................................... A8

42 U.S.C. § 18062 ......................................................................... A10

42 U.S.C. § 18063 ......................................................................... A10

Pub. L. No. 113-76, 128 Stat. 374 (Jan. 17, 2014) ...................... A12

Pub. L. 113-235, § 227, 128 Stat. 2491 (Dec. 16, 2014) ............. A13

Pub. L. 114-113, § 225, 129 Stat. 2624 (Dec. 18, 2015) ............. A14

Pub. L. 115-31, § 223, 131 Stat. 135 (May 5, 2017) ................... A15

**Regulations**

45 C.F.R. § 153.230(d) ................................................................. A17

45 C.F.R. § 153.510(b) ................................................................. A18

45 C.F.R. § 153.510(d) ................................................................. A18

45 C.F.R. § 153.530(d) ................................................................. A19



aggregation, and analysis systems span an increasingly broad range of patient populations, providers, and geographic areas over time.''

## § 280j–2. Public reporting of performance information

### (a) Development of performance websites

The Secretary shall make available to the public, through standardized Internet websites, performance information summarizing data on quality measures. Such information shall be tailored to respond to the differing needs of hospitals and other institutional health care providers, physicians and other clinicians, patients, consumers, researchers, policymakers, States, and other stakeholders, as the Secretary may specify.

### (b) Information on conditions

The performance information made publicly available on an Internet website, as described in subsection (a), shall include information regarding clinical conditions to the extent such information is available, and the information shall, where appropriate, be provider-specific and sufficiently disaggregated and specific to meet the needs of patients with different clinical conditions.

### (c) Consultation

#### (1) In general

In carrying out this section, the Secretary shall consult with the entity with a contract under section 1890(a) of the Social Security Act [42 U.S.C. 1395aaa(a)], and other entities, as appropriate, to determine the type of information that is useful to stakeholders and the format that best facilitates use of the reports and of performance reporting Internet websites.

#### (2) Consultation with stakeholders

The entity with a contract under section 1890(a) of the Social Security Act [42 U.S.C. 1395aaa(a)] shall convene multi-stakeholder groups, as described in such section, to review the design and format of each Internet website made available under subsection (a) and shall transmit to the Secretary the views of such multi-stakeholder groups with respect to each such design and format.

### (d) Coordination

Where appropriate, the Secretary shall coordinate the manner in which data are presented through Internet websites described in subsection (a) and for public reporting of other quality measures by the Secretary, including such quality measures under title XVIII of the Social Security Act [42 U.S.C. 1395 et seq.].

### (e) Authorization of appropriations

To carry out this section, there are authorized to be appropriated such sums as may be necessary for fiscal years 2010 through 2014.

(July 1, 1944, ch. 373, title III, §399JJ, as added Pub. L. 111–148, title III, §3015, Mar. 23, 2010, 124 Stat. 388.)

#### REFERENCES IN TEXT

The Social Security Act, referred to in subsec. (d), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Title XVIII of the Act is classified generally to subchapter XVIII (§1395 et seq.) of chapter 7 of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

## § 280j–3. Quality improvement program for hospitals with a high severity adjusted readmission rate

### (a) Establishment

#### (1) In general

Not later than 2 years after March 23, 2010, the Secretary shall make available a program for eligible hospitals to improve their readmission rates through the use of patient safety organizations (as defined in section 299b–21(4) of this title).

#### (2) Eligible hospital defined

In this subsection, the term ''eligible hospital'' means a hospital that the Secretary determines has a high rate of risk adjusted readmissions for the conditions described in section 1395ww(q)(8)(A) of this title and has not taken appropriate steps to reduce such readmissions and improve patient safety as evidenced through historically high rates of readmissions, as determined by the Secretary.

#### (3) Risk adjustment

The Secretary shall utilize appropriate risk adjustment measures to determine eligible hospitals.

### (b) Report to the Secretary

As determined appropriate by the Secretary, eligible hospitals and patient safety organizations working with those hospitals shall report to the Secretary on the processes employed by the hospital to improve readmission rates and the impact of such processes on readmission rates.

(July 1, 1944, ch. 373, title III, §399KK, as added Pub. L. 111–148, title III, §3025(b), Mar. 23, 2010, 124 Stat. 412.)

PART T—ORAL HEALTHCARE PREVENTION ACTIVITIES

## § 280k. Oral healthcare prevention education campaign

### (a) Establishment

The Secretary, acting through the Director of the Centers for Disease Control and Prevention and in consultation with professional oral health organizations, shall, subject to the availability of appropriations, establish a 5-year national, public education campaign (referred to in this section as the ''campaign'') that is focused on oral healthcare prevention and education, including prevention of oral disease such as early childhood and other caries, periodontal disease, and oral cancer.

### (b) Requirements

In establishing the campaign, the Secretary shall—

(1) ensure that activities are targeted towards specific populations such as children, pregnant women, parents, the elderly, individuals with disabilities, and ethnic and racial minority populations, including Indians, Alas-

PART C—TRAINING IN FAMILY MEDICINE, GEN-ERAL INTERNAL MEDICINE, GENERAL PEDIAT-RICS, PHYSICIAN ASSISTANTS, GENERAL DEN-TISTRY, AND PEDIATRIC DENTISTRY

### § 293j. Repealed. Pub. L. 105–392, title I, § 102(2), Nov. 13, 1998, 112 Stat. 3537

Section, act July 1, 1944, ch. 373, title VII, § 746, as added Pub. L. 102–408, title I, § 102, Oct. 13, 1992, 106 Stat. 2034; amended Pub. L. 102–531, title III, § 313(a)(2), Oct. 27, 1992, 106 Stat. 3507; Pub. L. 103–43, title XX, § 2008(i)(3), June 10, 1993, 107 Stat. 213, related to area health education center programs.

A prior section 746 of act July 1, 1944, was classified to section 294q–2 of this title prior to the general revision of this subchapter by Pub. L. 102–408.

### § 293k. Family medicine, general internal medi-cine, general pediatrics, general dentistry, pediatric dentistry, and physician assistants

#### (a) Training generally

The Secretary may make grants to, or enter into contracts with, any public or nonprofit pri-vate hospital, school of medicine or osteopathic medicine, or to or with a public or private non-profit entity (which the Secretary has deter-mined is capable of carrying out such grant or contract)—

(1) to plan, develop, and operate, or partici-pate in, an approved professional training pro-gram (including an approved residency or in-ternship program) in the field of family medi-cine, internal medicine, or pediatrics for medi-cal (M.D. and D.O.) students, interns (includ-ing interns in internships in osteopathic medi-cine), residents, or practicing physicians that emphasizes training for the practice of family medicine, general internal medicine, or gen-eral pediatrics (as defined by the Secretary);

(2) to provide financial assistance (in the form of traineeships and fellowships) to medi-cal (M.D. and D.O.) students, interns (includ-ing interns in internships in osteopathic medi-cine), residents, practicing physicians, or other medical personnel, who are in need thereof, who are participants in any such pro-gram, and who plan to specialize or work in the practice of family medicine, general inter-nal medicine, or general pediatrics;

(3) to plan, develop, and operate a program for the training of physicians who plan to teach in family medicine (including geri-atrics), general internal medicine or general pediatrics training programs;

(4) to provide financial assistance (in the form of traineeships and fellowships) to physi-cians who are participants in any such pro-gram and who plan to teach in a family medi-cine (including geriatrics), general internal medicine or general pediatrics training pro-gram;

(5) to meet the costs of projects to plan, de-velop, and operate or maintain programs for the training of physician assistants (as defined in section 295p of this title), and for the train-ing of individuals who will teach in programs to provide such training; and

(6) to meet the costs of planning, developing, or operating programs, and to provide finan-cial assistance to residents in such programs, of general dentistry or pediatric dentistry.

For purposes of paragraph (6), entities eligible for such grants or contracts shall include enti-ties that have programs in dental schools, ap-proved residency programs in the general or pe-diatric practice of dentistry, approved advanced education programs in the general or pediatric practice of dentistry, or approved residency pro-grams in pediatric dentistry.

#### (b) Academic administrative units

##### (1) In general

The Secretary may make grants to or enter into contracts with schools of medicine or os-teopathic medicine to meet the costs of projects to establish, maintain, or improve academic administrative units (which may be departments, divisions, or other units) to pro-vide clinical instruction in family medicine, general internal medicine, or general pediat-rics.

##### (2) Preference in making awards

In making awards of grants and contracts under paragraph (1), the Secretary shall give preference to any qualified applicant for such an award that agrees to expend the award for the purpose of—

(A) establishing an academic administra-tive unit for programs in family medicine, general internal medicine, or general pediat-rics;[1]

(B) substantially expanding the programs of such a unit; or[1]

##### (3) Priority in making awards

In making awards of grants and contracts under paragraph (1), the Secretary shall give priority to any qualified applicant for such an award that proposes a collaborative project between departments of primary care.

#### (c) Priority

##### (1) In general

With respect to programs for the training of interns or residents, the Secretary shall give priority in awarding grants under this section to qualified applicants that have a record of training the greatest percentage of providers, or that have demonstrated significant im-provements in the percentage of providers, which enter and remain in primary care prac-tice or general or pediatric dentistry.

##### (2) Disadvantaged individuals

With respect to programs for the training of interns, residents, or physician assistants, the Secretary shall give priority in awarding grants under this section to qualified appli-cants that have a record of training individ-uals who are from disadvantaged backgrounds (including racial and ethnic minorities under-represented among primary care practice or general or pediatric dentistry).

##### (3) Special consideration

In awarding grants under this section the Secretary shall give special consideration to projects which prepare practitioners to care for underserved populations and other high risk groups such as the elderly, individuals

---

[1] So in original.

with HIV-AIDS, substance abusers, homeless, and victims of domestic violence.

**(d) Duration of award**

The period during which payments are made to an entity from an award of a grant or contract under subsection (a) of this section may not exceed 5 years. The provision of such payments shall be subject to annual approval by the Secretary of the payments and subject to the availability of appropriations for the fiscal year involved to make the payments.

**(e) Funding**

**(1) Authorization of appropriations**

For the purpose of carrying out this section, there is authorized to be appropriated $78,300,000 for fiscal year 1998, and such sums as may be necessary for each of the fiscal years 1999 through 2002.

**(2) Allocation**

**(A) In general**

Of the amounts appropriated under paragraph (1) for a fiscal year, the Secretary shall make available—

(i) not less than $49,300,000 for awards of grants and contracts under subsection (a) of this section to programs of family medicine, of which not less than $8,600,000 shall be made available for awards of grants and contracts under subsection (b) of this section for family medicine academic administrative units;

(ii) not less than $17,700,000 for awards of grants and contracts under subsection (a) of this section to programs of general internal medicine and general pediatrics;

(iii) not less than $6,800,000 for awards of grants and contracts under subsection (a) of this section to programs relating to physician assistants; and

(iv) not less than $4,500,000 for awards of grants and contracts under subsection (a) of this section to programs of general or pediatric dentistry.

**(B) Ratable reduction**

If amounts appropriated under paragraph (1) for any fiscal year are less than the amount required to comply with subparagraph (A), the Secretary shall ratably reduce the amount to be made available under each of clauses (i) through (iv) of such subparagraph accordingly.

(July 1, 1944, ch. 373, title VII, §747, as added Pub. L. 102–408, title I, §102, Oct. 13, 1992, 106 Stat. 2042; amended Pub. L. 105–392, title I, §102(3), Nov. 13, 1998, 112 Stat. 3537.)

PRIOR PROVISIONS

A prior section 747 of act July 1, 1944, was classified to section 294q–3 of this title prior to the general revision of this subchapter by Pub. L. 102–408.

AMENDMENTS

1998—Pub. L. 105–392, §102(3)(A), substituted "Family medicine, general internal medicine, general pediatrics, general dentistry, pediatric dentistry, and physician assistants" for "Family medicine" in section catchline.

Subsec. (a). Pub. L. 105–392, §102(3)(B)(iv), (v), (vii), added pars. (5) and (6) and concluding provisions.

Subsec. (a)(1). Pub. L. 105–392, §102(3)(B)(i), inserted ", internal medicine, or pediatrics" after "family medicine" and inserted before semicolon at end "that emphasizes training for the practice of family medicine, general internal medicine, or general pediatrics (as defined by the Secretary)".

Subsec. (a)(2). Pub. L. 105–392, §102(3)(B)(ii), inserted ", general internal medicine, or general pediatrics" before semicolon at end.

Subsec. (a)(3), (4). Pub. L. 105–392, §102(3)(B)(iii), inserted "(including geriatrics), general internal medicine or general pediatrics" after "family medicine".

Subsec. (b)(1), (2)(A). Pub. L. 105–392, §102(3)(C)(i), inserted ", general internal medicine, or general pediatrics" after "family medicine".

Subsec. (b)(3). Pub. L. 105–392, §102(3)(C)(ii), (iii), added par. (3).

Subsecs. (c) to (e). Pub. L. 105–392, §102(3)(D), (E), added subsec. (c) and redesignated former subsecs. (c) and (d) as (d) and (e), respectively.

Subsec. (e)(1). Pub. L. 105–392, §102(3)(F)(i), substituted "$78,300,000 for fiscal year 1998, and such sums as may be necessary for each of the fiscal years 1999 through 2002." for "$54,000,000 for each of the fiscal years 1993 through 1995."

Subsec. (e)(2). Pub. L. 105–392, §102(3)(F)(ii), added par. (2) and struck out heading and text of former par. (2). Text read as follows: "Of the amounts appropriated under paragraph (1) for a fiscal year, the Secretary shall make available not less than 20 percent for awards of grants and contracts under subsection (b) of this section."

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 288, 293*l*, 295j of this title.

**§ 293*l*. Advisory Committee on Training in Primary Care Medicine and Dentistry**

**(a) Establishment**

The Secretary shall establish an advisory committee to be known as the Advisory Committee on Training in Primary Care Medicine and Dentistry (in this section referred to as the "Advisory Committee").

**(b) Composition**

**(1) In general**

The Secretary shall determine the appropriate number of individuals to serve on the Advisory Committee. Such individuals shall not be officers or employees of the Federal Government.

**(2) Appointment**

Not later than 90 days after November 13, 1998, the Secretary shall appoint the members of the Advisory Committee from among individuals who are health professionals. In making such appointments, the Secretary shall ensure a fair balance between the health professions, that at least 75 percent of the members of the Advisory Committee are health professionals, a broad geographic representation of members and a balance between urban and rural members. Members shall be appointed based on their competence, interest, and knowledge of the mission of the profession involved.

**(3) Minority representation**

In appointing the members of the Advisory Committee under paragraph (2), the Secretary shall ensure the adequate representation of women and minorities.

tration, and in coordination with the Assistant Secretary for Preparedness and Response, shall

(1) provide guidance and technical assistance to health centers funded under section 254b of this title and to State and local health departments and emergency managers to integrate health centers into State and local emergency response plans and to better meet the primary care needs of populations served by health centers during public health emergencies; and

(2) encourage employees at health centers funded under section 254b of this title to participate in emergency medical response programs including the National Disaster Medical System authorized in section 300hh–11 of this title, the Volunteer Medical Reserve Corps authorized in section 300hh–15 of this title, and the Emergency System for Advance Registration of Health Professions Volunteers authorized in section 247d–7b of this title.

(July 1, 1944, ch. 373, title XXVIII, §2815, as added Pub. L. 110–355, §6(a), Oct. 8, 2008, 122 Stat. 3994.)

PART C—STRENGTHENING PUBLIC HEALTH SURVEILLANCE SYSTEMS

### § 300hh–31.  Epidemiology-laboratory capacity grants

#### (a) In general

Subject to the availability of appropriations, the Secretary, acting through the Director of the Centers for Disease Control and Prevention, shall establish an Epidemiology and Laboratory Capacity Grant Program to award grants to State health departments as well as local health departments and tribal jurisdictions that meet such criteria as the Director determines appropriate. Academic centers that assist State and eligible local and tribal health departments may also be eligible for funding under this section as the Director determines appropriate. Grants shall be awarded under this section to assist public health agencies in improving surveillance for, and response to, infectious diseases and other conditions of public health importance by—

(1) strengthening epidemiologic capacity to identify and monitor the occurrence of infectious diseases and other conditions of public health importance;

(2) enhancing laboratory practice as well as systems to report test orders and results electronically;

(3) improving information systems including developing and maintaining an information exchange using national guidelines and complying with capacities and functions determined by an advisory council established and appointed by the Director; and

(4) developing and implementing prevention and control strategies.

#### (b) Authorization of appropriations

There are authorized to be appropriated to carry out this section $190,000,000 for each of fiscal years 2010 through 2013, of which—

(1) not less than $95,000,000 shall be made available each such fiscal year for activities under paragraphs (1) and (4) of subsection (a);

(2) not less than $60,000,000 shall be made available each such fiscal year for activities under subsection (a)(3); and

(3) not less than $32,000,000 shall be made available each such fiscal year for activities under subsection (a)(2).

(July 1, 1944, ch. 373, title XXVIII, §2821, as added Pub. L. 111–148, title IV, §4304, Mar. 23, 2010, 124 Stat. 584.)

SUBCHAPTER XXVII—LIFESPAN RESPITE CARE

### § 300ii.  Definitions

In this subchapter:

#### (1) Adult with a special need

The term ''adult with a special need'' means a person 18 years of age or older who requires care or supervision to—

(A) meet the person's basic needs;

(B) prevent physical self-injury or injury to others; or

(C) avoid placement in an institutional facility.

#### (2) Aging and disability resource center

The term ''aging and disability resource center'' means an entity administering a program established by the State, as part of the State's system of long-term care, to provide a coordinated system for providing—

(A) comprehensive information on available public and private long-term care programs, options, and resources;

(B) personal counseling to assist individuals in assessing their existing or anticipated long-term care needs, and developing and implementing a plan for long-term care designed to meet their specific needs and circumstances; and

(C) consumer access to the range of publicly supported long-term care programs for which consumers may be eligible, by serving as a convenient point of entry for such programs.

#### (3) Child with a special need

The term ''child with a special need'' means an individual less than 18 years of age who requires care or supervision beyond that required of children generally to—

(A) meet the child's basic needs; or

(B) prevent physical injury, self-injury, or injury to others.

#### (4) Eligible State agency

The term ''eligible State agency'' means a State agency that—

(A) administers the State's program under the Older Americans Act of 1965 [42 U.S.C. 3001 et seq.], administers the State's program under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.], or is designated by the Governor of such State to administer the State's programs under this subchapter;

(B) is an aging and disability resource center;

(C) works in collaboration with a public or private nonprofit statewide respite care coalition or organization; and

(D) demonstrates—

**(C) Continued application for purposes of MIPS**

The Secretary shall, in accordance with subsection (q)(1)(F), carry out subparagraph (B) for purposes of subsection (q).

**(3) Costs**

For purposes of paragraph (1), costs shall be evaluated, to the extent practicable, based on a composite of appropriate measures of costs established by the Secretary (such as the composite measure under the methodology established under subsection (n)(9)(C)(iii)) that eliminate the effect of geographic adjustments in payment rates (as described in subsection (e)), and take into account risk factors (such as socioeconomic and demographic characteristics, ethnicity, and health status of individuals (such as to recognize that less healthy individuals may require more intensive interventions)[11] and other factors determined appropriate by the Secretary. With respect to 2019 and each subsequent year, the Secretary shall, in accordance with subsection (q)(1)(F), carry out this paragraph for purposes of subsection (q).

**(4) Implementation**

**(A) Publication of measures, dates of implementation, performance period**

Not later than January 1, 2012, the Secretary shall publish the following:

(i) The measures of quality of care and costs established under paragraphs (2) and (3), respectively.

(ii) The dates for implementation of the payment modifier (as determined under subparagraph (B)).

(iii) The initial performance period (as specified under subparagraph (B)(ii)).

**(B) Deadlines for implementation**

**(i) Initial implementation**

Subject to the preceding provisions of this subparagraph, the Secretary shall begin implementing the payment modifier established under this subsection through the rulemaking process during 2013 for the physician fee schedule established under subsection (b).

**(ii) Initial performance period**

**(I) In general**

The Secretary shall specify an initial performance period for application of the payment modifier established under this subsection with respect to 2015.

**(II) Provision of information during initial performance period**

During the initial performance period, the Secretary shall, to the extent practicable, provide information to physicians and groups of physicians about the quality of care furnished by the physician or group of physicians to individuals enrolled under this part compared to cost (as determined under paragraphs

(2) and (3), respectively) with respect to the performance period.

**(iii) Application**

The Secretary shall apply the payment modifier established under this subsection for items and services furnished on or after January 1, 2015, with respect to specific physicians and groups of physicians the Secretary determines appropriate, and for services furnished on or after January 1, 2017, with respect to all physicians and groups of physicians. Such payment modifier shall not be applied for items and services furnished on or after January 1, 2019.

**(C) Budget neutrality**

The payment modifier established under this subsection shall be implemented in a budget neutral manner.

**(5) Systems-based care**

The Secretary shall, as appropriate, apply the payment modifier established under this subsection in a manner that promotes systems-based care.

**(6) Consideration of special circumstances of certain providers**

In applying the payment modifier under this subsection, the Secretary shall, as appropriate, take into account the special circumstances of physicians or groups of physicians in rural areas and other underserved communities.

**(7) Application**

For purposes of the initial application of the payment modifier established under this subsection during the period beginning on January 1, 2015, and ending on December 31, 2016, the term "physician" has the meaning given such term in section 1395x(r) of this title. On or after January 1, 2017, the Secretary may apply this subsection to eligible professionals (as defined in subsection (k)(3)(B)) as the Secretary determines appropriate.

**(8) Definitions**

For purposes of this subsection:

**(A) Costs**

The term "costs" means expenditures per individual as determined appropriate by the Secretary. In making the determination under the preceding sentence, the Secretary may take into account the amount of growth in expenditures per individual for a physician compared to the amount of such growth for other physicians.

**(B) Performance period**

The term "performance period" means a period specified by the Secretary.

**(9) Coordination with other value-based purchasing reforms**

The Secretary shall coordinate the value-based payment modifier established under this subsection with the Physician Feedback Program under subsection (n) and, as the Secretary determines appropriate, other similar provisions of this subchapter.

---

[11] So in original. Probably should be followed by a second closing parenthesis.

(II) such plans represent at least 60 percent of part D eligible individuals enrolled in any prescription drug plan or MA–PD plan.

**(C) Reduction in payment if adjusted allowable risk corridor costs below lower limit of risk corridor**

**(i) Costs between first and second threshold lower limits**

If the adjusted allowable risk corridor costs for the plan for the year are less than the first threshold lower limit, but not less than the second threshold lower limit, of the risk corridor for the plan for the year, the Secretary shall reduce the total of the payments made to the sponsor or organization offering the plan for the year under this section by an amount (or otherwise recover from the sponsor or organization an amount) equal to 50 percent (or, for 2006 and 2007, 75 percent) of the difference between the first threshold lower limit of the risk corridor and such adjusted allowable risk corridor costs.

**(ii) Costs below second threshold lower limit**

If the adjusted allowable risk corridor costs for the plan for the year are less the second threshold lower limit of the risk corridor for the plan for the year, the Secretary shall reduce the total of the payments made to the sponsor or organization offering the plan for the year under this section by an amount (or otherwise recover from the sponsor or organization an amount) equal to the sum of—

(I) 50 percent (or, for 2006 and 2007, 75 percent) of the difference between the first threshold lower limit and the second threshold lower limit; and

(II) 80 percent of the difference between the second threshold upper limit of the risk corridor and such adjusted allowable risk corridor costs.

**(3) Establishment of risk corridors**

**(A) In general**

For each plan year the Secretary shall establish a risk corridor for each prescription drug plan and each MA–PD plan. The risk corridor for a plan for a year shall be equal to a range as follows:

**(i) First threshold lower limit**

The first threshold lower limit of such corridor shall be equal to—

(I) the target amount described in subparagraph (B) for the plan; minus

(II) an amount equal to the first threshold risk percentage for the plan (as determined under subparagraph (C)(i)) of such target amount.

**(ii) Second threshold lower limit**

The second threshold lower limit of such corridor shall be equal to—

(I) the target amount described in subparagraph (B) for the plan; minus

(II) an amount equal to the second threshold risk percentage for the plan

(as determined under subparagraph (C)(ii)) of such target amount.

**(iii) First threshold upper limit**

The first threshold upper limit of such corridor shall be equal to the sum of—

(I) such target amount; and

(II) the amount described in clause (i)(II).

**(iv) Second threshold upper limit**

The second threshold upper limit of such corridor shall be equal to the sum of—

(I) such target amount; and

(II) the amount described in clause (ii)(II).

**(B) Target amount described**

The target amount described in this paragraph is, with respect to a prescription drug plan or an MA–PD plan in a year, the total amount of payments paid to the PDP sponsor or MA–PD organization for the plan for the year, taking into account amounts paid by the Secretary and enrollees, based upon the standardized bid amount (as defined in section 1395w–113(a)(5) of this title and as risk adjusted under subsection (c)(1) of this section), reduced by the total amount of administrative expenses for the year assumed in such standardized bid.

**(C) First and second threshold risk percentage defined**

**(i) First threshold risk percentage**

Subject to clause (iii), for purposes of this section, the first threshold risk percentage is—

(I) for 2006 and 2007, and[1] 2.5 percent;

(II) for 2008 through 2011, 5 percent; and

(III) for 2012 and subsequent years, a percentage established by the Secretary, but in no case less than 5 percent.

**(ii) Second threshold risk percentage**

Subject to clause (iii), for purposes of this section, the second threshold risk percentage is—

(I) for 2006 and 2007, 5 percent;

(II) for 2008 through 2011, 10 percent; and

(III) for 2012 and subsequent years, a percentage established by the Secretary that is greater than the percent established for the year under clause (i)(III), but in no case less than 10 percent.

**(iii) Reduction of risk percentage to ensure 2 plans in an area**

Pursuant to section 1395w–111(b)(2)(E)(ii) of this title, a PDP sponsor may submit a bid that requests a decrease in the applicable first or second threshold risk percentages or an increase in the percents applied under paragraph (2).

**(4) Plans at risk for entire amount of supplemental prescription drug coverage**

A PDP sponsor and MA organization that offers a plan that provides supplemental prescription drug benefits shall be at full finan-

---

[1] So in original. The word ''and'' probably should not appear.



ible with standards established under part C of subchapter XI, standards established under subsections (b)(2)(B)(i) and (e)(4) of section 1395w–104 of this title, standards adopted under section 300jj–14 of this title, and general health information technology standards.

**(2) Electronic submission of data to the Secretary**

**(A) In general**

Not later than 10 years after March 23, 2010, the Secretary shall have procedures in place to accept the optional electronic submission of clinical data by long-term care facilities pursuant to the standards adopted under paragraph (1).

**(B) Rule of construction**

Nothing in this subsection shall be construed to require a long-term care facility to submit clinical data electronically to the Secretary.

**(3) Regulations**

The Secretary shall promulgate regulations to carry out this subsection. Such regulations shall require a State, as a condition of the receipt of funds under this part, to conduct such data collection and reporting as the Secretary determines are necessary to satisfy the requirements of this subsection.

**(d) Authorization of appropriations**

There are authorized to be appropriated to carry out this section—

(1) for fiscal year 2011, $20,000,000;

(2) for fiscal year 2012, $17,500,000; and

(3) for each of fiscal years 2013 and 2014, $15,000,000.

(Aug. 14, 1935, ch. 531, title XX, §2041, as added Pub. L. 111–148, title VI, §6703(a)(1)(C), Mar. 23, 2010, 124 Stat. 791.)

<div align="center">REFERENCES IN TEXT</div>

Part C of subchapter XI, referred to in subsec. (c)(1), is classified to section 1320d et seq. of this title.

## §1397m–1. Adult protective services functions and grant programs

**(a) Secretarial responsibilities**

**(1) In general**

The Secretary shall ensure that the Department of Health and Human Services—

(A) provides funding authorized by this part to State and local adult protective services offices that investigate reports of the abuse, neglect, and exploitation of elders;

(B) collects and disseminates data annually relating to the abuse, exploitation, and neglect of elders in coordination with the Department of Justice;

(C) develops and disseminates information on best practices regarding, and provides training on, carrying out adult protective services;

(D) conducts research related to the provision of adult protective services; and

(E) provides technical assistance to States and other entities that provide or fund the provision of adult protective services, including through grants made under subsections (b) and (c).

**(2) Authorization of appropriations**

There are authorized to be appropriated to carry out this subsection, $3,000,000 for fiscal year 2011 and $4,000,000 for each of fiscal years 2012 through 2014.

**(b) Grants to enhance the provision of adult protective services**

**(1) Establishment**

There is established an adult protective services grant program under which the Secretary shall annually award grants to States in the amounts calculated under paragraph (2) for the purposes of enhancing adult protective services provided by States and local units of government.

**(2) Amount of payment**

**(A) In general**

Subject to the availability of appropriations and subparagraphs (B) and (C), the amount paid to a State for a fiscal year under the program under this subsection shall equal the amount appropriated for that year to carry out this subsection multiplied by the percentage of the total number of elders who reside in the United States who reside in that State.

**(B) Guaranteed minimum payment amount**

**(i) 50 States**

Subject to clause (ii), if the amount determined under subparagraph (A) for a State for a fiscal year is less than 0.75 percent of the amount appropriated for such year, the Secretary shall increase such determined amount so that the total amount paid under this subsection to the State for the year is equal to 0.75 percent of the amount so appropriated.

**(ii) Territories**

In the case of a State other than 1 of the 50 States, clause (i) shall be applied as if each reference to "0.75" were a reference to "0.1".

**(C) Pro rata reductions**

The Secretary shall make such pro rata reductions to the amounts described in subparagraph (A) as are necessary to comply with the requirements of subparagraph (B).

**(3) Authorized activities**

**(A) Adult protective services**

Funds made available pursuant to this subsection may only be used by States and local units of government to provide adult protective services and may not be used for any other purpose.

**(B) Use by agency**

Each State receiving funds pursuant to this subsection shall provide such funds to the agency or unit of State government having legal responsibility for providing adult protective services within the State.

**(C) Supplement not supplant**

Each State or local unit of government shall use funds made available pursuant to this subsection to supplement and not sup-

tract with a health insurance issuer for the offering of a multi-State qualified health plan under subsection (a) if—

(1) with respect to the first year for which the issuer offers such plan, such issuer offers the plan in at least 60 percent of the States;

(2) with respect to the second such year, such issuer offers the plan in at least 70 percent of the States;

(3) with respect to the third such year, such issuer offers the plan in at least 85 percent of the States; and

(4) with respect to each subsequent year, such issuer offers the plan in all States.

**(f) Applicability**

The requirements under chapter 89 of title 5 applicable to health benefits plans under such chapter shall apply to multi-State qualified health plans provided for under this section to the extent that such requirements do not conflict with a provision of this title.[3]

**(g) Continued support for FEHBP**

**(1) Maintenance of effort**

Nothing in this section shall be construed to permit the Director to allocate fewer financial or personnel resources to the functions of the Office of Personnel Management related to the administration of the Federal Employees Health Benefit Program under chapter 89 of title 5.

**(2) Separate risk pool**

Enrollees in multi-State qualified health plans under this section shall be treated as a separate risk pool apart from enrollees in the Federal Employees Health Benefit Program under chapter 89 of title 5.

**(3) Authority to establish separate entities**

The Director may establish such separate units or offices within the Office of Personnel Management as the Director determines to be appropriate to ensure that the administration of multi-State qualified health plans under this section does not interfere with the effective administration of the Federal Employees Health Benefit Program under chapter 89 of title 5.

**(4) Effective oversight**

The Director may appoint such additional personnel as may be necessary to enable the Director to carry out activities under this section.

**(5) Assurance of separate program**

In carrying out this section, the Director shall ensure that the program under this section is separate from the Federal Employees Health Benefit Program under chapter 89 of title 5. Premiums paid for coverage under a multi-State qualified health plan under this section shall not be considered to be Federal funds for any purposes.

**(6) FEHBP plans not required to participate**

Nothing in this section shall require that a carrier offering coverage under the Federal Employees Health Benefit Program under chapter 89 of title 5 also offer a multi-State qualified health plan under this section.

**(h) Advisory board**

The Director shall establish an advisory board to provide recommendations on the activities described in this section. A significant percentage of the members of such board shall be comprised of enrollees in a multi-State qualified health plan, or representatives of such enrollees.

**(i) Authorization of appropriations**

There is authorized to be appropriated, such sums as may be necessary to carry out this section.

(Pub. L. 111–148, title I, §1334, as added Pub. L. 111–148, title X, §10104(q), Mar. 23, 2010, 124 Stat. 902.)

REFERENCES IN TEXT

The Public Health Service Act, referred to in subsecs. (b)(2) and (c)(1)(C), is act July 1, 1944, ch. 373, 58 Stat. 682. Part A of title XXVII of the Act is classified generally to part A (§300gg et seq.) of subchapter XXV of chapter 6A of this title. For complete classification of this Act to the Code, see Short Title note set out under section 201 of this title and Tables.

This title, referred to in subsecs. (b)(2), (3), (c)(1)(B), and (f), is title I of Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 130, which enacted this chapter and enacted, amended, and transferred numerous other sections and notes in the Code. For complete classification of title I to the Code, see Tables.

CODIFICATION

In subsec. (a)(1), "section 6101 of title 41" substituted for "section 5 of title 41, United States Code," on authority of Pub. L. 111–350, §6(c), Jan. 4, 2011, 124 Stat. 3854, which Act enacted Title 41, Public Contracts.

PART E—REINSURANCE AND RISK ADJUSTMENT

**§18061. Transitional reinsurance program for individual market in each State**

**(a) In general**

Each State shall, not later than January 1, 2014—

(1) include in the Federal standards or State law or regulation the State adopts and has in effect under section 18041(b) of this title the provisions described in subsection (b); and

(2) establish (or enter into a contract with) 1 or more applicable reinsurance entities to carry out the reinsurance program under this section.

**(b) Model regulation**

**(1) In general**

In establishing the Federal standards under section 18041(a) of this title, the Secretary, in consultation with the National Association of Insurance Commissioners (the "NAIC"), shall include provisions that enable States to establish and maintain a program under which—

(A) health insurance issuers, and third party administrators on behalf of group health plans, are required to make payments to an applicable reinsurance entity for any plan year beginning in the 3-year period beginning January 1, 2014 (as specified in paragraph (3);[1] and

(B) the applicable reinsurance entity collects payments under subparagraph (A) and

---

[1] So in original. A second closing parenthesis probably should precede the semicolon.

uses amounts so collected to make reinsurance payments to health insurance issuers described in subparagraph (A) that cover high risk individuals in the individual market (excluding grandfathered health plans) for any plan year beginning in such 3-year period.

**(2) High-risk individual; payment amounts**

The Secretary shall include the following in the provisions under paragraph (1):

**(A) Determination of high-risk individuals**

The method by which individuals will be identified as high risk individuals for purposes of the reinsurance program established under this section. Such method shall provide for identification of individuals as high-risk individuals on the basis of—

(i) a list of at least 50 but not more than 100 medical conditions that are identified as high-risk conditions and that may be based on the identification of diagnostic and procedure codes that are indicative of individuals with pre-existing, high-risk conditions; or

(ii) any other comparable objective method of identification recommended by the American Academy of Actuaries.

**(B) Payment amount**

The formula for determining the amount of payments that will be paid to health insurance issuers described in paragraph (1)(B) that insure high-risk individuals. Such formula shall provide for the equitable allocation of available funds through reconciliation and may be designed—

(i) to provide a schedule of payments that specifies the amount that will be paid for each of the conditions identified under subparagraph (A); or

(ii) to use any other comparable method for determining payment amounts that is recommended by the American Academy of Actuaries and that encourages the use of care coordination and care management programs for high risk conditions.

**(3) Determination of required contributions**

**(A) In general**

The Secretary shall include in the provisions under paragraph (1) the method for determining the amount each health insurance issuer and group health plan described in paragraph (1)(A) contributing to the reinsurance program under this section is required to contribute under such paragraph for each plan year beginning in the 36-month period beginning January 1, 2014. The contribution amount for any plan year may be based on the percentage of revenue of each issuer and the total costs of providing benefits to enrollees in self-insured plans or on a specified amount per enrollee and may be required to be paid in advance or periodically throughout the plan year.

**(B) Specific requirements**

The method under this paragraph shall be designed so that—

(i) the contribution amount for each issuer proportionally reflects each issuer's fully insured commercial book of business for all major medical products and the total value of all fees charged by the issuer and the costs of coverage administered by the issuer as a third party administrator;

(ii) the contribution amount can include an additional amount to fund the administrative expenses of the applicable reinsurance entity;

(iii) the aggregate contribution amounts for all States shall, based on the best estimates of the NAIC and without regard to amounts described in clause (ii), equal $10,000,000,000 for plan years beginning in 2014, $6,000,000,000 for plan years beginning [2] 2015, and $4,000,000,000 for plan years beginning in 2016; and

(iv) in addition to the aggregate contribution amounts under clause (iii), each issuer's contribution amount for any calendar year under clause (iii) reflects its proportionate share of an additional $2,000,000,000 for 2014, an additional $2,000,000,000 for 2015, and an additional $1,000,000,000 for 2016.

Nothing in this subparagraph shall be construed to preclude a State from collecting additional amounts from issuers on a voluntary basis.

**(4) Expenditure of funds**

The provisions under paragraph (1) shall provide that—

(A) the contribution amounts collected for any calendar year may be allocated and used in any of the three calendar years for which amounts are collected based on the reinsurance needs of a particular period or to reflect experience in a prior period; and

(B) amounts remaining unexpended as of December, 2016, may be used to make payments under any reinsurance program of a State in the individual market in effect in the 2-year period beginning on January 1, 2017.

Notwithstanding the preceding sentence, any contribution amounts described in paragraph (3)(B)(iv) shall be deposited into the general fund of the Treasury of the United States and may not be used for the program established under this section.

**(c) Applicable reinsurance entity**

For purposes of this section—

**(1) In general**

The term "applicable reinsurance entity" means a not-for-profit organization—

(A) the purpose of which is to help stabilize premiums for coverage in the individual market in a State during the first 3 years of operation of an Exchange for such markets within the State when the risk of adverse selection related to new rating rules and market changes is greatest; and

(B) the duties of which shall be to carry out the reinsurance program under this section by coordinating the funding and operation of the risk-spreading mechanisms de-

---

[2] So in original. Probably should be followed by "in".

signed to implement the reinsurance program.

**(2) State discretion**

A State may have more than 1 applicable reinsurance entity to carry out the reinsurance program under this section within the State and 2 or more States may enter into agreements to provide for an applicable reinsurance entity to carry out such program in all such States.

**(3) Entities are tax-exempt**

An applicable reinsurance entity established under this section shall be exempt from taxation under chapter 1 of title 26. The preceding sentence shall not apply to the tax imposed by section 511 such[3] title (relating to tax on unrelated business taxable income of an exempt organization).

**(d) Coordination with State high-risk pools**

The State shall eliminate or modify any State high-risk pool to the extent necessary to carry out the reinsurance program established under this section. The State may coordinate the State high-risk pool with such program to the extent not inconsistent with the provisions of this section.

(Pub. L. 111–148, title I, §1341, title X, §10104(r), Mar. 23, 2010, 124 Stat. 208, 906.)

AMENDMENTS

2010—Pub. L. 111–148, §10104(r)(1), substituted "market" for "and small group markets" in section catch-line.

Subsec. (b)(2)(B). Pub. L. 111–148, §10104(r)(2), substituted "paragraph (1)(B)" for "paragraph (1)(A)" in introductory provisions.

Subsec. (c)(1)(A). Pub. L. 111–148, §10104(r)(3), substituted "individual market" for "individual and small group markets".

**§ 18062. Establishment of risk corridors for plans in individual and small group markets**

**(a) In general**

The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [42 U.S.C. 1395w–101 et seq.].

**(b) Payment methodology**

**(1) Payments out**

The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

(B) a participating plan's allowable costs for any plan year are more than 108 percent

of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

**(2) Payments in**

The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

**(c) Definitions**

In this section:

**(1) Allowable costs**

**(A) In general**

The amount of allowable costs of a plan for any year is an amount equal to the total costs (other than administrative costs) of the plan in providing benefits covered by the plan.

**(B) Reduction for risk adjustment and reinsurance payments**

Allowable costs shall[1] reduced by any risk adjustment and reinsurance payments received under section[2] 18061 and 18063 of this title.

**(2) Target amount**

The target amount of a plan for any year is an amount equal to the total premiums (including any premium subsidies under any governmental program), reduced by the administrative costs of the plan.

(Pub. L. 111–148, title I, §1342, Mar. 23, 2010, 124 Stat. 211.)

REFERENCES IN TEXT

The Social Security Act, referred to in subsec. (a), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Part D of title XVIII of the Act is classified generally to part D (§1395w–101 et seq.) of subchapter XVIII of chapter 7 of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

**§ 18063. Risk adjustment**

**(a) In general**

**(1) Low actuarial risk plans**

Using the criteria and methods developed under subsection (b), each State shall assess a charge on health plans and health insurance issuers (with respect to health insurance coverage) described in subsection (c) if the actuarial risk of the enrollees of such plans or coverage for a year is less than the average actu-

---

[3] So in original. Probably should be preceded by "of".

[1] So in original. Probably should be followed by "be".

[2] So in original. Probably should be "sections".

arial risk of all enrollees in all plans or coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1001 et seq.]).

**(2) High actuarial risk plans**

Using the criteria and methods developed under subsection (b), each State shall provide a payment to health plans and health insurance issuers (with respect to health insurance coverage) described in subsection (c) if the actuarial risk of the enrollees of such plans or coverage for a year is greater than the average actuarial risk of all enrollees in all plans and coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974).

**(b) Criteria and methods**

The Secretary, in consultation with States, shall establish criteria and methods to be used in carrying out the risk adjustment activities under this section. The Secretary may utilize criteria and methods similar to the criteria and methods utilized under part C or D of title XVIII of the Social Security Act [42 U.S.C. 1395w–21 et seq., 1395w–101 et seq.]. Such criteria and methods shall be included in the standards and requirements the Secretary prescribes under section 18041 of this title.

**(c) Scope**

A health plan or a health insurance issuer is described in this subsection if such health plan or health insurance issuer provides coverage in the individual or small group market within the State. This subsection shall not apply to a grandfathered health plan or the issuer of a grandfathered health plan with respect to that plan.

(Pub. L. 111–148, title I, §1343, Mar. 23, 2010, 124 Stat. 212.)

<div align="center">REFERENCES IN TEXT</div>

The Employee Retirement Income Security Act of 1974, referred to in subsec. (a), is Pub. L. 93–406, Sept. 2, 1974, 88 Stat. 829, which is classified principally to chapter 18 (§1001 et seq.) of Title 29, Labor. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of Title 29 and Tables.

The Social Security Act, referred to in subsec. (b), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Parts C and D of title XVIII of the Act are classified generally to parts C (§1395w–21 et seq.) and D (§1395w–101 et seq.), respectively, of subchapter XVIII of chapter 7 of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

<div align="center">SUBCHAPTER IV—AFFORDABLE COVERAGE CHOICES FOR ALL AMERICANS</div>

<div align="center">PART A—PREMIUM TAX CREDITS AND COST-SHARING REDUCTIONS</div>

**§ 18071. Reduced cost-sharing for individuals enrolling in qualified health plans**

**(a) In general**

In the case of an eligible insured enrolled in a qualified health plan—

(1) the Secretary shall notify the issuer of the plan of such eligibility; and

(2) the issuer shall reduce the cost-sharing under the plan at the level and in the manner specified in subsection (c).

**(b) Eligible insured**

In this section, the term ''eligible insured'' means an individual—

(1) who enrolls in a qualified health plan in the silver level of coverage in the individual market offered through an Exchange; and

(2) whose household income exceeds 100 percent but does not exceed 400 percent of the poverty line for a family of the size involved.

In the case of an individual described in section 36B(c)(1)(B) of title 26, the individual shall be treated as having household income equal to 100 percent for purposes of applying this section.

**(c) Determination of reduction in cost-sharing**

**(1) Reduction in out-of-pocket limit**

**(A) In general**

The reduction in cost-sharing under this subsection shall first be achieved by reducing the applicable out-of pocket[1] limit under section 18022(c)(1) of this title in the case of—

(i) an eligible insured whose household income is more than 100 percent but not more than 200 percent of the poverty line for a family of the size involved, by two-thirds;

(ii) an eligible insured whose household income is more than 200 percent but not more than 300 percent of the poverty line for a family of the size involved, by one-half; and

(iii) an eligible insured whose household income is more than 300 percent but not more than 400 percent of the poverty line for a family of the size involved, by one-third.

**(B) Coordination with actuarial value limits**

**(i) In general**

The Secretary shall ensure the reduction under this paragraph shall not result in an increase in the plan's share of the total allowed costs of benefits provided under the plan above—

(I) 94 percent in the case of an eligible insured described in paragraph (2)(A);

(II) 87 percent in the case of an eligible insured described in paragraph (2)(B);

(III) 73 percent in the case of an eligible insured whose household income is more than 200 percent but not more than 250 percent of the poverty line for a family of the size involved; and

(IV) 70 percent in the case of an eligible insured whose household income is more than 250 percent but not more than 400 percent of the poverty line for a family of the size involved.

**(ii) Adjustment**

The Secretary shall adjust the out-of pocket[1] limits under paragraph (1) if nec-

---

[1] So in original. Probably should be ''out-of-pocket''.

CENTERS FOR MEDICARE AND MEDICAID SERVICES

GRANTS TO STATES FOR MEDICAID

For carrying out, except as otherwise provided, titles XI and XIX of the Social Security Act, $177,872,985,000, to remain available until expended.

For making, after May 31, 2014, payments to States under title XIX or in the case of section 1928 on behalf of States under title XIX of the Social Security Act for the last quarter of fiscal year 2014 for unanticipated costs incurred for the current fiscal year, such sums as may be necessary.

For making payments to States or in the case of section 1928 on behalf of States under title XIX of the Social Security Act for the first quarter of fiscal year 2015, $103,472,323,000, to remain available until expended.

Payment under such title XIX may be made for any quarter with respect to a State plan or plan amendment in effect during such quarter, if submitted in or prior to such quarter and approved in that or any subsequent quarter.

PAYMENTS TO HEALTH CARE TRUST FUNDS

For payment to the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund, as provided under sections 217(g), 1844, and 1860D–16 of the Social Security Act, sections 103(c) and 111(d) of the Social Security Amendments of 1965, section 278(d)(3) of Public Law 97–248, and for administrative expenses incurred pursuant to section 201(g) of the Social Security Act, $255,185,000,000.

In addition, for making matching payments under section 1844 and benefit payments under section 1860D–16 of the Social Security Act that were not anticipated in budget estimates, such sums as may be necessary.

PROGRAM MANAGEMENT

For carrying out, except as otherwise provided, titles XI, XVIII, XIX, and XXI of the Social Security Act, titles XIII and XXVII of the PHS Act, the Clinical Laboratory Improvement Amendments of 1988, and other responsibilities of the Centers for Medicare and Medicaid Services, not to exceed $3,669,744,000, to be transferred from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund, as authorized by section 201(g) of the Social Security Act; together with all funds collected in accordance with section 353 of the PHS Act and section 1857(e)(2) of the Social Security Act, funds retained by the Secretary pursuant to section 302 of the Tax Relief and Health Care Act of 2006; and such sums as may be collected from authorized user fees and the sale of data, which shall be credited to this account and remain available until September 30, 2019: *Provided,* That all funds derived in accordance with 31 U.S.C. 9701 from organizations established under title XIII of the PHS Act shall be credited to and available for carrying out the purposes of this appropriation: *Provided further,* That the Secretary is directed to collect fees in fiscal year 2014 from Medicare Advantage organizations pursuant to section 1857(e)(2) of the Social Security Act and from eligible organizations with risk-sharing contracts

of all funds used by the Centers for Medicare and Medicaid Services specifically for Health Insurance Marketplaces for each fiscal year since the enactment of the Patient Protection and Affordable Care Act (Public Law 111–148) and the proposed uses for such funds for fiscal year 2016. Such information shall include, for each such fiscal year—

 (1) the amount of funds used for each activity specified under the heading "Health Insurance Marketplace Transparency" in the explanatory statement described in section 4 (in the matter preceding division A of this Consolidated Act) accompanying this Act; and

 (2) the milestones completed for data hub functionality and implementation readiness.

SEC. 227. None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

SEC. 228. (a) Subject to the succeeding provisions of this section, activities authorized under part A of title IV and section 1108(b) of the Social Security Act shall continue through September 30, 2015, in the manner authorized for fiscal year 2014, and out of any money in the Treasury of the United States not otherwise appropriated, there are hereby appropriated such sums as may be necessary for such purpose. Grants and payments may be made pursuant to this authority through September 30, 2015, at the level provided for such activities for fiscal year 2014, except as provided in subsections (b) and (c).

(b) In the case of the Contingency Fund for State Welfare Programs established under section 403(b) of the Social Security Act—

 (1) the amount appropriated for section 403(b) of such Act shall be $608,000,000 for each of fiscal years 2015 and 2016;

 (2) the requirement to reserve funds provided for in section 403(b)(2) of such Act shall not apply during fiscal years 2015 and 2016; and

 (3) grants and payments may only be made from such Fund for fiscal year 2015 after the application of subsection (d).

(c) In the case of research, evaluations, and national studies funded under section 413(h)(1) of the Social Security Act, no funds shall be appropriated under that section for fiscal year 2015 or any fiscal year thereafter.

42 USC 613 note.

(d) Of the amount made available under subsection (b)(1) for section 403(b) of the Social Security Act for fiscal year 2015—

 (1) $15,000,000 is hereby transferred and made available to carry out section 413(h) of the Social Security Act; and

 (2) $10,000,000 is hereby transferred and made available to the Bureau of the Census to conduct activities using the Survey of Income and Program Participation to obtain information to enable interested parties to evaluate the impact of the amendments made by title I of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996.

ACA, and the amendments made by that Act, in the proposed fiscal year and each fiscal year since the enactment of the ACA.

(b) With respect to employees or contractors supported by all funds appropriated for purposes of carrying out the ACA (and the amendments made by that Act), the Secretary shall include, at a minimum, the following information:

(1) For each such fiscal year, the section of such Act under which such funds were appropriated, a statement indicating the program, project, or activity receiving such funds, the Federal operating division or office that administers such program, and the amount of funding received in discretionary or mandatory appropriations.

(2) For each such fiscal year, the number of full-time equivalent employees or contracted employees assigned to each authorized and funded provision detailed in accordance with paragraph (1).

(c) In carrying out this section, the Secretary may exclude from the report employees or contractors who—

(1) are supported through appropriations enacted in laws other than the ACA and work on programs that existed prior to the passage of the ACA;

(2) spend less than 50 percent of their time on activities funded by or newly authorized in the ACA; or

(3) work on contracts for which FTE reporting is not a requirement of their contract, such as fixed-price contracts.

SEC. 223. The Secretary shall publish, as part of the fiscal year 2017 budget of the President submitted under section 1105(a) of title 31, United States Code, information that details the uses of all funds used by the Centers for Medicare and Medicaid Services specifically for Health Insurance Exchanges for each fiscal year since the enactment of the ACA and the proposed uses for such funds for fiscal year 2017. Such information shall include, for each such fiscal year, the amount of funds used for each activity specified under the heading "Health Insurance Exchange Transparency" in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act).

SEC. 224. (a) The Secretary shall provide to the Committees on Appropriations of the House of Representatives and the Senate:

(1) Detailed monthly enrollment figures from the Exchanges established under the Patient Protection and Affordable Care Act of 2010 pertaining to enrollments during the open enrollment period; and

(2) Notification of any new or competitive grant awards, including supplements, authorized under section 330 of the Public Health Service Act.

(b) The Committees on Appropriations of the House and Senate must be notified at least 2 business days in advance of any public release of enrollment information or the award of such grants.

SEC. 225. None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).



H. R. 244

# One Hundred Fifteenth Congress
## of the
## United States of America

### AT THE FIRST SESSION

*Begun and held at the City of Washington on Tuesday,*
*the third day of January, two thousand and seventeen*

## An Act

Making appropriations for the fiscal year ending September 30, 2017, and for
other purposes.

*Be it enacted by the Senate and House of Representatives of*
*the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Consolidated Appropriations
Act, 2017".

**SEC. 2. TABLE OF CONTENTS.**

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.
Sec. 4. Explanatory statement.
Sec. 5. Statement of appropriations.
Sec. 6. Availability of funds.
Sec. 7. Technical allowance for estimating differences.
Sec. 8. Correction.

DIVISION A—AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG
ADMINISTRATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2017

Title I—Agricultural Programs
Title II—Conservation Programs
Title III—Rural Development Programs
Title IV—Domestic Food Programs
Title V—Foreign Assistance and Related Programs
Title VI—Related Agency and Food and Drug Administration
Title VII—General Provisions

DIVISION B—COMMERCE, JUSTICE, SCIENCE, AND RELATED AGENCIES
APPROPRIATIONS ACT, 2017

Title I—Department of Commerce
Title II—Department of Justice
Title III—Science
Title IV—Related Agencies
Title V—General Provisions

DIVISION C—DEPARTMENT OF DEFENSE APPROPRIATIONS ACT, 2017

Title I—Military Personnel
Title II—Operation and Maintenance
Title III—Procurement
Title IV—Research, Development, Test and Evaluation
Title V—Revolving and Management Funds
Title VI—Other Department of Defense Programs
Title VII—Related Agencies
Title VIII—General Provisions
Title IX—Overseas Contingency Operations/Global War on Terrorism
Title X—Department of Defense—Additional Appropriations

DIVISION D—ENERGY AND WATER DEVELOPMENT AND RELATED
AGENCIES APPROPRIATIONS ACT, 2017

Title I—Corps of Engineers—Civil

H. R. 244—409

such fiscal year, the amount of funds used for each activity specified under the heading "Health Insurance Exchange Transparency" in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act).

SEC. 222. (a) The Secretary shall provide to the Committees on Appropriations of the House of Representatives and the Senate:

(1) Detailed monthly enrollment figures from the Exchanges established under the Patient Protection and Affordable Care Act of 2010 pertaining to enrollments during the open enrollment period; and

(2) Notification of any new or competitive grant awards, including supplements, authorized under section 330 of the Public Health Service Act.

(b) The Committees on Appropriations of the House and Senate must be notified at least 2 business days in advance of any public release of enrollment information or the award of such grants.

SEC. 223. None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

SEC. 224. In addition to the amounts otherwise available for "Centers for Medicare and Medicaid Services, Program Management", the Secretary of Health and Human Services may transfer up to $305,000,000 to such account from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund to support program management activity related to the Medicare Program: *Provided*, That except for the foregoing purpose, such funds may not be used to support any provision of Public Law 111–148 or Public Law 111–152 (or any amendment made by either such Public Law) or to supplant any other amounts within such account.

SEC. 225. The Secretary shall include in the fiscal year 2018 budget justification an analysis of how section 2713 of the PHS Act will impact eligibility for discretionary HHS programs.

SEC. 226. Effective during the period beginning on November 1, 2015 and ending January 1, 2019, any provision of law that refers (including through cross-reference to another provision of law) to the current recommendations of the United States Preventive Services Task Force with respect to breast cancer screening, mammography, and prevention shall be administered by the Secretary involved as if—

(1) such reference to such current recommendations were a reference to the recommendations of such Task Force with respect to breast cancer screening, mammography, and prevention last issued before 2009; and

(2) such recommendations last issued before 2009 applied to any screening mammography modality under section 1861(jj) of the Social Security Act (42 U.S.C. 1395x(jj)).

This title may be cited as the "Department of Health and Human Services Appropriations Act, 2017".

the applicable benefit year the national contribution rate and the proportion of contributions collected under the national contribution rate to be allocated to:

(1) Reinsurance payments;

(2) Payments to the U.S. Treasury as described in paragraph (b)(2) of this section; and

(3) Administrative expenses of the applicable reinsurance entity or HHS when performing reinsurance functions under this subpart.

(d) *Additional State collections.* If a State establishes a reinsurance program:

(1) The State may elect to collect more than the amounts that would be collected based on the national contribution rate set forth in the annual HHS notice of benefit and payment parameters for the applicable benefit year to provide:

(i) Funding for administrative expenses of the applicable reinsurance entity; or

(ii) Additional funds for reinsurance payments.

(2) A State may use additional funds which were not collected as additional reinsurance contributions under this part for reinsurance payments under the State supplemental payment parameters under § 153.232.

[77 FR 17245, Mar. 23, 2012, as amended at 77 FR 29236, May 17, 2012, 78 FR 15525, Mar. 11, 2013; 78 FR 66655, Nov. 6, 2013]

**§ 153.230 Calculation of reinsurance payments made under the national contribution rate.**

(a) *Eligibility for reinsurance payments under the national reinsurance parameters.* A health insurance issuer of a reinsurance-eligible plan becomes eligible for reinsurance payments from contributions collected under the national contribution rate when its claims costs for an individual enrollee's covered benefits in a benefit year exceed the national attachment point.

(b) *National reinsurance payment parameters.* The national reinsurance payment parameters for each benefit year commencing in 2014 and ending in 2016 set forth in the annual HHS notice of benefit and payment parameters for each applicable benefit year will apply with respect to reinsurance payments

made from contributions received under the national contribution rate.

(c) *National reinsurance payments.* Each reinsurance payment made from contributions received under the national contribution rate will be calculated as the product of the national coinsurance rate multiplied by the health insurance issuer's claims costs for an individual enrollee's covered benefits that the health insurance issuer incurs in the applicable benefit year between the national attachment point and the national reinsurance cap.

(d) *Uniform adjustment to national reinsurance payments.* If HHS determines that all reinsurance payments requested under the national payment parameters from all reinsurance-eligible plans in all States for a benefit year will not be equal to the amount of all reinsurance contributions collected for reinsurance payments under the national contribution rate in all States for an applicable benefit year, HHS will determine a uniform pro rata adjustment to be applied to all such requests for reinsurance payments for all States. Each applicable reinsurance entity, or HHS on behalf of a State, must reduce or increase the reinsurance payment amounts for the applicable benefit year by any adjustment required under this paragraph (d).

[78 FR 15526, Mar. 11, 2013, as amended at 78 FR 66655, Nov. 6, 2013; 79 FR 13835, Mar. 11, 2014]

**§ 153.232 Calculation of reinsurance payments made under a State additional contribution rate.**

(a) *State supplemental reinsurance payment parameters.* (1) If a State establishes a reinsurance program and elects to collect additional contributions under § 153.220(d)(1)(ii) or use additional funds for reinsurance payments under § 153.220(d)(2), the State must set supplemental reinsurance payment parameters using one or more of the following methods:

(i) Decreasing the national attachment point;

(ii) Increasing the national reinsurance cap; or

(iii) Increasing the national coinsurance rate.

(2) The State must ensure that additional reinsurance contributions and

§155.20 of this subchapter) provided that such differences are tied directly and exclusively to Federal or State requirements or prohibitions on the coverage of benefits that apply differently to plans depending on whether they are offered through or outside an Exchange.

*Risk corridors* means any payment adjustment system based on the ratio of allowable costs of a plan to the plan's target amount.

*Target amount* means, with respect to a QHP, an amount equal to the total premiums earned with respect to a QHP, including any premium tax credit under any governmental program, reduced by the allowable administrative costs of the plan.

*Taxes and regulatory fees* mean, with respect to a QHP, Federal and State licensing and regulatory fees paid with respect to the QHP as described in §158.161(a) of this subchapter, and Federal and State taxes and assessments paid with respect to the QHP as described in §158.162(a)(1) and (b)(1) of this subchapter.

[77 FR 17248, Mar. 23, 2012, as amended at 78 FR 15530, 15550, Mar. 11, 2013; 78 FR 54133, Aug. 30, 2013]

### §153.510  Risk corridors establishment and payment methodology.

(a) *General requirement.* A QHP issuer must adhere to the requirements set by HHS in this subpart and in the annual HHS notice of benefit and payment parameters for the establishment and administration of a program of risk corridors for calendar years 2014, 2015, and 2016.

(b) *HHS payments to health insurance issuers.* QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:

(1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and

(2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(c) *Health insurance issuers' remittance of charges.* QHP issuers must remit charges to HHS in the following amounts, under the following circumstances:

(1) If a QHP's allowable costs for any benefit year are less than 97 percent but not less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and

(2) When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the difference between 92 percent of the target amount and the allowable costs.

(d) *Charge submission deadline.* A QHP issuer must remit charges to HHS within 30 days after notification of such charges.

[77 FR 17248, Mar. 23, 2012, as amended at 78 FR 15530, Mar. 11, 2013]

### §153.520  Attribution and allocation of revenue and expense items.

(a) *Attribution to QHP.* Each item of revenue or expense in the target amount with respect to a QHP must be reasonably attributable to the operation of the QHP, with the attribution based on a generally accepted accounting method, consistently applied. To the extent that an issuer utilizes a specific method for allocating expenses for purposes of §158.170 of this subchapter, the method used for purposes of this paragraph must be consistent.

(b) *Allocation across plans.* Each item of revenue or expense in the target amount must be reasonably allocated across a QHP issuer's plans, with the allocation based on a generally accepted accounting method, consistently applied. To the extent that an issuer utilizes a specific method for allocating expenses for purposes of §158.170 of this subchapter, the method used for purposes of this paragraph must be consistent.

**Department of Health and Human Services**                    **§ 153.530**

charges to HHS in the following amounts, under the following circumstances:

(1) If a QHP's allowable costs for any benefit year are less than 97 percent but not less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and

(2) When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the difference between 92 percent of the target amount and the allowable costs.

(d) *Charge submission deadline.* A QHP issuer must remit charges to HHS within 30 days after notification of such charges.

(e) A QHP issuer is not subject to the provisions of this subpart with respect to a stand-alone dental plan.

(f) *Eligibility under health insurance market rules.* The provisions of this subpart apply only for plans offered by a QHP issuer in the SHOP or the individual or small group market, as determined according to the employee counting method applicable under State law, that are subject to the following provisions: §§ 147.102, 147.104, 147.106, 147.150, 156.80, and subpart B of part 156 of this subchapter.

[77 FR 17248, Mar. 23, 2012, as amended at 78 FR 15530, Mar. 11, 2013; 78 FR 65094, Oct. 30, 2013; 79 FR 13836, Mar. 11, 2014]

**§ 153.520  Attribution and allocation of revenue and expense items.**

(a) *Attribution to plans.* Each item of expense in the target amount with respect to a QHP must be reasonably attributable to the operation of the QHP issuer's non-grandfathered health plans in a market within a State, with the attribution based on a generally accepted accounting method, consistently applied. To the extent that a QHP issuer utilizes a specific method for allocating expenses for purposes of § 158.170 of this subchapter, the method used for purposes of this paragraph must be consistent.

(b) *Allocation across plans.* Each item of expense in the target amount must reflect an amount equal to the pro rata portion of the aggregate amount of such expense across all of the QHP issuer's non-grandfathered health plans in a market within a State, allocated to the QHP based on premiums earned.

(c) *Disclosure of attribution and allocation methods.* A QHP issuer must submit to HHS a report, in the manner and timeframe specified in the annual HHS notice of benefit and payment parameters, with a detailed description of the methods and specific bases used to perform the attributions and allocations set forth in paragraphs (a) and (b) of this section.

(d) *Attribution of reinsurance and risk adjustment to benefit year.* A QHP issuer must attribute reinsurance payments and risk adjustment payments and charges to allowable costs for the benefit year with respect to which the reinsurance payments or risk adjustment calculations apply.

(e) *Maintenance of records.* A QHP issuer must maintain documents and records, whether paper, electronic, or in other media, sufficient to enable the evaluation of the issuer's compliance with applicable risk corridors standards, for each benefit year for at least 10 years, and must make those documents and records available upon request from HHS, the OIG, the Comptroller General, or their designees, to any such entity, for purposes of verification, investigation, audit or other review.

[77 FR 17248, Mar. 23, 2012, as amended at 78 FR 15530, 15550, Mar. 11, 2013; 78 FR 65094, Oct. 30, 2013]

**§ 153.530  Risk corridors data requirements.**

(a) *Premium data.* A QHP issuer must submit to HHS data on the premiums earned with respect to each QHP that the issuer offers in a manner specified by HHS.

(b) *Allowable costs.* A QHP issuer must submit to HHS data on the allowable costs incurred with respect to the QHP issuer's non-grandfathered health plans in a market within a State in a manner specified by HHS. For purposes of this subpart, allowable costs must be —

(1) Increased by any risk adjustment charges paid by the issuer for the non-grandfathered health plans under the

907

**A19**

risk adjustment program established under subpart D of this part.

(2) Reduced by —

(i) Any risk adjustment payments received by the issuer for the non-grandfathered health plans under the risk adjustment program established pursuant to subpart D of this part;

(ii) Any reinsurance payments received by the issuer for the non-grandfathered health plans under the transitional reinsurance program established pursuant to subpart C of this part; and

(iii) Any cost-sharing reduction payments received by the issuer for the QHP issuer's QHPs in a market within a State to the extent not reimbursed by the provider furnishing the item or service.

(c) *Allowable administrative costs.* A QHP issuer must submit to HHS data on the allowable administrative costs incurred with respect to the QHP issuer's non-grandfathered health plans in a market within a State in a manner specified by HHS.

(d) *Timeframes.* For each benefit year, a QHP issuer must submit all information required under paragraphs (a) through (c) of this section by July 31 of the year following the benefit year.

(e) *Requirement to submit enrollment data for risk corridors adjustment.* A health insurance issuer in the individual or small group market of a transitional State must submit, in a manner and timeframe specified by HHS, the following:

(1) A count of its total enrollment in the individual market and small group market; and

(2) A count of its total enrollment in individual market and small group market policies that meet the criteria for transitional policies outlined in the CMS letter dated November 14, 2013.

[77 FR 17248, Mar. 23, 2012, as amended at 78 FR 15531, Mar. 11, 2013; 78 FR 65094, Oct. 30, 2013; 79 FR 13836, Mar. 11, 2014; 79 FR 37662, July 2, 2014]

### § 153.540 Compliance with risk corridors standards.

HHS or its designee may audit a QHP issuer to assess its compliance with the requirements of this subpart. HHS will conduct an audit in accordance with the procedures set forth in § 158.402(a) through (e) of this subchapter.

[79 FR 13836, Mar. 11, 2014]

## Subpart G—Health Insurance Issuer Standards Related to the Risk Adjustment Program

### § 153.600  [Reserved]

### § 153.610  Risk adjustment issuer requirements.

(a) *Data requirements.* An issuer that offers risk adjustment covered plans must submit or make accessible all required risk adjustment data for those risk adjustment covered plans in accordance with the risk adjustment data collection approach established by the State, or by HHS on behalf of the State.

(b) *Risk adjustment data storage.* An issuer that offers risk adjustment covered plans must store all required risk adjustment data in accordance with the risk adjustment data collection approach established by the State, or by HHS on behalf of the State.

(c) *Issuer contracts.* An issuer that offers risk adjustment covered plans may include in its contract with a provider, supplier, physician, or other practitioner, provisions that require such contractor's submission of complete and accurate risk adjustment data in the manner and timeframe established by the State, or HHS on behalf of the State. These provisions may include financial penalties for failure to submit complete, timely, or accurate data.

(d) *Assessment of charges.* An issuer that offers risk adjustment covered plans that has a net balance of risk adjustment charges payable, including adjustments made pursuant to § 153.350(c), will be notified by the State, or by HHS on behalf of the State, of those net charges, and must remit those risk adjustment charges to the State, or to HHS on behalf of the State, as applicable.

(e) *Charge submission deadline.* An issuer must remit net charges to the State, or HHS on behalf of the State, within 30 days of notification of net charges payable by the State, or HHS on behalf of the State.

(f) *Assessment and collection of user fees for HHS risk adjustment operations.*

**ADDENDUM: OPINION AND JUDGMENT**

# In the United States Court of Federal Claims

No. 16-651C
Filed: April 18, 2017
FOR PUBLICATION

|  |  |  |
|---|---|---|
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, | ) ) ) | |
| Plaintiff, | ) ) | The Patient Protection and Affordable Care Act; Risk Corridors; RCFC 12(b)(1), |
| v. | ) ) | Subject-matter Jurisdiction; RCFC 12(b)(6), Failure to State a Claim; |
| THE UNITED STATES, | ) ) | Ripeness. |
| Defendant. | ) ) | |

*Lawrence S. Sher*, Counsel of Record, Reed Smith LLP, Washington, DC; *Kyle R. Bahr*, Of Counsel, *Conor M. Shaffer*, Of Counsel, Reed Smith LLP, Pittsburgh, PA, for plaintiff.

*Charles E. Cantor*, Counsel of Record, *L. Misha Preheim*, Trial Attorney, *Frances M. McLaughlin*, Trial Attorney, *Marc S. Sacks*, Trial Attorney, *Terrance A. Mebane*, Trial Attorney, *Kirk T. Manhardt*, Deputy Director, *Ruth A. Harvey*, Director, *Chad A. Readler*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

GRIGGSBY, Judge

## I. INTRODUCTION

Plaintiff, Blue Cross and Blue Shield of North Carolina ("Blue Cross"), brings this action alleging statutory, breach of contract and takings claims against the United States to recover certain payments allegedly due under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010) (the "ACA"). *See generally* Compl. The government has moved to dismiss this action for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See generally* Def. Mot. For the reasons discussed below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to dismiss.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background[1]

#### 1.     Overview

Plaintiff, Blue Cross, brings this action alleging statutory, breach of contract and takings claims against the government to recover certain payments allegedly due under the ACA's Risk Corridors Program. *See generally* Compl. The Risk Corridors Program is a three-year, temporary premium stabilization program, in which the government and Qualified Health Plans ("QHPs"), like Blue Cross, "share in the risk associated with the new marketplace's uncertainty for each of the temporary program's three years: 2014, 2015 and 2016" (the "Risk Corridors Program"). *Id*. at ¶ 6; *see also id*. at 33; 42 U.S.C. § 18062. Blue Cross participated in the Risk Corridors Program during 2014, 2015 and 2016. *Id*. at ¶¶ 34-44. Under the Risk Corridors Program, Blue Cross and other QHPs may receive money from the United States Department of Health and Human Services ("HHS") to help reduce financial uncertainty during the initial years of the ACA. Compl. at ¶ 21. To date, Blue Cross has received only a portion of such payments for 2014 (the "Risk Corridors Program Payments").[2] Compl. at ¶¶ 135-36.

Blue Cross asserts five claims in the complaint to recover the full amount of its 2014 Risk Corridors Program Payments. First, Blue Cross alleges that the government violated Section 1342 of the ACA and its implementing regulations, 45 C.F.R. § 153.510, by failing to make full, annual Risk Corridors Program Payments to Blue Cross. *Id*. at ¶¶ 154-65. Second, Blue Cross alleges that the government also breached its QHP Agreement with the government by failing to make these payments in full, upon an annual basis. *Id*. at ¶¶ 166-79. Third, Blue

---

[1] The facts recited herein are taken from the complaint ("Compl."); the government's motion to dismiss ("Def. Mot."); the appendix to the government's motion to dismiss ("Def. App."); plaintiff's response thereto ("Pl. Opp."); and the government's reply brief ("Def. Reply"). Unless otherwise stated herein, the facts are undisputed.

[2] Plaintiff's Risk Corridors Program Payments and the governments pro-rated payment amounts for calendar year 2014 are as follows:

| Plaintiff | State / Market | Risk Corridor Amount | Prorated Amount | Percent Pro Rata |
|---|---|---|---|---|
| BCBSNC | NC / Individual | $147,421,876.38 | $18,601,495.60 | 12.6% |
| BCBSNC | NC / Small Group | $53,091.97 | $6,699.07 | 12.6% |

Compl. at ¶ 135.

Cross contends that the government also breached implied-in-fact contracts with Blue Cross to make full, annual Risk Corridors Program Payments. *Id*. at ¶¶ 180-98.

In addition, Blue Cross contends that the government breached the covenant of good faith and fair dealing implied in its alleged express and implied contracts with the government, by failing to make these payments. *Id*. at ¶¶ 199-210. Lastly, Blue Cross alleges that the government has improperly taken its property interest in a statutory, regulatory and contractual right to receive full, annual Risk Corridors Program Payments, in violation of the Fifth Amendment of the United States Constitution. *Id*. at ¶¶ 211-18. Blue Cross also requests that the Court declare that the government must make full, annual Risk Corridors Program Payments for calendar years 2015 and 2016. Compl. at Prayer for Relief.

### 2. The Affordable Care Act

As background, Congress enacted the Patient Protection and Affordable Care Act in 2010. *See* Pub. L. No. 111-148. The goal of the ACA is to increase access to affordable, quality health insurance coverage for all Americans. *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015).

The ACA contains three key reforms to the health insurance system: (1) to prohibit health insurance companies from denying coverage or setting premiums based upon health status or medical history; (2) to require individuals to maintain health insurance coverage or make a payment to the Internal Revenue Service; and (3) to provide federal insurance subsidies in the form of premium tax credits and cost sharing reductions to make insurance more affordable to eligible consumers. *Id*. at 2486-87 (citing 42 U.S.C. §§ 300gg, 300gg–1(a), 18081-82, 18091 (2016); 26 U.S.C. §§ 36B, 5000A (2016)); *see also* 42 U.S.C. § 18071 (2016). To implement the aforementioned reforms, the ACA creates American Health Benefit Exchanges ("Exchanges"), which are virtual marketplaces in each state where individuals and small groups can purchase health insurance coverage. 42 U.S.C. §§ 18031-41 (2016). The Exchanges provide, among other things, a centralized location for consumers to enroll in qualified health plans and competitive marketplaces for insurers to compete for business. *Id.*

All plans offered through the Exchanges must be QHPs, meaning that such a plan must provide "essential health benefits" and comply with other regulatory parameters such as provider network requirements, benefit design rules, and cost sharing limitations. *See* 42 U.S.C. § 18021;

45 C.F.R. §§ 155-56.  As part of the process to ensure that issuers that participate in the Exchanges comply with the ACA's requirements, HHS requires issuers to, among other things, execute an agreement known as a "Qualified Health Plan Certification Agreement and Privacy and Security Agreement" (the "QHP Agreement").  45 C.F.R. § 155.260(b)(2).  In the QHP Agreement, QHP issuers agree to, among other things, adhere to certain privacy and security standards when conducting transactions on the federally-facilitated Exchanges.  *Id.*; *see e.g.*, Compl. at Exs. 2-4.

### 3.  The Risk Corridors Program

Because the ACA introduced millions of previously uninsured individuals into the insurance markets, pricing uncertainties arose from the unknown health status of these additional enrollees and the fact that insurers could no longer charge higher premiums or deny coverage based upon an enrollee's health.  *See* 42 U.S.C. §§ 300gg, 300gg-1; 45 C.F.R. §§ 147.104-147.110; 78 Fed. Reg. 13406-01, 13432-33, 2013 WL 685066 (Feb. 27, 2013); Compl. at ¶¶ 4-5.  To mitigate the pricing risk and incentives for adverse selection arising from these changes, the ACA establishes three premium stabilization programs (the "3Rs") that have been modeled upon similar programs established under the Medicare Program.  *See* Compl. at ¶¶ 5, 7, 21.  The 3Rs began in 2014 and consist of the reinsurance, risk adjustment, and risk corridors programs.  *See generally* 42 U.S.C. §§ 18061-63.  The reinsurance and risk corridors programs expire after the third year of the new ACA Marketplace.  Pl. Opp. at 7.

Specifically relevant to this case, the Risk Corridors Program is authorized under Section 1342 of the ACA, which directs the Secretary of Health and Human Services (the "Secretary") to establish and administer the program under which qualifying health plans either pay money to, or receive money from, HHS based upon the ratio of insurance premiums to claims costs.  42 U.S.C. § 18062.  This program seeks to reduce financial uncertainty for QHP issuers during the initial years of the ACA.  *See* Compl. at ¶ 21.

Section 1342 provides, in pertinent part, that:

> (a) In general
>
> The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market

> shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [42 U.S.C. 1395w–101 et seq.].

42 U.S.C. § 18062(a) (brackets in original). With respect to the methodology for making the Risk Corridors Program Payments, Section 1342 also provides that:

> (b) Payment methodology
>
>> (1) Payments out
>>
>> The Secretary shall provide under the program established under subsection (a) that if—
>>
>>> (A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
>>>
>>> (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.
>>
>> (2) Payments in
>>
>> The Secretary shall provide under the program established under subsection (a) that if—
>>
>>> (A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and
>>>
>>> (B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80

> percent of the excess of 92 percent of the target
> amount over the allowable costs.

42 U.S.C. § 18062(b).  Under the payment methodology set forth in Section 1342, if a QHP issuer's allowable costs exceed the target amount by more than three percent, the issuer will receive a percentage of the difference in the form of a payment from HHS.  42 U.S.C. § 18062(b)(1).  Conversely, if a QHP issuer's allowable costs are less than the target amount by more than three percent, an issuer must pay a percentage of the difference in the form of a payment to HHS.  42 U.S.C. § 18062(b)(2).

HHS has also promulgated regulations to implement the Risk Corridors Program.  With regards to the Risk Corridors Program Payments made to QHP issuers, these regulations provide that:

> **§ 153.510 Risk corridors establishment and payment methodology.**
>
> (a) *General requirement.* A QHP issuer must adhere to the requirements set by HHS in this subpart and in the annual HHS notice of benefit and payment parameters for the establishment and administration of a program of risk corridors for calendar years 2014, 2015, and 2016.
>
> (b) *HHS payments to health insurance issuers.* QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:
>
>> (1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and
>>
>> (2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

45 C.F.R. § 153.510(a)-(b).  Under these regulations, QHP issuers must compile and submit premium and cost data and other information underlying their risk corridors calculations to HHS after the close of each benefit year, and no later than July 31 of the next calendar year.  45 C.F.R.

§ 153.530(a)-(d).  HHS uses the data provided to calculate the charges and payments due to, and from, each issuer for the preceding benefit year under the Risk Corridors Program.  *See* 45 C.F.R. § 153.530(a)-(c); HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410-01, 15,473-74, 2013 WL 865946 (Mar. 11, 2013).  Although HHS's regulations provide that QHP issuers must submit the Risk Corridors Program Payments to HHS within 30 days of HHS's announcement of final charge amounts, neither Section 1342 nor its implementing regulations provide a specific deadline for HHS to make the Risk Corridors Program Payments to QHP issuers.  *See generally* 42 U.S.C. § 18062; 45 C.F.R. § 153.510.

### 4.  HHS's Rulemaking On The Risk Corridors Program Payments

Congress did not include an appropriation or an authorization of funding for the Risk Corridors Program in the ACA.  Def. Mot. at 8; Def. Reply at 13 (citation omitted); *see also* 42 U.S.C. § 18062; United States Government Accountability Office, Opinion Letter on Department of Health & Human Services-Risk Corridors Program to former Senator Jeff Sessions and Congressman Fred Upton, 2014 WL 4825237, at *2 (Sept. 30, 2014) ("Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1).").  And so, HHS has addressed funding for the program through rulemaking.  *See, e.g.*, *Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 76 Fed. Reg. 41,930-01, 2011 WL 2728043 (proposed July 15, 2011); *Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 77 Fed. Reg. 17,220-01, 2012 WL 959270 (Mar. 23, 2012); *HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. 15,410-01, 2013 WL 865946 (Mar. 11, 2013); *HHS Notice of Benefit and Payment Parameters for 2015*, 79 Fed. Reg. 13,744-01, 13,787, 2014 WL 909454 (Mar. 11, 2014); *Exchange and Insurance Market Standards for 2015 and Beyond Final Rule*, 79 Fed. Reg. 30,240-01, 30,260, 2014 WL 2171429 (May 27, 2014); *HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. 10,750-01, 10,779, 2015 WL 799390 (Feb. 27, 2015).

In this regard, the Secretary has interpreted Section 1342 to not require that HHS make full Risk Corridors Program Payments until the end of the three-year Risk Corridors Program.  Def. Mot. at 17.  Specifically, in July 2011, HHS published a proposed rule observing that the Congressional Budget Office ("CBO") "assumed [risk corridors] collections would equal payments to plans in the aggregate," when the CBO performed a cost estimate

7

contemporaneously with ACA's passage. *Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 76 Fed. Reg. at 41,948. In the same proposed rule, HHS considered establishing deadlines for the Risk Corridors Program Payments made to issuers, as well as for the payments made to HHS. *Id.* at 41,943. But, in a final rule published on March 11, 2013, HHS established a 30-day deadline for only the Risk Corridors Program Payments that QHP issuers make to HHS. *See HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. 15410-01, 15,531, 2013 WL 865946 (Mar. 11, 2013) (codified at 45 C.F.R. § 153.510(d)).

HHS has also issued rulemaking on how to address the circumstance where payments owed by HHS exceed the collections received under the Risk Corridors Program. As background, in February 2014, the CBO issued a report providing that: "[i]n contrast [to the reinsurance and risk adjustment programs], payments and collections under the risk corridors program will not necessarily equal one another . . . ." CBO, The Budget and Economic Outlook: 2014 to 2024, at 59 (Feb. 2014), *available at* https://www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/45010-outlook2014feb0.pdf. While the CBO projected that the Risk Corridors Program would result in $8 billion in net gain to the government, the CBO's report also acknowledged that "[i]f insurers' costs exceed their expectations, on average, the risk corridor program will impose costs on the federal budget . . . ." *Id.* at 110.

On March 11, 2014, HHS issued a final rule stating that "[w]e intend to implement th[e] [risk corridors] program in a budget neutral manner, and may make future adjustments, either upward or downward to this program . . . to the extent necessary to achieve this goal." *HHS Notice of Benefit and Payment Parameters for 2015 Final Rule*, 79 Fed. Reg. at 13,787; *see also id.* at 13,829 ("HHS intends to implement this program in a budget neutral manner."); *Exchange and Insurance Market Standards for 2015 and Beyond Proposed Rule*, 79 Fed. Reg. 15,808-01, 15,822, 2014 WL 1091600 (proposed Mar. 21, 2014) (same). And so, HHS issued guidance explaining that it would make the Risk Corridors Program Payments to QHP issuers to the extent that these payments could be satisfied by the collections under the Risk Corridors Program. Compl. at Ex. 20; *see also Exchange and Insurance Market Standards for 2015 and Beyond*, 79 Fed. Reg. at 30,260; *HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. at 10,779. On April 11, 2014, HHS also advised that any shortfall in payments would result in a pro-rata reduction of all the Risk Corridors Program Payments to QHP issuers. Compl. at Ex. 20.

### 5. Relevant Appropriations Legislation

In September 2014, the United States Government Accountability Office ("GAO") responded to an inquiry from former Senator Jeff Sessions and Representative Fred Upton regarding the availability of appropriations to make the Risk Corridors Program Payments. United States Government Accountability Office, Opinion Letter on Department of Health & Human Services-Risk Corridors Program to former Senator Jeff Sessions and Congressman Fred Upton, 2014 WL 4825237, at *1 (Sept. 30, 2014). The GAO's response to this inquiry provided that "the CMS [Program Management] appropriation for FY 2014 would have been available for making the payments pursuant to section 1342(b)(1)." *Id.* at *3.

On December 9, 2014, Congress enacted the Consolidated and Further Continuing Appropriations Act, 2015 (the "2015 Appropriations Act"), which addressed the budget authority for the Risk Corridors Program. Pub. L. No. 113-235, div. G, title II (2014). The 2015 Appropriations Act expressly limited the availability of Program Management funds for the Risk Corridors Program, as follows:

> None of the funds made available by this Act from [CMS trust funds], or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

*Id.* at § 227. On December 18, 2015, Congress enacted an identical funding limitation with respect to the Risk Corridors Program in the Consolidated and Further Continuing Appropriations Act, 2016 (the "2016 Appropriations Act"). *See* Pub. L. No. 114-113, div. H, title II, § 225 (2015).

### 6. Pro-Rata Reduction Of The Risk Corridors Program Payments

Due to the spending limitations imposed by Congress, HHS reduced the amount of its Risk Corridors Program Payments to QHP issuers. Specifically, on October 1, 2015, HHS announced that collections under the Risk Corridors Program for 2014 were expected to total $362 million, while payments calculated for the program totaled $2.87 billion. Def. Mot. at 13 (citing *Centers for Medicare & Medicaid Services, Risk Corridors Payment Proration Rate for 2014* (Oct. 1, 2015)). Because the amount of payments exceeded the collections, HHS also announced that the government would pay 12.6% of the Risk Corridors Program Payments

9

during the 2015 payment cycle. *Id.* In late 2015, HHS also issued a guidance explaining that HHS would make pro-rata Risk Corridors Program Payments, with "[t]he remaining 2014 risk corridors payments . . . made from 2015 risk corridors collections [in 2016], and if necessary, 2016 collections [in 2017]." Def. Mot. at 13 (citing *Centers for Medicare & Medicaid Services, Risk Corridors Payments for the 2014 Benefit Year* (Nov. 19, 2015)); Compl. at Ex. 17

In November 2015, HHS began collecting the Risk Corridors Program Payments from QHP issuers for the 2014 benefit year. Def. Mot. at 13. In December 2015, HHS began remitting its pro-rata Risk Corridors Program Payments to QHP issuers, including Blue Cross. *Id.* at 13-14.

Although HHS is currently making pro-rata payments to QHP issuers under the Risk Corridors Program, HHS appears to have interpreted Section 1342 to require that full payments must be made. *See* 45 C.F.R. § 153.510(b) ("QHP issuers *will* receive payment from HHS . . . .") (emphasis supplied); *Exchange and Insurance Market Standards for 2015 and Beyond*, 79 Fed. Reg. at 30,260 ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers."); Compl. at Ex. 17 (same). And so, HHS has committed to using funding sources other than the risk corridors collections to satisfy these outstanding payments, subject to the availability of appropriations at the conclusion of the program. Def. Mot. at 9-10; s*ee also HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. at 10,779; *Exchange and Insurance Market Standards for 2015 and Beyond*, 79 Fed. Reg. at 30,260; *HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. at 15,473. To that end, on September 9, 2016, HHS announced that:

> As we have said previously, in the event of a shortfall for the 2016 benefit year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments. HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required.

Def. App. at A248; *id*. at A144.

### 7. Blue Cross's Risk Corridors Program Payments

To date, Blue Cross has received approximately $25 million of the Risk Corridors Program Payments that it is owed for 2014. Compl. at ¶¶ 135-38. Blue Cross submitted its calendar year 2014 risk corridors data to the Centers for Medicare and Medicaid Services ("CMS") in July 2015, and this data reflects that the government owes Blue Cross more than $140 million in Risk Corridors Program Payments for 2014. Pl. Opp. at 12. On November 2, 2015, Kevin J. Counihan, Director of CMS's Center for Consumer Information & Insurance Oversight and Chief Executive Officer of the ACA Marketplace, sent a letter to Blue Cross stating that, because the $362 million in risk corridors collections could not match the payment requests of $2.87 billion:

> [T]he remaining 2014 risk corridors claims will be paid out of 2015 risk corridors collections, and if necessary, 2016 collections. . . . . [W]e will not know the total loss or gain for the program until the fall of 2017 when the data from all three years of the program can be analyzed and verified. In the event of a shortfall for the 2016 program year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments.

Compl. at Ex. 18. Mr. Counihan also stated that HHS "recognizes that the [ACA] requires the Secretary to make full payments to issuers, and that HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligations of the United States government for which full payment is required." *Id.*

### B. Relevant Procedural Background

Plaintiff commenced this action on June 2, 2016. *See generally* Compl. On September 30, 2016, the government moved to dismiss the complaint for lack of subject-matter jurisdiction, pursuant to RCFC 12(b)(1) or, in the alternative, for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6). *See generally* Def. Mot.

On October 31, 2016, plaintiff filed an opposition to the government's motion to dismiss. *See generally* Pl. Opp. The government filed a reply in support of its motion to dismiss on November 22, 2016. *See generally* Def. Reply. On December 6, 2016 plaintiff, filed a sur-reply in support of its opposition to the government's motion to dismiss. *See generally* Pl. Sur-Reply.

On February 13, 2017, the Court directed the parties to file supplemental briefs on the following issues: (1) whether the purpose of the Risk Corridors Program may only be fulfilled by the full, annual payment of the Risk Corridors Program Payments; (2) whether HHS's proposed rule dated March 23, 2012, 77 Fed. Reg. 17220-01, 17238, 2012 WL 959270 (Mar. 23, 2012), requires that HHS provide full, annual payment of the Risk Corridors Program Payments; (3) whether the Court should dismiss Count I of the complaint pursuant to RCFC 12(b)(6), if the Court concludes that plaintiff is not entitled to "presently due money damages" under Section 1342; and (4) whether the Court should dismiss Counts II-IV of the complaint, pursuant to RCFC 12(b)(6), if the Court concludes that plaintiff is not entitled to "presently due money damages" under Section 1342.[3]  *See generally* Scheduling Order, Feb. 13, 2017.

On March 3, 2017, Blue Cross and the government filed their respective initial supplemental briefs.  Pl. Supp. Br.; Def. Supp. Br.  On March 17, 2017, Blue Cross and the government filed their respective responsive supplemental briefs.  Pl. Supp. Resp.; Def. Supp. Resp.  The Court held oral argument on the government's motion to dismiss on April 11, 2017.

The aforementioned matter having been fully briefed, the Court resolves the pending motion to dismiss.

## III.   LEGAL STANDARDS

### A.  Jurisdiction And RCFC 12(b)(1)

When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* RCFC 12(b)(1).  But, plaintiff bears the burden of establishing subject-matter jurisdiction, and plaintiff must do so by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  And so, should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim."  *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006) (citations omitted); *see also* RCFC 12(h)(3).

---

[3] HHS's rule dated March 23, 2012, is a final rule.  *See Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 77 Fed. Reg. 17220-01, 17238, 2012 WL 959270 (Mar. 23, 2012).

In this regard, the United States Court of Federal Claims is a court of limited jurisdiction and "possess[es] only that power authorized by Constitution and statute . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The Tucker Act grants the Court jurisdiction over:

> [A]ny claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act, however, is a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976) (citation omitted). And so, to pursue a claim against the United States under the Tucker Act, a plaintiff must identify and plead a money-mandating constitutional provision, statute, or regulation; an express or implied contract with the United States; or an illegal exaction of money by the United States. *Cabral v. United States*, 317 F. App'x 979, 981 (Fed. Cir. 2008) (citing *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005). "[A] statute or regulation is money-mandating for jurisdictional purposes if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'" *Fisher*, 402 F.3d at 1173 (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983)) (brackets in original).

### B. Ripeness

Even when the Court's jurisdiction over a claim has been established, the Court may not adjudicate a claim if the claim is not ripe for judicial review. *See, e.g.*, *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 772 (2017); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (citing *Howard W. Heck & Assocs., Inc. v. United States*, 134 F.3d 1468 (Fed. Cir. 1998)). To that end, "[r]ipeness is a justiciability doctrine that prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citations and internal punctuation omitted). This Court has also recognized that, while the ripeness doctrine

has been developed through Article III courts, the doctrine's principles are equally applicable in this Court. *See CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 557–58 (2000). And so,

> [a] court should dismiss a case for lack of ripeness when the case is abstract or hypothetical. . . . A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.

*Rothe Dev. Corp. v. DOD*, 413 F.3d 1327, 1335 (Fed. Cir. 2005) (quoting *Monk v. Houston*, 340 F.3d 279, 282 (5th Cir. 2003)) (ellipsis existing).

In determining whether a dispute is ripe for review, the Court must evaluate two factors: "(1) the 'fitness' of the disputed issues for judicial resolution; and (2) 'the hardship to the parties of withholding court consideration.'" *Shinnecock*, 782 F.3d at 1348 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1383-84 (Fed. Cir. 2012)). Under the first prong, "an action is fit for judicial review where further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'" *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1295 (Fed. Cir. 2008) (citing *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)) (bracket existing). Under the second prong, "withholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." *Id.* (citing *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967)).

### C. RCFC 12(b)(6)

When deciding a motion to dismiss based upon failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6), this Court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the non-movant's favor. *Erickson*, 551 U.S. at 94; *see also* RCFC 12(b)(6). To survive a motion to dismiss pursuant to RCFC 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). And so, when the complaint fails to "state a claim to relief that is plausible on its face," the Court must dismiss the complaint. *Iqbal*, 556 U.S. at 678 (citation omitted). On the other hand, "[w]hen there are well-pleaded factual

allegations, a court should assume their veracity" and determine whether it is plausible, based upon these facts, to find against defendant. *Id*. at 679.

### D. Statutory Interpretation

When interpreting a statute, the Court must "start[] with the plain language." *Barela v. Shinseki*, 584 F.3d 1379, 1382-83 (Fed. Cir. 2009) (citation omitted). Statutes are not, however, interpreted in a vacuum and the Court "must consider not only the bare meaning of each word but also the placement and purpose of the language within the statutory scheme." *Id.* at 1383 (citation omitted). And so, a statute's meaning, regardless of whether the language is "plain or not, thus depends on context." *Id.* (citation omitted)

Generally, this Court must defer to an agency's interpretation of ambiguous statutory provisions, provided that the interpretation is reasonable. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). When the Court reviews an agency's construction of a statute which it administers, the Court is confronted with two questions. First, the Court examines "whether Congress has directly spoken to the precise question at issue." *Id*. at 842. If so, the Court "must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43; *see also Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1362 (Fed. Cir. 2005). If the statute is ambiguous, the Court must proceed to step two and examine "whether the agency responsible for filling a gap in the statute has rendered an interpretation that is based on a permissible construction of the statute." *Doe v. United States*, 372 F.3d 1347, 1358 (Fed. Cir. 2004) (citations omitted); *see also Cathedral Candle Co.*, 400 F.3d at 1364-65. And so, this standard of deference should apply, where "Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'" *Cathedral Candle Co.,* 400 F.3d at 1361 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)).

In addition, courts generally accord *Chevron* deference when Congress has authorized an administrative agency to engage in rulemaking or adjudication that produces regulations or rulings for which the deference is claimed. *Chevron*, 467 U.S. at 1361. And so, in this instance, an agency's interpretation of its own regulations is also entitled to broad deference from the Court. *Id*. at 1363-64.

### E.  Contract Claims Against The Government

To bring a valid contract claim against the United States in this Court, the underlying contract must be either express or implied-in-fact.  *Aboo v. United States*, 86 Fed. Cl. 618, 626-27 (2009).  In addition, plaintiff bears the burden of proving the existence of a contract with the United States, and a plaintiff must show that there is "something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights."  *D & N Bank v. United States*, 331 F.3d 1374, 1377 (Fed. Cir. 2003).  To establish the existence of either an express or implied-in-fact contract with the United States, a plaintiff must show:  (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon.  *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012); *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).  A government official's authority to bind the United States must be express or implied.  *Roy v. United States*, 38 Fed. Cl. 184, 188-89, *dismissed*, 124 F.3d 224 (Fed. Cir. 1997).  And so, "the [g]overnment, unlike private parties, cannot be bound by the apparent authority of its agents."  *Id.* at 187.

In this regard, a government official possesses express actual authority to bind the United States in contract "only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms."  *Jumah v. United States*, 90 Fed. Cl. 603, 612 (2009) *aff'd*, 385 F. App'x 987 (Fed. Cir. 2010) (internal citations omitted); *see also City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (citation omitted).  On the other hand, a government official possesses implied actual authority to bind the United States in contract "when the employee cannot perform his assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees."  *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2007) (citations omitted); *see also Aboo*, 86 Fed. Cl. at 627 (implied actual authority "is restricted to situations where 'such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.'") (quoting *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989)).  In addition, when a government agent does not possess express or implied actual authority to bind the United States in contract, the government

16

can still be bound by contract if the contract was ratified by an official with the necessary authority. *Janowsky v. United States*, 133 F.3d 888, 891–92 (Fed. Cir. 1998).[4]

### F. Takings Claims

Lastly, this Court may consider takings claims under the Fifth Amendment of the United States Constitution. *See* 28 U.S.C. § 1491; U.S. CONST. amend. V; *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("[T]he Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."); *see also Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1304 (Fed. Cir. 2008) (citing *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998)). The Takings Clause of the Fifth Amendment guarantees just compensation whenever private property is "taken" for public use. U.S. CONST. amend. V. And so, the purpose of the Fifth Amendment is to prevent the "[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 123 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)); *see also Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1571 (Fed. Cir. 1994).

To have a cause of action for a Fifth Amendment takings, a plaintiff must point to a protectable property interest that is asserted to be the subject of the takings. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'") (citation omitted). In this regard, contract rights can be the subject of a takings action. *See e.g.*, *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."); *see also United*

---

[4] Ratification may take place at the individual or institutional level. *SGS-92-X003*, 74 Fed. Cl. at 653-54. Individual ratification occurs when a supervisor: (1) possesses the actual authority to contract; (2) fully knew the material facts surrounding the unauthorized action of his or her subordinate; and (3) knowingly confirmed, adopted, or acquiesced to the unauthorized action of the subordinate. *Id.* at 654 (quoting *Leonardo v. United States*, 63 Fed. Cl. 552, 560 (2005)). In contrast, institutional ratification occurs when the government "seeks and receives the benefits from an otherwise unauthorized contract." *SGS-92-X003*, 74 Fed. Cl. at 654; *see also Janowsky v. United States*, 133 F.3d 888, 891–92 (Fed. Cir. 1998).

*States v. Petty Motor Co.*, 327 U.S. 372, 380-81 (1946) (holding that plaintiff was entitled to compensation for government's takings of an option to renew a lease).

## IV.  LEGAL ANALYSIS

The government has moved to dismiss this matter for several reasons.  First, the government argues that the Court should dismiss Blue Cross's claim based upon Section 1342 and its implementing regulations upon the ground that Blue Cross has no right to "presently due" money damages under these provisions, pursuant to RCFC 12(b)(1) or, alternatively, pursuant to RCFC 12(b)(6).  Def. Mot. at 14-31; Def. Supp. Br. at 5-8.  Second, the government argues that the Court should dismiss Blue Cross's statutory, breach of contract and takings claims upon the ground that these claims are not ripe, because HHS has not yet determined the total amount of the Risk Corridors Program Payments that Blue Cross will receive.  Def. Mot. at 21-22.

In addition, the government has moved to dismiss Blue Cross's statutory claim for failure to state a claim upon which relief can be granted, because Section 1342 does not mandate the Risk Corridors Program Payments in excess of amounts collected, or impose a contractual obligation upon the government.  *Id*. at 22-31; Def. Supp. Br. at 5-8.  The government has also moved to dismiss Blue Cross's contract and takings claims for failure state a claim upon which relief can be granted, because: (1) HHS has no contractual obligation to make the Risk Corridors Program Payments and (2) Blue Cross has no vested property right to full, annual Risk Corridors Program Payments.  Def. Mot. at 32-44.  Lastly, the government also seeks the dismissal of Blue Cross's request for declaratory relief in this matter, because such relief would not be collateral or incidental to a money judgment in this action.  *Id*. at 44.

For the reasons discussed below, the Court possess subject-matter jurisdiction to entertain Blue Cross's statutory, contract and takings claims.  But, Blue Cross fails to state plausible claims for relief with respect to these claims.  And so, the Court must dismiss these claims pursuant to RCFC 12(b)(6).

In addition, the Court must dismiss Blue Cross's request for declaratory relief because the relief that Blue Cross seeks is neither incidental nor collateral to any judgment for monetary relief in this matter.  RCFC 12(b)(1).  And so, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to dismiss.

### A. The Court Possesses Jurisdiction To Consider Plaintiff's Claims

#### 1. The Court May Consider Blue Cross's Statutory Claim

As an initial matter, the Court possesses jurisdiction to consider Blue Cross's claim alleging a violation of Section 1342 and its implementing regulations. *See generally* Compl. at ¶¶ 154-165. In the complaint, Blue Cross alleges that HHS has violated Section 1342 and its implementing regulations, by failing to make full, annual Risk Corridors Program Payments. *Id.*; 42 U.S.C. § 1342; 45 C.F.R. § 153.510. Because Section 1342 and its implementing regulations are money-mandating sources of law, the Court possesses jurisdiction to consider Blue Cross's claim.

It is well established that to pursue a claim for monetary relief against the government, Blue Cross must plead a money-mandating source of law. *See Cabral v. United States*, 317 F. App'x 979, 981 (Fed. Cir. 2008) (citing *Fisher*, 402 F.3d at 1172). A source is money-mandating when it "can fairly be interpreted as mandating compensation by the [government]." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citing *Mitchell*, 463 U.S. at 217). And so, a source is money-mandating if it is "reasonably amenable to the reading that it mandates a right of recovery in damages." *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 19 (2011) (quoting *White Mountain Apache Tribe*, 537 U.S. at 473). In contrast, a source is not money-mandating when it provides the government with "complete discretion" regarding whether it will make payments. *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (citations omitted); *see ARRA Energy Co. I*, 97 Fed. Cl. at 19 (noting that the determination of whether a source is money-mandating "generally turns on whether the government has discretion to refuse to make payments under that [source].").

In this case, Section 1342 provides that if "a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary *shall pay* to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount." 42 U.S.C. § 18062(b)(1) (emphasis supplied). This statute further provides that if "a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary *shall pay* to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount." *Id.* (emphasis supplied).

Section 1342's implementing regulations also provide that "[w]hen a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS *will pay* the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount" and that "[w]hen a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS *will pay* to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount." 45 C.F.R. § 153.510(b) (emphasis supplied).

The aforementioned provisions are plainly money-mandating. Indeed, the Federal Circuit has "repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating." *Agwia v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003) (citing *McBryde v. United States*, 299 F.3d 1357, 1361 (Fed. Cir. 2002); *Huston v. United States*, 956 F.2d 259, 261-62 (Fed. Cir. 1992); *Grav v. United States*, 886 F.2d 1305, 1307 (Fed. Cir. 1989)); *see also Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed. Cl. 584, 594 (2011). Because Section 1342 and its implementing regulations provide that the government "shall pay" and "will pay" the Risk Corridors Program Payments, these provisions mandate compensation by the government. 42 U.S.C. § 18062(b)(1); 45 C.F.R. § 153.510(b). And so, Section 1342 and its implementing regulations are money-mandating sources of law upon which Blue Cross may rely to establish jurisdiction.

The Court is also not persuaded by the government's argument that that the Court should dismiss plaintiff's statutory claim for lack of subject-matter jurisdiction, because Blue Cross has no right to "presently due money damages" under Section 1342 and its implementing regulations. Def. Mot. at 15-20. As the government correctly states in its motion to dismiss, the Supreme Court held in *United States v. King*, that this Court's predecessor did not possess jurisdiction to consider a claim for declaratory relief because such a claim was not limited to "actual, presently due money damages from the United States." 395 U.S. 1, 3 (1969). But, *King* is distinguishable from this case because *King* involved a claim for equitable, rather than monetary, relief. *King*, 395 U.S. at 2-3; Compl. at ¶¶ 154-218.

In addition, as this Court recently recognized in *Land of Lincoln Mut. Health Ins. Co. v. United States*, the Federal Circuit's decisions in *Todd* and *Annuity Transfers* similarly do not support dismissal of Blue Cross's statutory claim for want of jurisdiction. *Land of Lincoln Mut.*

20

**Appx20**

*Health Ins. Co. v. United States*, 129 Fed. Cl. 81, 97-98 (2016); *see also Todd v. United States*, 386 F.3d 1091, 1093-94 (Fed. Cir. 2004) (holding the Court has jurisdiction under the Tucker Act only when the money damages are "actual" and "presently due") (citing *Testan*, 424 U.S. at 398); *Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 173, 179 (2009) (holding the Court has jurisdiction under the Tucker Act only if the settlement agreement upon which plaintiff's claim rests seeks "actual, presently due money damages from the United States") (citation omitted). *Todd* and *Annuity Transfers* both involve claims against the United States based upon contracts, rather than money-mandating statutes or regulations. *See Todd*, 386 F.3d at 1093-94; *Annuity Transfers, Ltd.*, 86 Fed. Cl. at 179.[5] And so, the Court does not read these cases to require that Blue Cross establish a right to actual, presently due money damages with respect to its claim pursuant to Section 1342 and its implementing regulations to establish jurisdiction.

Because Blue Cross has identified a money-mandating statute and money-mandating regulations to support its claim here, Blue Cross has no further obligation to establish jurisdiction. And so, the Court denies the government's motion to dismiss plaintiff's statutory claim for lack of subject-matter jurisdiction. RCFC 12(b)(1).

### 2. The Court May Consider Blue Cross's Contract And Takings Claims

The Court may also consider Blue Cross's contract and takings claims. Indeed, to the extent that Blue Cross asserts non-frivolous allegations of an express or implied-in-fact contract with the government, the Court may entertain these claims so long as the claims are for "actual, presently due money damages." *Speed v. United States*, 97 Fed. Cl. 58, 66 (2011) (quoting *King*, 395 U.S. at 3).[6]

---

[5] In *Todd*, the appellants sought back pay based upon alleged breaches of a collective bargaining agreement and memorandum of understanding. *Todd v. United States*, 386 U.S. 1091, 1093 (Fed. Cir. 2004). Similarly, in *Annuity Transfers*, the plaintiff alleged a breach of a settlement agreement with the government. *Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 163, 179 (2009) (finding jurisdiction lacking under "presently due money damages" because the plaintiff brought suit to recover a lump-sum payment instead of periodic payments as provided for in the agreement with the government); *see also United States v. Testan*, 424 U.S. 392 (1976) (holding that the plaintiffs were not entitled to "presently due money damages" absent first obtaining equitable relief in the form of a retroactive classification to a higher pay grade).

[6] Unlike plaintiff's statutory claim, plaintiff's contract claims require a showing of presently due money damages to establish jurisdiction. *See Speed v. United States*, 97 Fed. Cl. 58, 66 (2011).

In Count II of the complaint Blue Cross alleges that it "entered into a valid written QHP agreement with CMS" regarding the Risk Corridors Program Payments. Compl. at ¶ 167. Blue Cross further alleges that it has implied-in fact contracts with the government regarding the Risk Corridors Program Payments, and that the government is "in breach of an implied covenant of good faith and fair dealing" under its express and implied-in-fact contracts, in Counts III and IV of the complaint. *Id.* at ¶¶ 183, 202. It is well established that the Court possesses jurisdiction to consider such claims under the Tucker Act. 28 U.S.C. § 1491(a)(1) (The Tucker Act grants this Court jurisdiction to consider claims based "upon any express or implied contract with the United States."); *Aboo*, 86 Fed. Cl. at 626-27.

The Court may similarly entertain Blue Cross's claim that the government's failure to make full, annual Risk Corridors Program Payments "constitutes a deprivation and taking of Plaintiff's property interests." Compl. at ¶ 217; s*ee* 28 U.S.C. § 1491(a)(1); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("[T]he Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000.") (citation omitted); *see also Jan's Helicopter Serv., Inc.*, 525 F.3d at 1304 (citing *Eastern Enters.*, 524 U.S. at 520). And so, the Court denies the government's motion to dismiss Blue Cross's contract and takings claims for lack of subject-matter jurisdiction.

### B.  Plaintiff's Claims Are Also Ripe

While Blue Cross has established that the Court possesses jurisdiction to consider its statutory, contract and takings claims, the Court may not adjudicate any of these claims if the claims are not ripe for judicial review. *See, e.g.*, *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 772 (2017). The government argues in its motion to dismiss that Blue Cross's claims are unripe, because no money is presently due to Blue Cross under Section 1342 and because HHS has not yet completed the data analysis for the 2015 and 2016 Risk Corridors Program Payments. Def. Mot. at 21-22. Similar to its arguments with respect to jurisdiction, the government's ripeness arguments are unavailing.

It is well established that in determining whether a dispute is ripe for review, the Court must evaluate two factors: "(1) the 'fitness' of the disputed issues for judicial resolution; and (2) 'the hardship to the parties of withholding court consideration.'" *Shinnecock*, 782 F.3d at 1348 (citing *Abbott Labs.*, 387 U.S. at 149; *Sys. Application & Techs., Inc.*, 691 F.3d at 1383-84);

*Caraco Pharm. Labs., Ltd.*, 527 F.3d at 1295 ("[A]n action is fit for judicial review where further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'") (citing *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 812 (2003)).  In this case, Blue Cross seeks to recover all of its Risk Corridors Program Payments for calendar year 2014.  Compl. at Prayer for Relief.  There is no dispute that HHS has completed the data analysis for the Risk Corridors Program Payments owed to Blue Cross for that year.  Compl. at ¶¶ 135-38; Def. Mot. at 22.  It is also without dispute that HHS has already made a portion of the payments owed to Blue Cross for 2014.  Def. Mot. at 13-14; Compl. at ¶¶ 135-36.  Given this, plaintiff's claims seeking to recover the full amount of the 2014 Risk Corridors Program Payments are neither hypothetical nor in need of further factual development.  And so, this matter is fit for judicial review.

Withholding the Court's consideration of Blue Cross's claims would also cause a hardship to Blue Cross.  As Blue Cross argues in its opposition to the government's motion to dismiss, Blue Cross is owed almost $130 million in Risk Corridors Program Payments for calendar year 2014.  Pl. Opp. at 27.  This outstanding sum certainly imposes an immediate financial hardship on Blue Cross.  *See Caraco Pharm. Labs.*, 527 F.3d at 1295 (citing *Gardner*, 387 U.S. at 171) (A hardship exists where the complained-of conduct has an "immediate and substantial impact" on a party.).  And so, Blue Cross's claims are ripe and appropriate for judicial review.

### C.  Blue Cross Fails To State Plausible Claims

#### 1.  Blue Cross Fails To State A Plausible Statutory Claim

While ripe for judicial review, Blue Cross's claim pursuant to Section 1342 and its implementing regulations fails to state a plausible claim for relief.  In the complaint, Blue Cross alleges that it is "entitled under Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b) to recover full and timely mandated risk corridor payments from the Government for CY 2014." Compl. at ¶ 160.  During oral argument, Blue Cross further clarified that it maintains that the deadline for this payment was December 2015.  Tr. 37:14-18.  And so, Blue Cross argues that "[t]he Government's failure to make full and timely risk corridor payments [by this deadline] . . . constitutes a violation and breach of the Government's mandatory payment obligations" under Section 1342(b)(1) and its implementing regulations.  *Id*. at ¶ 164; *see also* Pl. Opp. at 21-23.

The Government argues in its motion to dismiss that the Court should dismiss Blue Cross's statutory claim pursuant to RCFC 12(b)(6), because Section 1342 and its implementing regulations do not impose "a deadline for HHS to tender full risk corridor payments to [qualified health plain issuers]." Def. Mot. at 16; 22-31. The Court agrees that neither Section 1342 nor its implementing regulations impose an annual deadline for making the Risk Corridors Program Payments in full. And so, the Court dismisses this claim pursuant to RCFC 12(b)(6).

A plain reading of Section 1342 demonstrates that Congress has not directly addressed the question of the timing of the Risk Corridors Program Payments in this statute. Specifically, Section 1342(a) provides, in relevant part, that:

> In general—
>
> The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [Medicare Part D, 42 U.S.C. 1395w–101, *et seq*.].

42 U.S.C. § 18062(a). Section 1342 also provides with respect to the payment methodology under the statute that:

> Payments out
>
> The Secretary shall provide under the program established under subsection (a) that if—
>
>> (A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
>>
>> (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

*Id*. § 18062(b)(1).  The above provisions demonstrate that Section 1342 neither addresses, nor establishes, a deadline for the payment of the Risk Corridors Program Payments.  And so, this statute is silent and, thus, ambiguous with respect to the timing of the Risk Corridors Program Payments.

When it enacted the ACA, Congress delegated authority to HHS to implement Section 1342.  42 U.S.C. § 18041 ("The Secretary shall, as soon as practicable after March 23, 2010, issue regulations setting standards for meeting the requirements under this title. . . .").  And so, HHS has filled the gap in Section 1342 regarding the timing of the Risk Corridors Program Payments through agency regulations and policy.

Specifically relevant to Blue Cross's claim here, HHS has promulgated regulations to implement the government's obligation to make the Risk Corridors Program Payments to issuers.  45 C.F.R. § 153.510.  These regulations provide, in relevant part, that:

> **§ 153.510  Risk corridors establishment and payment methodology.**
>
> (b) HHS payments to health insurance issuers. QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:
>
>> (1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and
>>
>> (2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

45 C.F.R. § 153.510(b).

A plain reading of the above regulations makes clear that HHS did not establish an annual deadline for the payment of the Risk Corridors Program Payments to insurers.  In fact, these regulations simply provide that HHS will make the Risk Corridors Program Payments to issuers if certain criteria are met regarding costs.  45 C.F.R. § 153.510(b).  And so, like Section

**Appx25**

1342, these regulations provide no deadline with respect to when HHS must make the Risk Corridors Program Payments to issuers.[7]

Although Section 1342 and its implementing regulations are silent with respect to the timing of Risk Corridors Program Payments owed to issuers, HHS has addressed this issue through other agency policy. In this regard, a Risk Corridors and Budget Neutrality Bulletin from HHS, dated April 11, 2014, addresses the methodology that HHS will employ to make the Risk Corridors Program Payments owed to issuers in the event that the Risk Corridors Program collects less money than it is required to pay out under the program. Compl. at Ex. 20; Def. Mot. at 18-19. This bulletin provides, in relevant part, that:

> [I]f risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.

Compl. at Ex. 20. The bulletin also provides that:

> If, after obligations for the previous year have been met, the total amount of collections available in the current year is insufficient to make payments in that year, the current year payments will be reduced pro rata to the extent of any shortfall. If any risk corridors funds remain after prior and current year payment obligations have been met, they will be held to offset potential insufficiencies in risk corridors collections in the next year.

Id. This policy allows HHS to make pro-rata Risk Corridors Program Payments to issuers during a particular program year. But, the policy also requires that the agency to make up any shortfall in those payments during the subsequent years of the program, as additional funds are collected.

---

[7] It is also notable that although HHS has established a 30-day deadline for issuers to make Risk Corridors Program Payments to HHS, HHS declined to establish such a deadline for the Risk Corridors Program Payments that are owed to issuers. See 45 C.F.R. § 153.510(d) ("A QHP issuer must remit charges to HHS within 30 days after notification of such charges."). The absence of such a deadline with respect to the payments owed to issuers indicates that HHS did not intend to establish an annual deadline for its payment of the Risk Corridors Program Payments.

Given Congress's express and broad delegation of authority to HHS to implement the Risk Corridors Program, HHS's policy regarding the timing of the Risk Corridors Program Payments is reasonable and consistent with Section 1342. 42 U.S.C §§ 18041, 18062. The policy affords HHS the full three years of this temporary program to make up any shortfall in the Risk Corridors Program Payments as funds become available. Given the absence of a statutory deadline for making the Risk Corridors Program Payments to issuers—and the temporary nature of the Risk Corridors Program—HHS's policy is sound and consistent with Section 1342. *Chevron*, 467 U.S. at 842-43. And so, the Court concludes that HHS has no obligation under Section 1342 or its implementing regulations to pay the full amount of Blue Cross's 2014 Risk Corridors Program Payments until, at a minimum, the agency completes its calculations for payments due for the final year of the Risk Corridors Program. During oral argument, the parties acknowledged that this deadline will not occur until December 2017 or January 2018. Tr. 26: 19-25.

The Court is also not persuaded by Blue Cross's argument that the government's pro-rata Risk Corridors Program Payments pursuant to the aforementioned policy undermine the purpose of the Risk Corridors Program. Pl. Opp. at 21-23; Pl. Supp. Br. at 5-10. As the government argues in its reply brief, pro-rata Risk Corridors Program Payments satisfy the stated purpose and objectives of the Risk Corridors Program, by protecting issuers from uncertainties regarding the cost of health insurance claims during the first three years of the ACA's Exchanges. *See* Def. Reply at 9-10. In fact, Blue Cross acknowledges in the complaint that it decided to continue to participate in the Risk Corridors Program despite HHS's announcement that the government would provide only pro-rata Risk Corridors Program Payments if the collections for a particular year could not satisfy the payments due. Compl. at ¶¶ 42-43; *see also* Compl. at Ex. 3-4.

Blue Cross's argument that Section 1342 and its implementing regulations require full, annual Risk Corridors Program Payments because Section 1342 is based upon Medicare Part D is equally unavailing. Compl. at ¶¶ 7, 30; Pl. Opp. at 21-22, 30. While there is no dispute that the Risk Corridors Program is based upon Medicare Part D, this fact, alone, does not demonstrate that Congress intended for HHS to pay the Risk Corridors Program Payments owed to issuers in full, upon an annual basis. In fact, the Court is not aware of—and plaintiff has not cited to—any requirement in Section 1342 or elsewhere in the ACA that HHS must administer the Risk Corridors Program in the same manner as the Medicare Part D risk corridors program.

In addition, the fact that HHS calculates the amount of Risk Corridors Program Payments due and owed for each year under the three-year Risk Corridors Program similarly fails to establish the existence of an obligation upon the part of HHS to make full Risk Corridors Program Payments upon an annual basis. Pl. Opp. at 22. Rather, as both parties acknowledged during oral argument, any deadline for making the Risk Corridors Program Payments to issuers could be no earlier than the December of the following year, because HHS must accommodate state-operated reinsurance and risk adjustment programs and include risk adjustment and reinsurance payments received in the calculation of risk corridors charges and payments. Tr. 14:16-24, 37:14-18; Def. Mot. at 17. And so, HHS has reasonably exercised its discretion with respect to the timing of Risk Corridors Program Payments to issuers, by making a pro-rata payment and requiring that the government make up any outstanding payments owed during the subsequent years of the program.

In sum, the plain language of Section 1342 and its implementing regulations provides no deadline for HHS to make the Risk Corridors Program Payments to Blue Cross. Blue Cross conceded this point, as it must, during oral argument. Tr. 45:23-25, 46:1-2. Rather, HHS has acted reasonably and consistent with Section 1342 and its implementing regulations by making pro-rata Risk Corridors Program Payments and committing to make up any shortfall in those payments during subsequent program years. Given this, the Risk Corridors Program Payments owed to Blue Cross for calendar year 2014 are not "presently due." For this reason, the Court must dismiss Count I of the complaint. RCFC 12(b)(6).

### 2. Blue Cross Fails To State A Plausible Express Contract Claim

The Court must also dismiss Count II of the complaint, because Blue Cross fails to state a plausible express contract claim. In Count II of the complaint, Blue Cross alleges that its QHP Agreement with CMS requires that HHS make full, annual Risk Corridors Program Payments. Compl. at ¶¶ 166-79. But, a plain reading of the complaint and the QHP Agreement shows, that Blue Cross's express contract claim fails as a matter of law.

First, to the extent that Blue Cross alleges that the government is contractually obligated to make full, annual Risk Corridors Program Payments, because Section 1342 and its implementing regulations have been incorporated into its QHP Agreement, this claim is not

28

viable. As discussed above, neither Section 1342, nor its implementing regulations, require that HHS make full, annual Risk Corridors Program Payments.

In addition, the contractual provisions that Blue Cross relies upon to show that HHS is contractually obligated to make full, annual Risk Corridors Program Payments cannot be reasonably read to create such an obligation. Specifically, Blue Cross relies upon section II, paragraph d of its QHP Agreement, which pertains to the acceptance of standard rules of conduct for QHP issuers and provides in relevant part, that:

> CMS will undertake all reasonable efforts to implement systems and processes that will support QHPI functions. In the event of a major failure of CMS systems and processes, CMS will work with QHPI in good faith to mitigate any harm caused by such failure.

Compl. at Ex. 2 at § II, ¶ d. But, this provision plainly does not require that HHS make the Risk Corridors Program Payments.

Section V, paragraph g of the QHPI Agreement, upon which Blue Cross also relies, similarly fails to address, or to require full, annual Risk Corridors Program Payments. Rather, this provision pertains to governing law and provides, in relevant part, that:

> This Agreement will be governed by the laws and common law of the United States of America, including without limitation such regulations as may be promulgated from time to time by the Department of Health and Human Services or any of its constituent agencies, without regard to any conflict of laws statutes or rules.

Compl. at Ex. 2 at § V, ¶ g. Again, to the extent that this provision can be read to incorporate Section 1342 and its implementing regulations, these legal provisions do not require full, annual Risk Corridors Program Payments. And so, because no reasonable reading of the contractual provisions that Blue Cross cites would show a contractual obligation upon the part of HHS to make full, annual Risk Corridors Program Payments, the Court must dismiss Count II of the complaint. RCFC 12(b)(6).

### 3. Blue Cross Fails To State A Plausible Implied-In-Fact Contract Claim

Blue Cross similarly fails to state a viable implied-in-fact contract claim. In this regard, Blue Cross alleges that "the combination of [Section] 1342, 45 C.F.R. § 153.510, and the Government's conduct before and after Plaintiff agreed to become a QHP for CY 2014, all

support a reasonable inference that the Government entered into implied-in-fact contracts obligating it to pay CY 2014 risk corridors payments in full by the end of CY 2015." Pl. Opp. at 46; *see also* Compl. at ¶¶ 180-98. And so, Blue Cross maintains that the government materially breached these implied-in-fact contracts by failing to make full, annual Risk Corridors Program Payments. *Id*. at ¶ 197. Blue Cross's implied-in-fact contract claim is not plausible.

As an initial matter, Blue Cross's implied-in-fact contract claim is based upon Section 1342, and Blue Cross cannot overcome the general presumption that Congress did not intend for the statutory obligations set forth in Section 1342 to contractually bind the government. To allege a plausible implied-in-fact contract claim here, Blue Cross must show, among other things, mutual intent on the part of the parties to contract with respect to the Risk Corridors Program Payments. *Kam-Almaz*, 682 F.3d at 1368 (To establish the existence of either an express or implied-in-fact contract with the United States, a plaintiff must show: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon.).

This Court has also long recognized that "[t]here is a general presumption that statutes are not intended to create any vested contractual rights." *ARRA Energy Co. I*, 97 Fed. Cl. at 27 (2011). And so, to determine whether Blue Cross can overcome such a presumption here, the Court must look to the text of Section 1342 to determine whether this statute contains specific language that creates a contract. *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 631 (Fed. Cir. 2012). If not, the Court may also look to whether the circumstances surrounding the passage of Section 1342 manifest such an intent to bind the government contractually. *Id*.

Neither Section 1342 nor its implementing regulations contain language that creates a contractual obligation with respect to the Risk Corridors Program Payments. Section 1342 and its implementing regulations do mandate the payment of the Risk Corridors Program Payments under the ACA's Risk Corridors Program. But, these provisions do not contain any language to create a contractual obligation for HHS to make these payments. And so, the Court must look to the circumstances surrounding the enactment of the ACA to determine whether there is any evidence that Congress, nonetheless, intended to contractually bind the government with respect to the Risk Corridors Program Payments. *Id*.

In this regard, Blue Cross does not identify any circumstances surrounding the enactment of the ACA that would manifest an intent upon the part of Congress to contractually bind the government. Rather, Blue Cross points to "the Government's conduct before and after [Blue Cross] agreed to become a QHP for CY 2014" to show that the parties entered into implied-in-fact contracts regarding the Risk Corridors Program Payments. Pl. Sur-Reply at 17.

When this Court has previously examined whether the circumstances surrounding a statute passage manifest an intent to contract, the Court has looked to the conduct of Congress and the President in enacting and signing that statute. For example, in *ARRA Energy*, the Court considered whether Congress's intent to contract could be inferred from the conduct of Congress and the President in enacting and signing the American Recovery and Reinvestment Act. *ARRA Energy Co. I*, 97 Fed. Cl. at 27. Similarly, in *Brooks*, the Federal Circuit looked to the legislative history and other evidence during the passage of the Leahy-Smith America Invents Act, Pub. L. 112-29, 125 Stat 284 (2011), to determine whether the circumstances surrounding the passage of that statute manifested Congressional intent to contractually bind the government. *Brooks*, 702 F.3d at 631.

But, here, the alleged conduct and statements that Blue Cross relies upon to establish implied-in-fact contracts with the government occurred several years after the enactment of the ACA. Compl. at ¶¶ 89-105, 182; Pl. Opp. at 21-22. For example, Blue Cross alleges that the statements, letters and emails that it received from CMS in 2015 manifest Congressional intent to contractually bind the government. Compl. at ¶¶ 99-105, 182.[8]

---

[8] The government also argues persuasively that Blue Cross's reliance upon the United States Claims Court's decision in *New York Airways v. United States* to support its implied-in-fact contract claim is misplaced. In *New York Airways*, our predecessor Court held that the actions of the parties in that case could support the existence of an implied-in-fact contract requiring the United States Federal Aviation Administration to make certain subsidy payments to compensate helicopter companies for the transport of U.S. mail. *New York Airways v. United States,* 369 F.2d 743, 751-52 (1966). The Claims Court also held that Congressional intent to contractually bind the government for these payments could be inferred from the Independent Offices Appropriation Act and the Second Supplemental Appropriation Act for fiscal year 1965. *Id*. at 752 ("That Congress recognized the contract nature of the subsidy payments is inferred by the title 'Payments to Air Carriers (Liquidation of Contract Authorization),' which was given to the subsidy appropriations in [the appropriations legislation]."). *New York Airways* is, however, factually distinguishable from this case, because the Risk Corridors Program Payments are made in connection with administering the Risk Corridors Program, rather than payments for particular goods or services.

More importantly, even if the Court were to accept Blue Cross's allegation that it has entered into implied-in-fact contracts with the government regarding the Risk Corridors Program Payments as true, Blue Cross cannot show that the government breached such contracts in this case. As discussed above, neither Section 1342 nor its implementing regulations set an annual deadline for the Risk Corridors Program Payments. Given this, Blue Cross has not–and cannot– establish that the government breached an implied-in-fact contract based upon Section 1342 by failing to make full, annual 2014 Risk Corridors Program Payments. Def. Supp. Br. at 9; Tr. 62:18-25, 63: 1-2; RCFC 12(b)(6).

### 4. Blue Cross Fails To State A Plausible Implied Covenant Claim

Because the Court concludes that Blue Cross has not alleged plausible express or implied-in-fact contract claims in the complaint, the Court must also dismiss Blue Cross's claim for breach of the implied covenant of good faith and fair dealing. The Federal Circuit has recognized that every contract imposes upon the parties a duty of good faith and fair dealing and that the failure to fulfill that duty constitutes a breach of that contract. *Metcalf Constr. Co. v. United States,* 742 F.3d 984, 990. (Fed. Cir. 2014) (citations omitted). But, such an implied covenant cannot expand the parties' contractual duties beyond those existing in the contract, or create duties that are inconsistent with that contract. *Id.* at 991 (citation omitted).

Blue Cross alleges in Count IV of the complaint that "[b]y failing to make full and timely CY 2014 risk corridor payments to [Blue Cross], the United States . . . [is] in breach of an implied covenant of good faith and fair dealing" under its alleged express and implied-in-fact contracts. Compl. at ¶ 202. But, the absence of either an express or implied contractual obligation upon the part of HHS to make the Risk Corridors Program Payments in full, upon an annual basis, precludes Blue Cross from establishing any right under an implied covenant of good faith and fair dealing. And so, the Court must also dismiss Count IV of the complaint. RCFC 12(b)(6).

### 5. Blue Cross Fails To State A Plausible Takings Claim

The Court must also dismiss Blue Cross's takings claim, because Blue Cross cannot demonstrate that it has a cognizable property interest in full, annual Risk Corridors Program Payments. In this regard, the Federal Circuit has long held that a plaintiff must have a cognizable property interest to state a viable Fifth Amendment takings claim. *Adams v. United*

*States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004) (In evaluating a takings claim, the Court first determines whether the claimant possessed a cognizable property interest in the subject of the alleged taking for purposes of the Fifth Amendment.) (citations omitted).  While Blue Cross alleges that it "has a vested property interest in its contractual, statutory, and regulatory rights to receive" full, annual Risk Corridors Program Payments, neither Section 1342 nor its implementing regulations—nor any alleged contract by and between Blue Cross and the government—obligates the government to make full, annual Risk Corridors Program Payments. Compl. at ¶ 213.  And so, Blue Cross simply cannot show that it has a cognizable contractual, statutory, or regulatory right to receive full, annual Risk Corridors Program Payments.  RCFC 12(b)(6).

### D.    The Court May Not Consider Blue Cross's Claim For Declaratory Relief

As a final matter, the Court must also dismiss Blue Cross's request "that the Court declare, as incidental to [a] monetary judgment, that based on the Court's legal determinations as to the Government's CY 2014 risk corridor payment obligations, the Government must make full and timely CY 2015 and CY 2016 risk corridor payments to Plaintiff if Plaintiff experiences losses during those years."  Compl. at Prayer for Relief.  Such relief is not incident of, or collateral to, any monetary judgment related to Blue Cross's 2014 Risk Corridors Program Payments.

This Court has long recognized that the Tucker Act provides the Court with jurisdiction to grant equitable or declaratory relief in limited circumstances.  *See Annuity Transfers*, 86 Fed. Cl. at 181.  Relevant to the present matter, the Court may "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records" as an "incident of and collateral to" a monetary judgment.  28 U.S.C. § 1491(a)(2).  But, the declaratory relief that Blue Cross seeks here is not incident of or collateral to a monetary judgment regarding its 2014 Risk Corridors Program Payments.  Rather, such declaratory relief pertains to Risk Corridors Program Payments for 2015 and 2016, and those payments are not at issue in this litigation.[9]  In addition, the Court has determined that Blue

---

[9] During oral argument, Blue Cross informed the Court that it withdraws its claim for declaratory relief with respect to the 2016 Risk Corridors Program Payments.  Tr. 101:7-13.  Blue Cross further advised

Cross has no right to full, annual Risk Corridors Program Payments under Section 1342 and its implementing regulations. Given this, the declaratory relief that Blue Cross seeks is also unwarranted based upon the circumstances of this case. And so, the Court must also dismiss plaintiff's claim for declaratory relief.[10]

## V.  CONCLUSION

In sum, while the Court possesses jurisdiction to consider Blue Cross's statutory, contract and takings claims to recover the full amount of its Risk Corridors Program Payments for 2014 in this action, Blue Cross fails to state plausible claims for relief. As Blue Cross acknowledged during oral argument, there is no requirement in Section 1342 or its implementing regulations that HHS make these payments in full by December 2015. As a result, Blue Cross fails to show that it is entitled to presently due money damages from the government.

In reaching the decision to dismiss this action, the Court concludes only that the government has no obligation to make full, annual Risk Corridors Program Payments and that the government may continue to make up any shortfall in plaintiff's 2014 Risk Corridors Program Payments until HHS completes its data calculations and collections for the final year of the Risk Corridors Program. And so, the Court does not reach the question of whether the government may, ultimately, limit such payments to the amount of collections under that program.

Because Blue Cross's claim for declaratory relief regarding its 2015 Risk Corridors Program Payments is not incidental of or collateral to plaintiff's claim for monetary relief in this action, the Court also dismisses this claim.

---

that it would seek to amend the complaint with regards to plaintiff's request for declaratory relief regarding the 2015 Risk Corridors Program Payments. Tr. 101:13-18.

[10] Although the Court does not reach the question of whether the Risk Corridors Program Payments are an obligation to pay money under a statutory benefits program, the Federal Circuit has held that an obligation to pay money under a statutory benefit program does not create a cognizable property interest. *Adams v. United States*, 391 F.2d 1212, 1223-24 (Fed. Cir. 2004). Because the Court concludes that the government has no obligation to make full, annual Risk Corridors Program Payments under Section 1342 and its implementing regulations, and that HHS's policy with respect to the timing of those payments is reasonable and consistent with Section 1342, the Court does not reach the issue of whether Section 1342 mandates Risk Corridors Program Payments in excess of collections.

And so, for the foregoing reasons, the Court:

1.   **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to dismiss; and

2.   **DISMISSES** the complaint.

The Clerk shall enter judgment accordingly.

The parties shall bear their own costs.

 **IT IS SO ORDERED.**

<div align="right">

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge

</div>

35

# In the United States Court of Federal Claims

### No. 16-651 C

**BLUE CROSS AND BLUE SHIELD OF**
**NORTH CAROLINA,**

        **Plaintiff,**

              **JUDGMENT**

        **v.**

**THE UNITED STATES,**

        **Defendant.**

        Pursuant to the court's Memorandum Opinion and Order filed April 18, 2017, granting-in-part and denying-in-part defendant's motion to dismiss,

        IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed.  The parties shall bear their own costs.

                        Lisa L. Reyes
                        Acting Clerk of Court

**April 18, 2017**          By:    s/ Anthony Curry

                        Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. Cir. R. 32(a) because it contains 13,807 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(1).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface, Times New Roman, 14-point, using Microsoft Word.


Dated:  August 21, 2017                    s/ *Lawrence S. Sher*

## CERTIFICATE OF SERVICE

I, Lawrence S. Sher, hereby certify that, on August 21, 2017, I electronically filed the foregoing Brief for Appellant with the Clerk of this Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


 s/ *Lawrence S. Sher*